FILED: 9/13/2024 4:50 PM
Vermont Superior Court
Washington Unit
24-CV-02759

USDC - DVT
2:24-cv-1103

## STATE OF VERMONT

| | |
|---|---|
| SUPERIOR COURT | CIVIL DIVISION |
| WASHINGTON UNIT | Docket No. 24-CV-02759 |

THE STATE OF VERMONT,

       PLAINTIFF,

       V.

EVERNORTH HEALTH, INC.
(FORMERLY EXPRESS SCRIPTS
HOLDING COMPANY); EXPRESS
SCRIPTS, INC.; EXPRESS SCRIPTS
ADMINISTRATORS, LLC; ESI MAIL
PHARMACY SERVICE, INC.; MEDCO
HEALTH SOLUTIONS, INC.;
EXPRESS SCRIPTS PHARMACY, INC.;
ACCREDO HEALTH GROUP, INC.;
ASCENT HEALTH SERVICES LLC;
CVS HEALTH CORPORATION; CVS
PHARMACY, INC.; CAREMARK RX,
L.L.C.; CAREMARKPCS HEALTH,
L.L.C.; CAREMARK, L.L.C.; ZINC
HEALTH VENTURES, LLC; ZINC
HEALTH SERVICES, LLC;
CAREMARK ARIZONA SPECIALTY
PHARMACY, L.L.C.; CAREMARK
CALIFORNIA SPECIALTY
PHARMACY, L.L.C; CAREMARK
FLORIDA SPECIALTY PHARMACY,
LLC; CAREMARK ILLINOIS
SPECIALTY PHARMACY, LLC;
CAREMARK KANSAS SPECIALTY
PHARMACY, LLC; CAREMARK
MASSACHUSETTS SPECIALTY
PHARMACY, LLC; CAREMARK
MICHIGAN SPECIALTY PHARMACY,
LLC; CAREMARK NEW JERSEY
SPECIALTY PHARMACY, LLC;
CAREMARK NORTH CAROLINA

SPECIALTY PHARMACY, LLC; AND
CAREMARK TENNESSEE SPECIALTY
PHARMACY, LLC,

        DEFENDANTS.

## FIRST AMENDED COMPLAINT

# TABLE OF CONTENTS

I.     **INTRODUCTION** ................................................................. 1

II.    **PARTIES** ................................................................................ 9

     A.    Plaintiff ............................................................................. 9

     B.    Defendants ........................................................................ 9

III.   **JURISDICTION AND VENUE** ...................................... 28

IV.   **BACKGROUND** ............................................................... 29

     A.    Drug Prices Have Significantly Increased over the Past Two Decades ............................................................................. 29

     B.    Pharmaceutical Payment and Supply Chain ........................ 35

         1.    PBMs role in pharmaceutical pricing chain ............................. 35

         2.    The rise of the PBMs in the pharmaceutical supply chain ........ 40

         3.    Drug Pricing ................................................................ 42

V.     **FACTUAL ALLEGATIONS** ........................................... 44

     A.    PBM Defendants Represent That They Lower Drug Prices, Promote Patient Health and Act in the Best Interests of Payors and Patients ..................................................................... 44

     B.    PBM Defendants' Drive Up Prices for Patients and Payors and Foreclose Access to Lower Priced Drugs ................................ 53

         1.    PBMs construct formularies and negotiate Manufacturer Payments in a manner that drives up prices and shut off access to lower priced drugs. ................................................................ 54

         2.    The PBM Defendants obfuscate and retain Manufacturer Payments as profits ...................................................... 67

         3.    PBM Defendants drive up prices for patients and payors through their captive specialty and mail order pharmacies ...... 74

         4.    PBM Defendants increase their profits by harming pharmacies in their networks .................................................... 88

     C.    PBM Defendants' Conduct Harms Vermont Patients and Payors ....... 90

**VI.    CLAIMS FOR RELIEF** ..................................................................... **94**

VIOLATION OF THE VERMONT CONSUMER PROTECTION ACT
    DECEPTIVE ACTS AND PRACTICES ................................................ 94

VIOLATION OF THE VERMONT CONSUMER PROTECTION ACT
    UNFAIR ACTS AND PRACTICES ....................................................... 95

BREACH OF FIDUCIARY DUTY.................................................................. 97

**PRAYER FOR RELIEF** ........................................................................... **98**

## TABLE OF FIGURES

Figure 1: Rising List Prices of Humalog Vials and Pens from 1996 – March 2023 .................................................................................... 31

Figure 2: Rising List Prices of Novolog Vials and Pens ............................................. 32

Figure 3: Rising List Prices of Type 2 Drugs ............................................................. 33

Figure 4: Rising Price for Multiple Sclerosis Drugs ................................................. 34

Figure 5: Pharmaceutical Drug Distribution and Payment Chain ........................... 36

Figure 6: PBM Defendant Consolidation .................................................................... 41

Figure 7: PBM Formulary Exclusions from 2012-2024 .............................................. 55

Figure 8: Manufacturer Revenue and Manufacturer Payments 2011-2019 ............ 59

Figure 9: PBMs' Gross Profits, 2017-2019 ................................................................. 69

Figure 10: Manufacturer Payment Increases ............................................................. 72

Figure 11: PBM Defendant Vertical Integration ........................................................ 75

Figure 12: Abiraterone Acetate PBM Defendant Prices ........................................... 79

Figure 13: Average Markups for Medicines Dispensed through Mail Order versus other channels .................................................................... 80

Figure 14: Specialty Dispensing Revenue Shares (Retail and Mail Order) ............. 81

Figure 15: PBMs' Specialty Drug Lists ....................................................................... 82

Figure 16: Gross Pharmacy Reimbursement Rates for a One-Month Supply of Generic Gleevec Paid to PBM-Affiliated and Unaffiliated Pharmacies by Commercial and Medicare Part D Plans and Members, and NADAC ............................................................... 86

The Vermont Attorney General (the "State" or "Plaintiff") brings this action against the above-named Defendants for violations of the Vermont Consumer Protection Act, 9 V.S.A. §§ 2451 *et. seq.* ("VCPA") and Vermont common law on behalf of the State and Vermont consumers, including Vermont patients and businesses. The State alleges upon information and belief as follows:

## I.   INTRODUCTION

1.     Pharmacy benefit managers ("PBMs") first came into existence in the 1960s to provide claims processing and administrative services to health plans.  For decades there were many different PBMs and the role that each PBM filled in the pharmaceutical pricing and distribution chain was fairly limited.

2.     That role, however, has continued to expand, and today PBMs stand at the center of the United States' healthcare industry. Given the nature of PBM interaction with drug manufacturers via rebate and formulary contracts, pharmacies via in-network agreements and their own captive mail order and specialty pharmacies, insurers and large employer health plans via pharmacy benefit management services, and, of course, individual plan members (*i.e.*, patients in need of prescription drugs), it is no exaggeration to say that PBMs are the literal hub of the healthcare universe.

3.     In the early 2000s, there were over a dozen PBMs competing for space and market share.

4.     As a result of significant consolidation within the industry (both horizontal and vertical),[1] however, today the PBM landscape is controlled by only a few players, including Defendants CVS Caremark and Express Scripts ("PBM Defendants" or "Defendants," defined further below).

5.     The PBM Defendants named in this Complaint now dominate the prescription drug supply chain as they represent: (1) the largest PBMs in Vermont (controlling approximately 95% of the commercial PBM market) (2) the largest pharmacies in the United States (making up 2 of the top 5 dispensing pharmacies.); (3) the largest specialty pharmacies in the United States (CVS Health's specialty pharmacy generated $73 billion in 2023, while Express Scripts specialty pharmacy made $59.5 billion); and (4) PBMs affiliated with two of the largest insurers in the United States (CVS Health is owned by Aetna, Express Scripts is owned by Cigna).

6.     These PBM conglomerates sit at 6th (CVS Health) and 16th (Express Scripts) on the Fortune 500 list ranking largest corporations by revenue.

7.     As a result of this massive consolidation, CVS Caremark and Express Scripts have near complete control of the pricing, dispensing, and reimbursement systems for all prescription drugs for their covered lives.[2]  They affect nearly every drug transaction in Vermont.

---

[1] "Horizontal consolidation" refers to when two competing entities combine (*i.e.* when a PBM acquires/merges with another PBM), "vertical consolidation" refers to when two entities that sit at different levels of the same industry/distribution chain combine (*i.e.,* when a PBM acquires a pharmacy or an insurance company acquires a PBM).

[2] "Covered lives" refers to a member of the PBM Defendants' clients.  Defendants Express Scripts and CVS Caremark each have approximately 100 million covered lives in the United States.

8.    Are you a prescription drug manufacturer that wants patients and payors to have access to your drugs in Vermont? You must deal with the PBM Defendants and pay handsomely in the form of rebates and other fees to have that privilege.

9.    Are you a pharmacy that wants to dispense prescriptions to health plan members? You must deal with the PBM Defendants and agree to their below market reimbursement rates and often-onerous contract terms and fees to be included in their networks.

10.    Are you a health plan that wants pharmacy benefit management services for your members? Again, you are obliged to deal with the PBM Defendants.

11.    Are you a patient with a chronic or life-threatening illness—such as cancer, multiple sclerosis, or diabetes—who requires specialty drugs and treatments? You are not only forced to deal exclusively with the PBM Defendants' own captive pharmacies, but you are also only allowed to receive the treatments that the PBM Defendants choose and which are often the most expensive drugs available on the market (and most profitable for the PBM).

12.    While the PBM Defendants represent that they perform their services on behalf of their clients and patients to lower drug prices and promote health, these representations are false. Rather, the PBM Defendants have distorted the market to their benefit at the expense of Vermont patients and payors.

13.    Through their interconnected roles as PBMs and pharmacies, the PBMs are driving up drug prices and foreclosing patients' access to life-sustaining treatments in order to increase their profits.

14.    One key service that Defendants provide as pharmacy benefit managers is designing and implementing drug formularies.

15.    The PBM Defendants' formularies play a crucial role in their ability to control the drug pricing and payment chain. Drug formularies are tiered lists which determine which drugs are available, at what out-of-pocket cost, and with what restrictions for insured consumers.

16.    If a drug is not included on a formulary, then it is not covered by health insurance.

17.    Because these PBM Defendants control over 95% of the Vermont pharmacy benefit market, unless they include a drug on one of their standard formularies, it is not available to 95% of Vermont's insured consumers.

18.    Drug manufacturers understand that the PBM Defendants wield enormous control over drug prices and purchasing behavior.  For a manufacturer's drug to be successful, it must obtain preferred placement on the PBM Defendants' formularies.

19.    PBM Defendants have created a business model where, in order to gain preferred formulary positions, the drug manufacturers must pay the PBMs

4

substantial amounts of money (referred to herein as "Manufacturer Payments"[3]). These Manufacturer Payments are provided under a variety of labels, yet, however they are described, these Payments are the *quid pro quo* for formulary inclusion on the PBMs' formularies.

20.    Rather than pass through these Manufacturer Payments to patients and their clients to lower the prices, the PBMs instead obfuscate and retain significant amounts of these Payments as profit.[4]

21.    Moreover, around 2012, PBM Defendants began to implement a bold new formulary strategy by creating so-called exclusionary formularies which entirely exclude (*i.e.*, do not cover or list) one or more drugs used to treat the same condition. The PBM Defendants created exclusionary formularies to further drive up their profits. By threatening total exclusion (rather than simple preferential versus non-preferential treatment) the PBM Defendants were able to significantly increase the amount of Manufacturer Payments that they were receiving from drug manufacturers.

---

[3] In the context of this Complaint, the term "Manufacturer Payments" is defined as all payments or financial benefits of any kind conferred by drug manufacturers to PBM Defendants (or a subsidiary, affiliated entity, or group purchasing organization or rebate aggregator acting on the PBM's behalf). Manufacturer Payments include rebates, administrative fees, inflation fees, pharmacy supplemental discounts, volume discounts, price or margin guarantees, price concessions, indirect purchase fees and rebates, and any other form of consideration exchanged. This broad definition is necessary because PBMs historically have continued to change and evolve the nature of their payment streams to avoid disclosure to clients and disclosure pursuant to state transparency laws. While the route by which the payment streams reach the PBMs has evolved, the fact that the payments do, in fact, reach the PBMs has remained the same.

[4] In response to concern regarding this PBM practice of retaining/obfuscating Manufacturer Payments, the Vermont Legislature enacted a statutory amendment to require pharmacy benefit managers to pass through all payments to their clients that are related to "the dispensation of prescription drugs within the State based on volume of sales for certain prescription drugs or classes or brands of drugs within the State." 18 V.S.A. § 9472(c)(4).

22.    As a direct result of the PBM Defendants' conduct, drug prices in the United States have increased exponentially in the last decade; drug manufacturers raised their list prices[5] to make Manufacturer Payments while maintaining their profit margins.

23.    Notably—and contrary to their public representations—the PBM Defendants make more money from drugs with higher list prices and higher Manufacturer Payment amounts.

24.    Thus, the PBM Defendants are incentivized to (and do) grant placement on their standard formularies to the drugs with the largest Manufacturer Payments and the highest list price, and exclude lower priced drugs. PBM Defendants' conduct drives up prescription drug prices for Vermont patients and payors and cuts off their access to lower priced (and often times life-saving) medications.

25.    PBM Defendants are not only driving up prices and foreclosing access to drugs through their formulary construction, but also through their relationships with their captive specialty pharmacies (Defendants CVS Specialty Pharmacy and Accredo Health).

26.    PBM Defendants require patients—often with chronic or serious illnesses—to fill their prescriptions from the PBMs' own in-house pharmacies and then restrict those patients' access to only the most expensive drugs, significantly

---

[5] As explained in greater detail in Section B(3) below, drug manufacturers' "list price" is the price that the manufacturers set for each brand drug.  Most commonly, "list price" refers to the wholesale acquisition cost ("WAC") price and/or the average wholesale price ("AWP"). For the purposes of this Complaint, the phrase "list price" refers to WAC and/or AWP prices.

overcharging these patients' health plans compared to the price that the plans would pay at other, non-PBM owned pharmacies.

27.     The reality of this specialty drug price gouging is shocking: as described below, PBM-affiliated specialty mail-order pharmacies have charged $4,465 per teriflunomide prescription (a generic multiple sclerosis medication), where the same drug is available via the Mark Cuban Cost Plus Drug Company ("Cost Plus") for less than $20; Express Scripts has charged $4,409 for the generic version of Tarcera, a cancer drug, when it is available at Cost Plus for $73 per month; and CVS Caremark charged a client $138,000 annually for another cancer medication, everolimus, that costs CVS Specialty Pharmacy only $14,000 per year to purchase.

28.     The abundant profit windfalls end up in the PBM Defendants' pockets. As described by *The New York Times*, CVS was collecting approximately $124,000 in annual profit from just a single patient's everolimus prescription.

29.     PBM Defendants also use their market power to hurt unaffiliated pharmacies in Vermont that compete with their captive retail, mail order, and specialty pharmacies. To remain in the PBM Defendants' pharmacy networks (and have access to the PBMs' covered lives) pharmacies are often required to accept reimbursement rates from the PBM Defendants significantly below their acquisition costs.  And almost none of this cost savings is passed on to payors—rather the PBM Defendants still charge their clients high prices for these drugs and pocket the "spread" between that price and their reimbursement to the pharmacy. The PBM

Defendants also divert payor funds to the PBMs' own affiliated pharmacies through "performance" payments.

30.    PBM Defendants further benefit at the expense of unaffiliated pharmacies by steering patients to the PBMs' own captive pharmacies.

31.    These oppressive PBM Defendant practices are so detrimental that independent pharmacies (often times in underserved areas of Vermont) are struggling to stay in business.

32.    The PBM Defendants' conduct has directly harmed both patients and payors in Vermont.

33.    The price paid by nearly every patient and payor is based upon the manufacturers' list prices.  Thus, every Vermont patient and payor has been harmed by the PBM Defendants' misconduct that is directly responsible for driving up these prices.

34.    Indeed, Vermont patients and payors have been overcharged millions of dollars a year as a result of the PBMs' misconduct.

35.    For Vermont patients, the physical, emotional, and financial tolls of paying such excessive prices drug prices can be devastating. For example, as a result of the PBMs' misconduct, many patients with chronic and often life-threatening conditions such as diabetes, multiple sclerosis, and cancer have either been cut off from access to affordable drugs through formulary exclusions or priced out of the treatments that their doctors prescribe. The consequences to the health and well-being of these patients and their families are undeniable.

36.    The PBM Defendants' misconduct also adds substantial costs to the Vermont health care system by increasing preventable complications.

37.    This Complaint asserts violations of the Vermont Consumer Protection Act and the Vermont common law.

38.    The State of Vermont brings this action on behalf of the State, as well as on behalf of consumers—including Vermont patients and businesses (as payors of their employees' prescription benefits)—to address the PBMs' misconduct and to protect the health and economic well-being of its citizens and businesses.

## II.    PARTIES

### A.    Plaintiff

39.    The Attorney General is authorized to represent the State in all civil matters at common law and as allowed by statute. Vt. Stat. Ann. tit. 3, § 152.  The Attorney General is charged with the responsibility of enforcing the Consumer Protection Act ("CPA") and all regulations promulgated thereunder, Vt. Stat. Ann. tit. 9, § 2458.

### B.    Defendants

40.    **Defendant CVS Health Corporation ("CVS Health")** is a Delaware corporation with its principal place of business at One CVS Drive, Woonsocket, Rhode Island, 02895. CVS Health transacts business and has locations throughout the United States and Vermont.

41.    CVS Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

42.    CVS Health, through its executives and employees, including its CEO, Chief Medical Officer, Executive Vice Presidents, Senior Executives in Trade Finance, and Chief Communication Officers, is directly involved in the PBM and pharmacy services that gave rise to the State's claims. Among other things, CVS Health sets the overarching policy and strategy to maximize profitability across the entire CVS Health family (including Defendants CVS Caremark and CVS Specialty Pharmacy).

43.    During the relevant time, CVS Health (or its predecessor)[6] has repeatedly, continuously, and explicitly stated that CVS Health:

   a.  "design[s] pharmacy benefit plans that minimize the costs to the client while prioritizing the welfare and safety of the clients' members and helping improve health outcomes;"[7]

   b.  "negotiate[s] with pharmaceutical companies to obtain discounted acquisition costs for many of the products on [CVS Health's] drug lists, and these negotiated discounts enable [CVS Health] to offer reduced costs to clients;"[8] and

   c.   "utilize[s] an independent panel of doctors, pharmacists and other medical experts, referred to as its Pharmacy and Therapeutics Committee, to select drugs that meet the highest standards of safety and efficacy for inclusion on [CVS Health's] drug lists."[9]

44.    CVS Health publicly represents that CVS Health constructs programs that lower the cost of drugs. For example, in 2016, CVS Health announced a new

---

[6] Until 2014, CVS Health was known as "CVS Caremark."  In September 2014, "CVS Caremark Corporation announced that it is changing its corporate name to CVS Health to reflect its broader health care commitment and its expertise in driving the innovations needed to shape the future of health."

[7] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2022).

[8] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2013).

[9] CVS Caremark/CVS Health, Annual Reports (Form 10-K) (Dec. 31, 2009-2022).

program to "reduce overall spending" that is available in all states, including Vermont, stating:

> "CVS Health introduced a new program available to help the company's pharmacy benefit management (PBM) clients to improve the health outcomes of their members, *lower pharmacy costs* through aggressive trend management and decrease medical costs . . . [and that] participating clients could save between $3000 to $5000 per year for each member who successfully improves control of their diabetes" (emphasis supplied).

45. In 2017, CVS Health stated that "CVS Health pharmacy benefit management (PBM) strategies reduced trend for commercial clients to 1.9 percent per member per year the lowest in five years. Despite manufacturer price increases of near 10 percent, CVS Health kept drug price growth at a minimal 0.2 percent."

46. In November 2018, CVS Health acquired Aetna, Inc. for $69 billion and became the first combination of a major health insurer, PBM, mail order and retail pharmacy chain. As a result, CVS Health controls the health plan/insurer, the PBM and the pharmacies utilized by approximately 40 million Aetna members in the United States, including in Vermont. CVS Health controls the entire drug pricing chain for these 40 million Americans.

47. **Defendant CVS Pharmacy, Inc. ("CVS Pharmacy")** is a Rhode Island corporation whose principal place of business is at the same location as CVS Health. CVS Pharmacy is a wholly owned subsidiary of CVS Health.

48. CVS Pharmacy owns and operates pharmacies throughout Vermont that are directly involved in and profit from Defendant CVS Caremark's misconduct.

11

49.    In its capacity as a retail pharmacy, CVS Pharmacy, working in conjunction with its corporate affiliate entities, assisted CVS Health and CVS Caremark in profiting from the higher list prices produced by the PBM Defendants' misconduct by pocketing the spread between acquisition cost for the drugs at issue (an amount well below the list price), and the amounts received from payors (which amounts were based on the list prices and, in many cases, were set by CVS Caremark in its capacity as a PBM).

50.    CVS Pharmacy is the immediate and direct parent of Defendant Caremark Rx, LLC.

51.    CVS Pharmacy is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 95B Main Street, Jeffersonville, Vermont, 05464-02101.

52.    During the relevant time period, CVS Pharmacy provided retail pharmacy services in Vermont.

53.    **Defendant Caremark Rx, L.L.C.** is a Delaware limited liability company and its principal place of business is at the same location as CVS Pharmacy and CVS Health.

54.    Caremark Rx, L.L.C. is a wholly owned subsidiary of Defendant CVS Pharmacy.

55.    Caremark Rx, L.L.C. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

12

56.    During the relevant time period, Caremark Rx, LLC provided PBM and mail order pharmacy services in Vermont.

57.    **Defendant Caremark, L.L.C.** is a California limited liability company whose principal place of business is at the same location as CVS Health. Caremark, L.L.C. is a wholly owned subsidiary of Caremark Rx, L.L.C.

58.    Caremark, LLC is registered to do business in Vermont may be served through its registered agent: C T Corporation System,  95B Main Street, Jeffersonville, Vermont, 05464-2101

59.    Caremark, L.L.C. holds 1 license with the Vermont Office of Professional Regulation.

60.    Caremark, L.L.C. is registered as a pharmacy benefit manager with the State of Vermont through the Vermont Health Care Uniform Reporting and Evaluation System ("VHCURES").

61.    During the relevant time period, Caremark, L.L.C. provided PBM and mail order pharmacy services in Vermont.

62.    **Defendant CaremarkPCS Health, L.L.C.** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health. CVS Health is the direct or indirect parent company of CaremarkPCS Health L.L.C.

63.     CaremarkPCS Health, L.L.C. provides pharmacy benefit management services.

64.     CaremarkPCS Health, L.L.C. is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 95B Main Street, Jeffersonville, Vermont, 05464-2101.

65.     CaremarkPCS Health, L.L.C. is registered as a pharmacy benefit manager with the State of Vermont through VHCURES.

66.     During the relevant time period, CaremarkPCS Health, L.L.C. provided PBM services in Vermont.

67.     **Defendant Zinc Health Ventures, LLC** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

68.     Zinc Health Ventures, LLC provides PBM services, including Manufacturer Payment negotiations on behalf of Vermont payors and patients.

69.     Zinc Health Ventures, LLC may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

70.     **Defendant Zinc Health Services, LLC** is a Delaware limited liability company whose principal place of business is at the same location as CVS Health.

71.     Zinc Health Services, LLC provides PBM services, including Manufacturer Payment negotiations on behalf of Vermont payors and patients.

72.     Zinc Health Services, LLC is registered to do business in Vermont and may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

73.    Zinc Health Services, LLC and Zinc Health Ventures, LLC are referred to collectively as "Zinc Health."

74.    **Defendant "CVS Specialty Pharmacy"** are limited liability companies whose principal places of business is at the same location as CVS Health.[10]

75.    CVS Specialty Pharmacy provides specialty pharmacy services.

76.    CVS Specialty Pharmacy is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 95B Main Street, Jeffersonville, Vermont, 05464-2101.

77.    CVS Specialty Pharmacy holds 9 pharmacy licenses through Vermont's Office of Professional Regulation.

78.    As a result of numerous interlocking directorships and shared executives, Caremark Rx, LLC, CVS Pharmacy, and CVS Health are directly involved in the conduct of and control CaremarkPCS Health, L.L.C., CVS Specialty Pharmacy, Zinc Health, and Caremark, LLC's operations, management and business decisions related to the at-issue formulary construction, Manufacturer Payments, and pharmacy services to the ultimate detriment of patients and payors in Vermont. For example:

---

[10] "CVS Specialty Pharmacy" collectively refers to: CVS Pharmacy, Caremark Arizona Specialty Pharmacy, L.L.C. (Arizona), Caremark California Specialty Pharmacy, L.L.C (California), Caremark Florida Specialty Pharmacy, LLC (Florida), Caremark Illinois Specialty Pharmacy, LLC (Illinois), Caremark Kansas Specialty Pharmacy, LLC (Kansas), Caremark Massachusetts Specialty Pharmacy, LLC (Massachusetts), Caremark Michigan Specialty Pharmacy, LLC (Michigan), Caremark New Jersey Specialty Pharmacy, LLC (New Jersey), Caremark North Carolina Specialty Pharmacy, LLC (North Carolina), and Caremark Tennessee Specialty Pharmacy, LLC (Tennessee)

a. During the relevant time period,[11] these parents and subsidiaries have had common officers and directors. Examples include:

    i. Thomas S. Moffatt was Vice President and Secretary of Caremark Rx, LLC, CaremarkPCS Health, L.L.C., and Caremark, L.L.C. at the same time he was a Vice President, Assistant Secretary, and Assistant General Counsel at CVS Health and Director, Vice President, and Secretary at CVS Pharmacy;

    ii. Melanie K. Luker was the Assistant Secretary of CVS Pharmacy, Caremark Rx, LLC, CaremarkPCS Health, L.L.C., and Caremark, L.L.C. at the same time she was a Senior Manager of Corporate Services at CVS Health;

    iii. Jonathan C. Roberts was an Executive Vice President and Chief Operating Officer at CVS Health at the same time he was CEO of Caremark Rx, L.L.C.;

    iv. Daniel P. Davison was the President of CaremarkPCS Health, L.L.C. at the same time he was a Senior Vice President at CVS Health; and

    v. Annie E. Klis was a Vice President at CVS Health at the same time she was CEO of Caremark, LLC.

b. CVS Health directly or indirectly owns all the stock of CVS Pharmacy, CVS Specialty Pharmacy, Caremark Rx, L.L.C., Caremark, L.L.C. and CaremarkPCS Health, L.L.C.

c. All the executives of CaremarkPCS Health, L.L.C., Caremark, L.L.C., Caremark Rx, L.L.C., CVS Specialty Pharmacy, and CVS Pharmacy ultimately report to the executives at CVS Health, including the President and CEO of CVS Health.

d. CVS Health, as a corporate family, does not operate as separate entities. The public filings, documents, and statements of CVS Health presents its subsidiaries, including CVS Pharmacy, CVS Specialty Pharmacy, CaremarkPCS Health, L.L.C., Caremark, L.L.C., Zinc Health, and Caremark Rx, L.L.C. as divisions or departments of one unified "diversified health services company" that "works together across our disciplines" to

---

[11] For the purposes of this Complaint the "relevant time period" is January 1, 2011-present. PBM Defendants' harm is ongoing.

"create unmatched human connections to transform the health care experience." The day-to-day operations of this corporate family reflect these public statements. These entities are a single business enterprise and should be treated as such as to all legal obligations discussed in this Complaint. The CVS Health enterprise and each of these entities, both individually and collectively, engaged in the at-issue misconduct.

79.    Collectively, Defendants CVS Health, CVS Pharmacy, Caremark Rx, L.L.C., Caremark, L.L.C., and CaremarkPCS Health, L.L.C., Zinc Health, and CVS Specialty Pharmacy including all predecessor and successor entities, are referred to as "CVS Caremark."

80.    CVS Caremark is named as a Defendant in its capacities as a PBM and retail, specialty, and mail order pharmacy.

81.    In its capacity as a PBM, CVS Caremark has the largest PBM market share based on total prescription claims managed, representing approximately 40% of the national market. CVS Health's revenue increased to over $350 billion in 2023.

82.    At all times relevant hereto, CVS Caremark offered pharmacy benefit services to Vermont payors, and derived substantial revenue therefrom, and, in doing so, made the at-issue misrepresentations and omissions (discussed below) and drove up drug prices to profit from Vermont patients and payors.

83.    At all times relevant hereto, CVS Caremark constructed standard formularies that are used nationwide, including by CVS Caremark's payor clients in Vermont and that are relied on by residents in Vermont as promoting health and lowering drug prices.

84.    At all times relevant hereto, and contrary to all its express representations, CVS Caremark has insisted that its payor clients, including in

17

Vermont, use list prices as the basis for payment for the price paid for prescription drugs.

85.     At all times relevant hereto, CVS Caremark has concealed its critical role in driving up those drug prices.

86.     In its capacity as a mail order, specialty, and retail pharmacy, CVS Caremark dispensed prescription drugs to Vermont patients and received payments from patients, the State, and payors in Vermont.

87.     At all relevant times, CVS Caremark had agreements with pharmaceutical manufacturers related to payments for placement on CVS Caremark's formularies for drugs prescribed to Vermonters.

88.     **Defendant Evernorth Health, Inc. ("Evernorth"),** formerly known as Express Scripts Holding Company, is a Delaware corporation with its principal place of business at 1 Express Way, St. Louis, Missouri, 63121.[12]

89.     Evernorth may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

90.     Evernorth, through its executives and employees, is directly involved in shaping the company policies that inform its PBM and pharmacy services and formulary construction.

---

[12] Until 2021, Evernorth Health, Inc. conducted business under the name Express Scripts Holding Company. For the purposes of this Complaint "Evernorth" refers to Evernorth Health, Inc and Express Scripts Holding Company.

91.    Evernorth's conduct has had a direct effect in Vermont and harmed patients, the State, and payors in Vermont.

92.    On a regular basis, Evernorth executives and employees communicate with and direct its subsidiaries related to the at-issue PBM and pharmacy services and formulary activities.

93.    Evernorth is the parent of the Express Scripts pharmacy and Express Scripts PBM Defendants named in this Complaint that operate throughout Vermont, which engaged in the activities that gave rise to this Complaint.

94.    In December 2018, Evernorth merged with Cigna in a $67 billion deal to consolidate their businesses as a major health insurer, PBM and mail order pharmacy. As a result, the Evernorth corporate family controls the health plan/insurer, the PBM and the mail order pharmacies utilized by approximately 15 million Cigna members in the United States. Evernorth controls the entire drug pricing chain for these 15 million Americans.

95.    In each annual report for at least the last decade, Evernorth has repeatedly, continuously, and explicitly stated:[13]

    a.  "[Evernorth] is one of the largest PBMs in North America . . . [and Evernorth] help[s] health benefit providers address access and affordability concerns resulting from rising drug costs while helping to improve healthcare outcomes."

    b.  "[Evernorth] manage[s] the cost of the drug benefit by . . . assist in controlling costs; evaluat[es] drugs for efficacy, value and price to assist[ing] clients in selecting a cost-effective formulary; [and] offer[s] cost-effective home delivery pharmacy and specialty services that result in cost savings for plan sponsors [and better care for

---

[13] Express Scripts Annual Reports (Form 10-K) (Dec. 31, 2009-2019).

members] leveraging purchasing volume to deliver discounts to health benefit providers."

c. "[Evernorth] works with clients, manufacturers, pharmacists and physicians to increase efficiency in the drug distribution chain, to manage costs in the pharmacy benefit chain and to improve members' health outcomes."

96. **Defendant Express Scripts, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts, Inc.'s principal place of business is at the same location as Evernorth.

97. Express Scripts, Inc. may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

98. Express Scripts, Inc. is the immediate or indirect parent of the Express Scripts pharmacy and Express Scripts PBM Defendants named in this Complaint that operate throughout Vermont that engaged in the conduct which gave rise to this Complaint.

99. During the relevant time period, Express Scripts Inc. was directly involved in the PBM and pharmacy services, which harmed patients, the State, and payors in Vermont.

100. **Defendant Express Scripts Administrators, LLC,** is a Delaware limited liability company and is a wholly owned subsidiary of Evernorth. Express Scripts Administrators, LLC's principal place of business is at the same location as Evernorth.

101. Express Scripts Administrators, LLC is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 95B Main Street, Jeffersonville, Vermont, 05464-2101.

102. Express Scripts Administrators, LLC is registered as a pharmacy benefit manager with the State of Vermont through VHCURES.

103. During the relevant time period, Express Scripts Administrators, LLC provided the PBM services in Vermont which harmed patients, the State, and payors in Vermont.

104. **Defendant Medco Health Solutions, Inc. ("Medco")** is a Delaware Corporation with its principal place of business located at 100 Parsons Pond Road, Franklin Lakes, New Jersey, 07417.

105. Medco is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 95B Main Street, Jeffersonville, Vermont, 05464.

106. Prior to merging with Express Scripts, Medco provided the at-issue PBM and mail order services which harmed patients, the State, and payors in Vermont.

107. In 2012, Express Scripts acquired Medco for $29 billion.

108. Prior to the merger Express Scripts and Medco were two of the largest PBMs in the United States and in Vermont.

109. Prior to the merger, Medco provided the at-issue PBM and mail-order services in Vermont.

21

110.    Following the merger, all of Medco's PBM and mail order pharmacy functions were combined into Express Scripts. The combined company (Medco and Express Scripts) continued under the name Express Scripts with all of Medco's payor customers and covered lives becoming Express Scripts' customers. The combined company covered over 155 million lives at the time of the merger.

111.    At the time of the merger, on December 6, 2011, in his testimony before the Senate Judiciary Committee, then CEO of Medco, David B Snow, publicly represented that "the merger of Medco and Express Scripts will result in immediate savings to our clients and, ultimately, to consumers. This is because our combined entity will achieve even greater [Manufacturer Payments] from drug manufacturers and other suppliers."

112.    The then-CEO of Express Scripts, George Paz, during a Congressional subcommittee hearing in September 2011, echoed these sentiments: "A combined Express Scripts and Medco will be well-positioned to protect American families from the rising cost of prescription medicines."

113.    **Defendant ESI Mail Pharmacy Service, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. ESI Mail Pharmacy Service, Inc.'s principal place of business is at the same location as Evernorth.

114.    ESI Mail Pharmacy Service, Inc. is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 95B Main Street Jeffersonville, Vermont, 05464-2101.

115.    ESI Mail Pharmacy Service, Inc. holds 6 licenses with the Vermont Office of Professional Regulation.

116.    During the relevant time period, ESI Mail Pharmacy Service, Inc. provided the mail order pharmacy services which harmed patients, the State, and payors in Vermont.

117.    **Defendant Express Scripts Pharmacy, Inc.** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Express Scripts Pharmacy, Inc.'s principal place of business is at the same location as Evernorth.

118.    Express Scripts Pharmacy, Inc. is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 95B Main Street, Jeffersonville, Vermont, 05464-2101.

119.    Express Scripts Pharmacy, Inc. holds 5 licenses with the Vermont Office of Professional Regulation.

120.    During the relevant time period, Express Scripts Pharmacy, Inc. provided the mail order pharmacy services which harmed patients, the State, and payors in Vermont.

121.    Collectively, ESI Mail Pharmacy Service, Inc and Express Scripts Pharmacy, Inc are referred to as "Express Scripts Pharmacy."

122.    **Defendant Ascent Health Services LLC. ("Ascent Health")** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Ascent Health's principal place of business is at Muhlentalstrasse 36, 8200 Schaffhausen, Switzerland.

123.   Ascent Health may be served through its registered agent: The Corporation Trust Company, Corporation Trust Center, 1209 Orange Street, Wilmington, Delaware, 19801.

124.   During the relevant time period, Ascent Health provided PBM services, including Manufacturer Payment negotiations on behalf of Vermont payors.

125.   **Defendant Accredo Health Group, Inc. ("Accredo Health")** is a Delaware corporation and is a wholly owned subsidiary of Defendant Evernorth. Accredo Health's principal place of business is at One Express Way, Saint Louis, Missouri, 63121.

126.   Accredo Health is registered to do business in Vermont and may be served through its registered agent: C T Corporation System, 95B Main Street, Jeffersonville, Vermont, 05464 - 2101.

127.   Accredo Health holds 4 licenses with the Vermont Office of Professional Regulation.

128.   During the relevant time period, Accredo Health provided specialty pharmacy services in Vermont.

129.   As a result of numerous interlocking directorships and shared executives, Evernorth and Express Scripts, Inc. are directly involved in the conduct of and control Express Scripts Administrators, LLC, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Accredo Health, Ascent Health, and Express Scripts Pharmacy, Inc's operations, management and business decisions related to the at-

issue formulary construction, Manufacturer Payments, and pharmacy services to the ultimate detriment of Vermont patients, payors, and the State. For example:

    a. During the relevant time period, these parent and subsidiaries have had common officers and directors:

        i. Officers and/or directors that have been shared between Express Scripts, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; David Queller, President; Jill Stadelman, Secretary; Timothy Smith, Vice President; and Scott Lambert, Treasury Manager Director;

        ii. Executives that have been shared between Express Scripts Administrators, LLC and Evernorth include Bradley Phillips, Chief Financial Officer; and Priscilla Duncan, Associate Secretary;

        iii. Officers and/or directors that have been shared between ESI Mail Pharmacy Service, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Priscilla Duncan, Associate Secretary; and Joanne Hart, Associate Treasurer;

        iv. Officers and/or directors that have been shared between Express Scripts Pharmacy, Inc. and Evernorth include Bradley Phillips, Chief Financial Officer; Jill Stadelman, Secretary; Scott Lambert, Treasury Manager Director; and Joanne Hart, Associate Treasurer; and

        v. Officers and/or directors that have been shared between Medco Health Solutions, Inc. and Evernorth include David Queller, President and Senior VP of Sales & Accounting; Christine Houston, VP and COO; Timothy Smith, VP and Treasurer; and all of the officers of Medco Health Solutions are also officers of Express Scripts, Inc.

    b. Evernorth directly or indirectly owns all the stock of Express Scripts Administrators, LLC, Accredo Health, Ascent Health, Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc. and Express Scripts, Inc.

    c. The Evernorth corporate family does not operate as separate entities. The public filings, documents, and statements of Evernorth presents its subsidiaries, including Express Scripts Administrators, LLC,

25

Medco Health Solutions, Inc., ESI Mail Pharmacy Service, Inc., Express Scripts Pharmacy, Inc., Accredo Health, Ascent Health, and Express Scripts, Inc. as divisions or departments of a single company that "unites businesses that have as many as 30+ years of experience . . . [to] tak[e] health services further with integrated data and analytics that help us deliver better care to more people." The day-to-day operations of this corporate family reflect these public statements. All of these entities are a single business enterprise and should be treated as such as to all legal obligations detailed in this Complaint. The Evernorth enterprise and each of these entities, both individually and collectively, engaged in the at-issue conduct that gave rise to the State's claims.

d. All of the executives of Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Accredo Health, Ascent Health, Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. ultimately report to the executives, including the CEO, of Evernorth.

e. As stated above, Evernorth's CEO and other executives and officers are directly involved in the policies and business decisions of Express Scripts Administrators, LLC, Accredo Health, Ascent Health, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Express Scripts Pharmacy, Inc., and Express Scripts, Inc. that gave rise to the State's claims in this Complaint.

130. Collectively, Defendants Evernorth Health, Inc., Express Scripts, Inc., Express Scripts Administrators, LLC, ESI Mail Pharmacy Service, Inc., Medco Health Solutions, Inc., Accredo Health, Ascent Health, and Express Scripts Pharmacy, Inc., including all predecessor and successor entities, are referred to as "Express Scripts."

131. Express Scripts is named as a Defendant in its capacities as a PBM and mail order and specialty pharmacy.

132. Prior to merging with Cigna in 2019, Express Scripts was the largest independent PBM in the United States. During the relevant period of this Complaint, Express Scripts controlled 30% of the PBM market in the United States.

133.    Express Scripts has only grown larger since the Cigna merger.

134.    Express Scripts' annual revenue is over $100 billion.

135.    Express Scripts contracts with approximately 65,000 retail chain and independent pharmacies that comprise its pharmacy networks, representing over 98% of all retail pharmacies in the nation.

136.    At all times relevant hereto, Express Scripts offered pharmacy benefit services, and derived substantial revenue therefrom, in Vermont and provided the at-issue PBM services to numerous payors in Vermont.

137.    At all times relevant hereto, and contrary to all of their express representations, Express Scripts has knowingly insisted that its payor clients, including those in Vermont, use list prices as the basis for reimbursement of prescription drugs.

138.    At all times relevant hereto, Express Scripts has concealed its critical role in increasing drug prices.

139.    At all times relevant hereto, Express Scripts constructed standard formularies that are used nationwide, including by Express Scripts' payor clients in Vermont, and that are relied on by residents in Vermont as promoting health and lowering drug prices.

140.    In its capacity as a mail order and specialty pharmacy, Express Scripts dispensed drugs to Vermont patients and received payments from Vermont patients and payors based on list prices and, as a result, harmed Vermont patients and payors.

27

141.   At all times relevant hereto, Express Scripts derived substantial revenue providing mail order and specialty pharmacy services in Vermont.

142.   During the relevant time period, Express Scripts provided pharmacy benefit and specialty and mail order pharmacy services to the State's employee health plan.

143.   At all relevant times, Express Scripts had agreements with pharmaceutical manufacturers related to payments for placement on Express Scripts's formularies for drugs prescribed to Vermonters.

144.   Collectively, CVS Caremark and Express Scripts are referred to as "PBM Defendants," "Defendants," or "PBMs."

### III.    JURISDICTION AND VENUE

145.   The Vermont Attorney General is authorized under the Vermont Consumer Protection Act, 9 V.S.A.§ 2458(b), to sue to enforce the Act's prohibitions on unfair and deceptive acts and practices in commerce.

146.   This Court has personal jurisdiction over each Defendant.   Each Defendant: (a) transacts business and/or is registered to do business within Vermont; (b) maintains substantial contacts in Vermont; and (c) committed the violations of Vermont statutes and the common law at issue in this lawsuit in whole or part within Vermont. The PBM Defendants' misconduct has been directed at, and has caused injury to persons residing in, located in, or doing business in Vermont, and to the State.

147.   All of the at-issue transactions occurred in Vermont and/or involved Vermont residents.

148.    Venue for this action properly lies in Washington County because Defendants transact business in this county and the causes of action arose in whole or in part in this county and the Attorney General is statutorily authorized to bring suit in this county pursuant to 12 V.S.A. § 402(a).

149.    The State does not allege any federal cause of action, and to the extent that any pleading allegedly can be interpreted as stating any claim arising under federal law or raising any issue to be adjudicated under federal law, any and all such federal claims or matters interpreted as raising questions for adjudication under federal law are expressly disclaimed. The State is relying exclusively on state law for the adjudication of its claims.[14]

## IV.    BACKGROUND

### A.    Drug Prices Have Significantly Increased over the Past Two Decades

150.    Since 2013 prescription drug prices have significantly outpaced inflation and price increases for any other medical commodity or service.

---

[14] This Complaint does not challenge, seek to recover any moneys related to, or seek to establish liability against any PBM Defendant for any conduct related to any federal officer(s) and/or federal plan(s), including but not limited to the creation of formularies for; the monitoring of pharmacy networks for; and/or the dispensing of drugs through mail order and/or specialty pharmacies to any federal officers and/or federal plans.  For the purposes of this Complaint "federal officer" and "federal plan" include any health care plan that is fully or partially funded by the federal government, any plan that is administered for any federal agency, or any plan that is delegated for administration by any federal agency.  Federal officer and/or federal plans include, but are not limited to, TRICARE, Federal Employment Health Benefits Act ("FEHBA") plans, Employer Group Waiver Plans ("EGWP"), Medicare Part D plans, or Medicare plans. As such, the Complaint does not seek relief from any PBM Defendant that is governed by or available pursuant to any claim(s) involving a federal officer associated with any Federal Employees Health Benefits Act, TRICARE-governed health benefits plan, and/or any other federal officer and/or federal plan.

29

151. As a direct result of rising drug prices, many life-saving medications have become unaffordable for many patients in Vermont and all payors are harmed by excessive costs.

152. Diabetic treatments have become a poster child for rising drug prices.

153. The list prices for these drugs have increased in some cases by more than 1,000% since the early 2000s; an astounding increase especially when compared to the general and a medical inflation rates.

154. By 2016, the average price per month of the four most popular types of diabetic treatments rose to $450 — and costs continue to rise, so much so that now one in four patients are rationing or skipping lifesaving doses. This behavior is dangerous to a patient's health and can lead to a variety of complications and even death.

155. For example, since 1996, drug manufacturer Eli Lilly has increased the list price for a package of pens of Humalog from less than $100 to $663 and from less than $50 for a vial to $342.

**Figure 1: Rising List Prices of Humalog Vials and Pens from 1996 – March 2023**



156. From 2002 through 2023, drug manufacturer Novo Nordisk has increased the list price of Novolog from $108 to $671 for a package of pens and from less than $50 to $347 for a vial (*See* Figure 2).

**Figure 2: Rising List Prices of Novolog Vials and Pens**



157.   In addition, other diabetic treatments, including Type 2 diabetic treatments, have experienced significant price increases as well. Figure 10 demonstrates price increases for Type 2 drugs, Trulicity, Victoza, and Ozempic.

**Figure 3: Rising List Prices of Type 2 Drugs**



158.   Diabetic treatments are not the only drugs that have experienced these types of significant price increases.  For example, the price of specialty drugs used to treat multiple sclerosis have also risen astronomically over the last couple of decades.

**Figure 4: Rising Price for Multiple Sclerosis Drugs**



159.     Similar price spikes have occurred for new cancer drugs. A report from US Congresswoman Katie Porter showed that the average annual cost of new cancer drugs in the United States jumped by 53% between 2017 and 2021. That increase continues through today for many cancer drugs. To make matters worse, comprehensive cancer drug studies have found no association between measures of efficacy and pricing of cancer drugs.

160.     Rising drug prices have led to an increase in spending for both payors and patients. The rise in prescription drug spending by private health plans climbed to nearly $152 billion in 2021, an 18 percent increase from 2016.

161.     This trend has continued through today. While prescription drugs have been the fastest-growing component of health benefit cost for years, in 2023 pharmacy

34

benefit cost jumped 8.4%, due in large part to a spike in the utilization of certain therapies for treatment of diabetes–glucagon-like peptide 1 (GLP-1) drugs.

162.   The costs paid by patients has spiked as well. For a consumer with Type 1 diabetes with commercial insurance, the annual cost of insulin nearly doubled from approximately $3,200 in 2012 to $5,900 in 2016.

163.   A 2022 study by Yale researchers found that 14% of patients face "catastrophic" spending on insulin (defined as 40% of their income beyond what they spend on food and housing) and nearly half of diabetics reported rationing their treatments because of its cost.

164.   As explained in more detail below, the PBM Defendants are both directly responsible for the significant rise in drug prices and have profited immensely from it, generating billions in profits from increasing list prices at the expense of Vermont patients and payors, including the State.

**B.   Pharmaceutical Payment and Supply Chain**

**1.   PBMs role in pharmaceutical pricing chain**

165.   As detailed below in Figure 5, the PBM Defendants sit at the center of the convoluted drug payment and pricing chain.

**Figure 5: Pharmaceutical Drug Distribution and Payment Chain**



166.    The PBM Defendants develop drug formularies, process claims, determine the prices that patients and payors pay for prescription drugs, and determine the amounts pharmacies receive for those drugs.

167.    The PBM Defendants provide services to both payors and consumers by administering prescription drug benefits. As CVS Caremark explains to consumers through its welcome kit: "We manage your prescription drug benefits just like your health insurance company manages your medical benefits."

168.    The PBM Defendants have consumer-facing websites representing that they "serve" consumers and that consumers are their "members."

169.    The PBM Defendants further represent that giving consumers access to necessary prescription drugs at an affordable price is a top priority.

170. Consumers pay premiums to their employers or insurance companies (third-party payors) for health insurance. Third-party payors then pay PBMs to administer prescription drug benefits for consumers. PBMs in turn negotiate and contract with pharmacies to determine the amount PBMs will pay pharmacies for prescription drugs (minus any cost-share amounts that consumers pay directly to pharmacies). Traditionally, PBMs mark-up the price they pay to pharmacies when seeking reimbursement for those payments from third-party payors—creating another revenue stream for the PBM.

171. In most cases, the cost-sharing amount that the consumer pays out of pocket is calculated based on the list prices set by drug manufacturers. Thus, when drug manufacturers increase their list prices, the amount that Vermont consumers (both patients and payors) pay for prescriptions increase as well.

172. In addition, the PBM Defendants' formularies determine which drugs are available to their covered lives, at what prices, and with what restrictions. PBM formularies are usually divided into three to five tiers that determine the out-of-pocket amounts (*e.g.*, the co-payment or co-insurance) that consumers must pay toward the cost of a prescription. The lower tiers have lower cost-share amounts than the higher tiers. For example, a typical three-tier formulary may be designed as follows:

    a. Tier 1 contains generic drugs with the lowest cost-share amount for consumers.

    b. Tier 2 contains preferred brand-name drugs with a cost-share amount that is higher than tier 1 but lower than tier 3.

   c.  Tier 3 contains non-preferred brand-name drugs with the highest payment by consumers.

173.   Because the PBM Defendants cover 95% of insured commercial lives in Vermont, the PBM Defendants have enormous control and influence on drug utilization throughout the State.

174.   Drug manufacturers understand that the PBM Defendants control access to the prescription drug market. Accordingly, the PBM Defendants negotiate and contract for various payments from prescription drug manufacturers in exchange for giving the manufacturers access to the PBMs' covered lives. These payments include rebates, data access fees, service fees, and other payments (referred to herein as "Manufacturer Payments").

175.   Manufacturers pay higher Manufacturer Payments for preferred formulary placement (*e.g.*, tier 2 instead of tier 3) or to avoid exclusion.

176.   PBMs also contract with a network of independent and chain pharmacies. Pharmacies in a PBM's network are approved to dispense drugs to the PBM's covered lives. Some of the pharmacies in the PBM's network are owned by the PBM, including Defendants Accredo Health, Express Scripts Pharmacy, and CVS Specialty Pharmacy. In exchange, network pharmacies agree to dispense drugs to the PBM's covered lives and pay fees back to the PBMs. PBMs then reimburse their network pharmacies for the drugs dispensed at rates set by the PBMs.

177.   The PBM Defendants ensure that the Manufacturer Payments they receive are highly confidential through non-disclosure agreements with the drug manufacturers. Thus, the exact terms of the arrangements between PBM Defendants

and prescription drug manufacturers are unknown to others in the supply chain—creating a pricing black box.

178.    In addition, Manufacturer Payments are usually paid on a per-unit basis and are based on the manufacturer list price. For example, a manufacturer may offer the PBM a rebate of 40% of the list price for each particular drug sold that has a preferred formulary position.

179.    Another role that the PBM Defendants play are owners of mail-order, retail and specialty pharmacies (*i.e.*, Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy) which purchase and take possession of prescription drugs and supply those drugs to patients.

180.    Collectively, all the ways in which the PBM Defendants interact with the pharmaceutical chain allows these PBMs to exert tremendous influence over what drugs are available throughout Vermont and at what prices.

181.    Thus, PBMs are at the center of the flow of money in the pharmaceutical supply chain. In general:

    a.    PBMs negotiate the price that patients and payors pay for prescription drugs (based on list prices);

    b.    PBMs separately negotiate a different (and often lower) price that pharmacies in their networks receive for that same drug;

    c.    PBMs set the amount in fees that the pharmacy pays back to the PBM for each drug sold (based on list prices);

    d.    PBMs set the price paid for each drug sold through their mail, specialty and retail pharmacies (based on list prices); and

    e.    PBMs negotiate the amount that drug manufacturers pay back to the PBM for each drug sold (based on list prices).

## 2. The rise of the PBMs in the pharmaceutical supply chain

182. When they first came into existence in the 1960s, PBMs functioned largely as claims processors. Over time, however, they have taken on a larger and larger role in the pharmaceutical industry. Today, PBMs wield significant control over the drug pricing system.

183. One of the roles PBMs took on was negotiating with drug manufacturers, ostensibly on behalf of patients and payors.

184. In the early 2000s, PBMs started buying pharmacies.

185. When a PBM combines with a pharmacy it has further incentive to steer patients to its in-house pharmacy and toward more expensive drugs (explained in greater detail below).

186. These perverse incentives still exist today with respect to both retail, specialty, and mail order pharmacies housed within the PBMs' corporate families, including Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy.

187. More recently, further consolidation in the industry has afforded PBMs a disproportionate amount of market power.

188. In total, nearly 25 different PBM entities (former competitors) have now merged or otherwise been absorbed into the PBM Defendants.

189. Figure 6 depicts this consolidation within the PBM market.

**Figure 6: PBM Defendant Consolidation**



190.    After merging or acquiring all their competitors and now backed by multi-billion-dollar corporations, PBM Defendants have taken over the market in Vermont—controlling over 95% of PBM market.

191.    Business is booming for PBM Defendants. Together, they report more than approximately $285 billion in annual revenue.

192.    PBM Defendants are able to use the consolidation in the market as leverage when negotiating with other entities in the pharmaceutical pricing chain. Last year, industry expert Lindsay Bealor Greenleaf from the Advice and Vision for the Healthcare Ecosystem (ADVI) consulting described this imbalance in power, "it's really difficult to engage in any type of fair negotiations when one of the parties has that kind of monopoly power . . . I think that is something that is going to continue getting attention, especially as we see more of these payors and PBMs continue to try to further consolidate."

### 3.    Drug Pricing

193.    As described above, the prescription-drug industry consists of an opaque network of entities engaged in multiple distribution and payment structures. These entities include drug manufacturers, wholesalers, pharmacies, health plans/third party payors, pharmacy benefit managers, consultants, and patients.

194.    Generally speaking, prescription drugs are distributed from manufacturer to wholesaler, wholesaler to pharmacy, and pharmacy to patient.

195.    The pharmaceutical industry is unique in that the pricing chain is distinct from the distribution chain. The prices for the drugs distributed in the pharmaceutical chain are different for each participating entity: different actors pay different prices set by different entities for the same drugs.

196.    The PBMs ensure there is no transparency in this pricing system and that all of their clients' and patients' payments are tied to the "list prices," wholesale acquisition cost ("WAC"), or average wholesale price ("AWP").

197.    Drug manufacturers self-report WACs to publishing compendiums such as First DataBank, Redbook and others.

198.    AWPs are then set at generally 20% greater than WAC.

199.    PBMs use AWP prices to set the amount that their payor clients pay for prescription drugs. These prices are set forth in the contracts between PBMs and their clients and are reflected as discounts off AWP (listed in the contract as AWP minus some percentage (*i.e.*, AWP-25%)).

200.    Notwithstanding their knowledge that list prices are disconnected from actual transaction costs, the PBM Defendants insist that their clients make payments

for brand, generic, and specialty drugs based on list prices. Even while PBM Defendants have more accurate pricing available, they persist in requiring AWP to be used by payors and patients.

201. In addition, the PBMs impose varying reimbursement formulas on their clients—all based on the inflated AWPs—depending on the type of drug at issue (brand, generic, specialty) and the profit to be made. PBMs require payors to pay for brand, generic, and specialty drugs based on different list-price-based formulas—each one intended to maximize the PBMs' profit at the payor's expense.

202. For specialty drugs, the PBM Defendants require payors to reimburse for these drugs at a higher rate than generic drugs. For example, a payor may contract with a PBM to pay AWP-85% (85% less than the drug's AWP price) for a generic drug, whereas for specialty drugs the discount off AWP may be significantly less (*i.e.* AWP-25%).

203. Making matters worse, there is also no set objective standard for what constitutes a "specialty" drug, as opposed to a generic drug. Rather, the PBMs have sole discretion to determine whether a drug is considered a specialty drug for purposes of reimbursement and how the PBM Defendants categorize a drug has a substantial impact on the price their clients pay for those drugs (discussed in greater detail below).

204. The PBM Defendants use this discretion to categorize drugs as brand, generic, or specialty to serve themselves at the expense of patients and payors.

205. In addition, the PBMs continue to perpetuate the use of list prices as the backbone of their contracts with benefit plan sponsors because it opens the door to

unchecked profitability—through Manufacturer Payments and pharmacy spread pricing (discussed in detail below).

## V.    FACTUAL ALLEGATIONS

**A.    PBM Defendants Represent That They Lower Drug Prices, Promote Patient Health and Act in the Best Interests of Payors and Patients**

206.    Throughout the relevant time period, the PBM Defendants have consistently and repeatedly represented that: (a) their interests are aligned with patients and payors; (b) they work to lower drug prices and, in doing so, they achieve substantial savings for patients and payors; and (c) the PBM Defendants construct formularies that drive down prices and improve patient health.

207.     PBM Defendants understand that patients and payors rely on the PBM Defendants to achieve the lowest prices for drugs and to construct formularies designed to improve health and lower costs.

208.    In addition to the general PBM representations discussed above in the Parties section, throughout the relevant time period and continuing to this day, the PBM Defendants have made representations about Manufacturer Payments, formulary construction, and the PBM Defendants' role in the drug pricing system.

209.    For example, on an Express Scripts' earnings call in February 2017, CEO Tim Wentworth stated, "Drugmakers set prices, and we exist to bring those prices down."

210.    Larry Merlo, head of CVS Caremark, sounded a similar refrain in February 2017; "Any suggestion that PBMs are causing prices to rise is simply erroneous."

44

211. In 2017, Express Scripts' Wentworth went on CBS News to again argue that PBMs play no role in rising drug prices, stating that PBMs work to "negotiate with drug companies to get the prices down."

212. Express Scripts claimed, in a 2019 article titled "What's a Pharmacy Benefit Manager," that Express Scripts "work[s] with plan sponsors to provide a benefit that delivers the best clinical outcome and the lowest possible cost." Express Scripts also publicly represented in this article:

    a. "By delivering smarter solutions to patients and clients, PBMs provide better care and lower cost with every prescription, every time."

    b. "Rebates do not raise drug prices, drug makers raise drug prices, and they alone can lower them. Consider the cost of Humalog®: over the past seven years, the list price for this medication has increased dramatically, yet the net cost has remained relatively constant. Without PBMs, and specifically without Express Scripts, plan sponsors would have paid exponentially more for their prescription drugs."

    c. "We . . . negotiate with drug manufacturers so no one pays more than they need to."

    d. "FACT: Public disclosure of negotiated rebates will not lower prescription drug costs. #PBMs Express Scripts negotiates with drug manufacturers to increase competition and lower costs for patients."

213. On November 28, 2022, Express Scripts published an article on its website stating that Express Scripts engages in "strategies [that] help reduce the prices of specialty drugs."

214. On May 10, 2023, PBM Defendants testified before Congress before the Senate Health, Education, Labor, and Pensions (HELP) Committee in a hearing entitled "The Need to Make Insulin Affordable for All Americans" ("2023 Senate Hearing"). At this hearing, Adam Kautzner, Express Scripts president, testified,

45

"Without the ability to use [rebates] to achieve lower drug costs, health care spending would be much higher."

215.    In 2022, CVS Health made the following representations to the Vermont Legislature:

a.    "CVS Health [is] Improving Access and Lowering Costs;'"

b.    "[CVS Health] help[s] people navigate their health care by improving access, lowering costs and being a trusted partner for every meaningful moment of their health;" and

c.    "[CVS Health's] pharmacy benefit manager (PBM) . . . bring[s] value to consumers and our clients, which include employers, unions and government health plans, by working to lower prescription drug costs."

216.    In 2024, Travis Tate, VP of Formulary and Trend Solutions for CVS Caremark, represented on CVS Health's website that CVS Caremark's "formulary design continues to deliver savings while optimizing plan member experience." Mr. Tate further represented that CVS Caremark's managed formularies deliver $4.8 billion in client savings and $138 in savings per patient. Mr. Tate also represented that "[CVS Caremark is] dedicated to keeping member costs low so they can afford their medications while limiting member disruption."

217.    In April 2024, David Joyner, the Executive Vice President of CVS Caremark, made the following representations in a Fortune article:

a.    "[CVS Caremark] exist[s] to make prescription drugs more affordable."

b. "As we work to bring down costs, you'll hear from others who want to raise [drug prices], specifically pharmaceutical companies who are directly responsible for how drugs are priced in our country."

c. "At CVS Caremark, we are creating a more transparent environment for drug pricing in this country . . . for every drug from every manufacturer for every condition and every patient."

d. "[CVS Caremark's] size and scale allow us to go toe-to-toe with drug companies, driving competition and negotiating discounts that make the difference between someone affording their medication or going without."

e. "[CVS Caremark] take[s] on every challenge, manage every drug, and deliver savings and safety."

218.    CVS Caremark's website represents it is "[w]orking to keep prescription drug costs down for members and clients." CVS Caremark further claims it is "[i]mproving health through affordability" because "people are more likely to take their prescribed medications when they know they can afford them – and that can lead to better health outcomes."

219.    CVS Caremark also represents on the CVS Health website:

a. "Pharmaceutical manufacturers insist that increasing drug prices are a result of them having to pay rebates. This is simply not true."

b. "Pharmaceutical manufacturers also argue that PBMs retain the rebates they negotiate, and that higher prices mean more rebates and greater profits for PBMs. This is entirely false. Rebate retention also has no correlation to higher drug prices."

c. "At CVS Health, we are committed to using every tool possible and continuing to drive innovation to bring down the cost of drugs. We remain focused on providing the right drug to the right patient at the right time at the lowest possible cost."

d. CVS Specialty's "top priority" is "making [specialty] medications available at the lowest possible cost" and that CVS Specialty "negotiate[s] with drug manufacturers for the most competitive prices . . .'"

220. Throughout the relevant time period, PBM Defendants have also represented that they are transparent about the Manufacturer Payments that they receive and that they pass along (or do not pass along) to payors. For example, in a 2017 CBS News interview, Express Scripts' CEO, represented, among other things, that Express Scripts was "absolutely transparent" about the Manufacturer Payments it receives and that payors "know exactly how the dollars flow" with respect to these Manufacturer Payments.

221. The PBM Defendants also repeatedly and consistently make representations regarding the amount of "savings" they generate for patients, payors, and the healthcare system. For example, in January 2016, Express Scripts' President Tim Wentworth stated at the 34th annual JP Morgan Healthcare Conference that Express Scripts "saved our clients more than $3 billion through the Express Scripts National Preferred Formulary."

222. Likewise, in April 2019, CVS Caremark President and Executive Vice President of CVS Health Corp. Derica Rice stated, "Over the last three years . . . CVS Caremark has helped our clients save more than $141 billion by blunting drug price inflation, prioritizing the use of effective, lower-cost drugs and reducing the member's out-of-pocket spend."

223. On November 28, 2022, Express Scripts President Amy Bricker stated "PBMs are built to lower prescription drug costs, and we work behind the scenes each day on behalf of the people we serve . . . [i]n fact, PBMs will help deliver $1 trillion in savings on drug costs to patients and health plans over the next 10 years."

224. In making these representations, the PBMs fail to disclose that the amount of "savings" they have generated is calculated based on the list prices which the PBM Defendants are directly responsible for driving up.

225. In addition, the PBM Defendants have repeatedly (and falsely) claimed that they lower prices throughout the relevant time period. Examples include:

a. In a public statement issued on May 11, 2010, CVS Caremark represented that it was focused on diabetes to "help us add value for our PBM clients and improve the health of plan members . . . a PBM client with 50,000 employees whose population has an average prevalence of diabetes could save approximately $3.3 million a year in medical expenditures."

b. On June 22, 2010, Andrew Sussman, Chief Medical Officer of CVS Caremark stated on national television that "CVS is working to develop programs to hold down costs."

c. In a public statement issued in November 2012, CVS Caremark represented that formulary decisions " [are] one way the company helps manage costs for clients."

d. On August 31, 2016, Glen Stettin, Senior Vice President and Chief Innovation Officer at Express Scripts released a statement that stated "[d]iabetes is wreaking havoc on patients, and it is also a runaway driver of costs for payors . . . [Express Scripts] helps our clients and diabetes patients prevail over cost and care challenges created by this terrible disease."

   • Mr. Stettin continued on to represent that Express Scripts "broaden[s] insulin options for patients and bend[s] down the cost curve of what is currently the costliest class of traditional prescription drugs."

e. In January 2017, Tim Wentworth, President of Express Scripts, represented that "without PBMs, and specifically without Express Scripts, our clients would pay [many times] more for [insulin]."

f. Mr. Wentworth continued on to state Express Scripts is dedicated to controlling prices because "we stand up for payors and patients."

g. On April 4, 2019, Steve Miller, Express Scripts' Chief Medical Officer, stated to Congress that Express Scripts "give[s] people who rely on insulin

49

greater affordability and cost predictability so they can focus on what matters most: their well-being." Dr. Miller continued on to describe Express Scripts' work on behalf of diabetics as "[b]etter care and better outcomes are rooted in greater choice, affordability, and access, and we can bring all of these to people with the greatest needs."

h. CVS Health's Chief Policy and External Affairs Officer testified to Congress in April 2019 that CVS Caremark "has taken a number of steps to address the impact of insulin price increases. We negotiate the best possible discounts off the manufacturers' price on behalf of employers, unions, government programs, and beneficiaries that we serve."

226.    PBM Defendants not only falsely represent that they lower the price of

drugs for *payors*, but also for *patients* as well.  Examples include:

a. Express Scripts' publicly available code of conduct states, "[a]t Express Scripts we're dedicated to keeping our promises to *patients and clients* . . . This commitment defines our culture, and all our collective efforts are focused on our mission to make the use of prescription drugs safer and more affordable." (Emphasis added).

b. Amy Bricker, then President at Express Scripts testified before Congress in April 2019, "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, *generating savings that are returned to patients* . . ." (Emphasis added).

c. In its 2017 Drug Report, CVS Caremark stated that the goal of its pharmacy benefit plans is to ensure "that the cost of a drug is aligned with the value it delivers in terms of *patient* outcomes . . . in 2018, we are doing even more to help keep drugs affordable with our new Savings *Patients* Money initiative." (Emphasis added).

227.    Throughout the relevant time period, the PBM Defendants have made

the foregoing misrepresentations consistently and directly to Vermont patients

through member communications, formulary change notifications, and through

direct-to-consumer pull through efforts and marketing.

228.    PBM Defendants also make these same representations directly to their

Vermont clients—they represent that their interests are aligned with their payor

clients, that they lower the price of the at-issue drugs, and that their formulary construction is for the benefit of patients and payors.

229.    As explained further in the sections below, each of the above PBM Defendant representation is false.

230.    Indeed, contrary to their representations that they lower drug prices for patients and payors, as explained in detail below, PBMs' formulary construction, the Manufacturer Payments they receive, and the manner in which they steer patients to their captive pharmacies—including Defendants Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy—have caused drug prices paid by patients and payors to significantly increase.

231.    The *New York Times* recently published an investigation titled, "The Opaque Industry Secretly Inflating Prices for Prescription Drugs: Pharmacy benefit managers are driving up drug costs for millions of people, employers and the government" ("NYT PBM Investigation").  The NYT PBM Investigation focused on the PBM Defendants (as well as a third large PBM) and found:

> The job of the P.B.M.s is to reduce drug costs. Instead, they frequently do the opposite. They steer patients toward pricier drugs, charge steep markups on what would otherwise be inexpensive medicines and extract billions of dollars in hidden fees, a New York Times investigation found.

232.    The NYT PBM Investigation further "found that the largest PBMs often act in their own financial interest, at the expense of their clients and patients." Among the findings of the NYT PBM Investigation:

    a.  P.B.M.s sometimes push patients toward drugs with higher out-of-pocket costs, shunning cheaper alternatives.

b. They often charge employers . . . multiple times the wholesale price of a drug, keeping most of the difference for themselves. That overcharging goes far beyond the markups that pharmacies, like other retailers, typically tack on when they sell products.

c. The largest P.B.M.s recently established subsidiaries that harvest billions of dollars in fees from drug companies, money that flows straight to their bottom line and does nothing to reduce health care costs.

233. Moreover, the PBM Defendants conceal the falsity of these representations by closely guarding their pricing structures, agreements, and sales figures.

234. PBM Defendants do not disclose to patients, payors or the public the details of their agreements with drug manufacturers or the Manufacturer Payments they receive from them—nor do they disclose the details related to their agreements with payors and pharmacies.

235. Each PBM Defendant also conceals the falsity of these representations by mandating that every entity in the supply chain with whom it contracts signs confidentiality agreements.

236. PBM Defendants have sued governmental entities to block the release of details on their pricing agreements with manufacturers and pharmacies.

237. Even when audited by payors, PBM Defendants often still refuse to disclose their agreements with manufacturers and pharmacies, relying on overly broad confidentiality provisions, claims of trade secrets and other unnecessary restrictions.

**B.    PBM Defendants' Drive Up Prices for Patients and Payors and Foreclose Access to Lower Priced Drugs**

238.    In nearly every transaction, the PBM Defendants profit from higher list prices.

239.    First, as explained in more detail below, PBM Defendants retain a portion of the Manufacturer Payments they negotiate as profit. Manufacturer Payments are paid as a percentage of list price. Thus, the higher the list price, the more profits for the PBM Defendants.

240.    The PBM Defendants also charge fees to pharmacies in their network. Again, often these fees are charged as a percentage of a drug's list price. And again, the higher the list price, the more profits for the PBM Defendants.

241.    The PBM Defendants also generate profits through "spread pricing." Spread pricing is the difference between what a client pays a PBM for a drug and what the PBM reimburses the pharmacy for the same drug. The amount that the client pays the PBM is based on the list price (in this case AWP) of a drug. The amount that the pharmacy receives from the PBM often is not based on the list price or is set at a discount from list price significantly higher than the client's. Thus, the higher the list price for a drug, the more profits the PBM Defendants make from spread pricing.

242.    The PBM Defendants also use higher list prices to generate profits from their captive mail order and specialty pharmacies, including Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy (as explained below).

243.    Consequently—and in contradiction to the PBM Defendants' representations—the PBM Defendants are driving up the prices of drugs, foreclosing

patients' and payors' access to lower priced drugs, and working against the interests of their clients and their beneficiaries in order to increase their own profits. In particular:

a. the PBM Defendants construct formularies and negotiate Manufacturer Payments in a manner that drives up prices and shuts off access to lower priced drugs;

b. the PBM Defendants obfuscate and retain Manufacturer Payments as profits;

c. the PBM Defendants drive up prices for patients and payors through their captive specialty and mail order pharmacies, including Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy; and

d. the PBM Defendants utilize spread pricing through their network pharmacies to further harm payors and independent pharmacies.

### 1. PBMs construct formularies and negotiate Manufacturer Payments in a manner that drives up prices and shut off access to lower priced drugs.

244.    The PBM Defendants are driving up drug prices by preferring drugs with high list prices (and corresponding high Manufacturer Payments) on their formularies over lower priced, more affordable drugs.

245.    Given their market power in Vermont, the PBM Defendants' formularies control access to prescription drugs for Vermont patients and payors and drive drug utilization.

246.    Moreover, given the asymmetry of information and disparity in market power between payors and PBM Defendants and the costs associated with making formulary changes, most payors accept the standard formularies offered by the PBM Defendants or otherwise defer to the PBM Defendants' formulary recommendations.

54

247. In 2012, PBM Defendants began excluding drugs from certain therapeutic classes from their formularies in order to drive up the amount the PBM Defendants received in Manufacturer Payments.[15] The threat of formulary exclusion fundamentally changed drug pricing as PBM Defendants demanded ever larger Manufacturer Payments in exchange for formulary placement. Manufacturer Payments went from modest discounts to steep payments that manufacturers paid because not paying PBMs could detrimentally affect a drug's chance of success.

248. CVS Caremark started excluding drugs from its formulary in 2012. Express Scripts began the practice in 2014. Figure 7 below shows the number of exclusions by PBM per year since 2012.

### Figure 7: PBM Formulary Exclusions from 2012-2024



---

[15] While the PBM Defendants did not implement their exclusionary formularies until 2012, the PBM Defendants were evaluating and creating their exclusionary formulary plans since at least January 1, 2011.

249.   The number of medicines excluded from the PBMs' formularies increased 961% from 2014 (109 unique drugs exclusions) to 2024 (1,156 unique drug exclusions). Drugs used to treat chronic conditions are most frequently excluded by PBM Defendants.

250.   Drug manufacturers recognize that because PBM Defendants have such a dominant market share, if they chose to exclude a particular drug from their standard formularies, or give it a non-preferred position, it could mean billions of dollars in profit loss for manufacturers.

251.   For example, in an interview, Olivier Brandicourt, drug manufacturer Sanofi's Chief Executive Officer, stressed the importance of the PBMs' standard formularies: "if you look at the way [CVS Caremark] is organized in the U.S . . . 15 million [lives] are part of [CVS Caremark's standard] formulary and that's very strict, all right. So, [if we were not included in CVS Caremark's standard formulary] we wouldn't have access to those 15 million lives."

252.   Given their size, even if the PBM Defendants move a drug to a less favorable formulary position, it can have a substantial negative impact on the revenues and profits that a drug will generate for the manufacturer.

253.   Drug manufacturers also recognize that the PBM Defendants' profits are directly tied to drug manufacturers' list prices.  For example, in January 2021, the United States Senate Finance Committee released an investigative report titled, "Insulin: Examining the Factors Driving the Rising Cost of a Century Old Drug"

("2021 Senate Report"). In summarizing the internal documents produced by drug manufacturers in response to the investigation, the 2021 Senate Report noted:

> [B]oth Eli Lilly and Novo Nordisk executives, when considering lower list prices, were sensitive to the fact that PBMs largely make their money on rebates and fees that are based on a percentage of a drug's list price . . . In other words, the drug makers were aware that higher list prices meant higher revenue for PBMs.

254.    In order to avoid exclusion and gain preferable formulary access, the amount that drug manufacturers pay in Manufacturer Payments to the PBM Defendants has increased substantially during the last decade. For example, the January 2021 Senate Report found that:

> In July 2013, Sanofi offered rebates between 2% and 4% for preferred placement on CVS Caremark's commercial formulary. Five years later, in 2018, Sanofi rebates were as high as 56% for preferred formulary placement. Similarly, rebates to Express Scripts and OptumRx increased dramatically between 2013 and 2019 for long-acting insulins. For example, in 2019, Sanofi offered OptumRx rebates up to 79.75% for Lantus for preferred formulary placement on their client's commercial formulary, compared to just 42% in 2015. Similarly, Novo Nordisk offered Express Scripts rebates up to 47% for Levemir for preferred formulary placement on their client's commercial formulary, compared to 25% in 2014.

255.    Beyond increased rebate demands, the PBM Defendants have also requested and received larger and larger administrative fee payments from drug manufacturers during the relevant time period.

256.    In 2019, the Pew Charitable Trust estimated that, between 2012 and 2016, the amount of administrative and other fees that the PBMs requested and received from the Manufacturers tripled, reaching more than $16 billion.

257. The value of Manufacturer Payments to the PBMs was highlighted during the 2023 Senate Hearing where executives from Sanofi, Eli Lilly, and Novo Nordisk testified that $0.75 to $0.84 of every dollar spent on the list price of many of their drugs goes directly to PBM Defendants (or their affiliated rebate aggregators). Similar valuation has occurred across many drug classes, particularly in the specialty category.

258. Drug manufacturers have responded to the rising Manufacturer Payment amounts by increasing their list prices to maintain their profits. The gap between list price and net price has become significant.

259. From 2011 to 2019, Manufacturer Payments from drug manufacturers nearly tripled. In 2011, a sample of 13 manufacturers paid 29.2% of their net revenue ($50.1 billion) to PBMs and other intermediaries. By 2019, the same manufacturers paid more than twice that amount: 67.4% of net revenue ($141.4 billion).

260. Around 2012—when PBMs' exclusion tactics created a rise in Manufacturer Payments—list prices and payments from manufacturers began growing disproportionately higher than manufacturers' net revenue (as shown in Figure 8 below).

**Figure 8: Manufacturer Revenue and Manufacturer Payments 2011-2019**



261.    Humira, AbbVie's blockbuster rheumatoid arthritis drug, is a good example of list price inflation caused by the PBM Defendants' exclusionary formularies. Humira's list price increased 78% from 2015 to 2019. Yet, most of the list price increase is attributable to Manufacturer Payments—which grew over 600% during this period. In sharp contrast, the net price AbbVie received for Humira only grew about 18% (from $2,623 to $3,104 in 2019).

262.    The NYT PBM Investigation also focused on Humira in discussing how the PBM Defendants' profit from the Manufacturer Payments paid by AbbVie, even at the great expense of patients and payors:

> Perhaps the clearest example of how the P.B.M.s find creative ways to profit is Humira, the blockbuster medication for conditions like arthritis. After two decades of the brand-name drug being the only version available, lower-cost alternatives came on the market in 2023.

Collectively, employers, insurance programs and patients stood to save up to $6 billion a year by switching to copycat drugs, according to the data company IQVIA. But P.B.M.s would lose money from switching. Humira had become a big moneymaker for P.B.M.s, in large part because its manufacturer, AbbVie, was shelling out hundreds of millions of dollars in fees to the benefit managers' [rebate aggregators]. Those fees would vanish if the P.B.M.s switched patients off Humira. The P.B.M.s moved slowly. In March, 14 months after the first cheaper version became available, 96 percent of prescriptions for the drug in the United States were still for the brand-name version, according to IQVIA.

263.    In exchange for drug manufacturers raising their list prices and paying the PBM Defendants increasing amounts in Manufacturer Payments, PBM Defendants grant the drug manufacturers' products with the highest list price and highest Manufacturer Payment amount preferred status on their formularies, while at the same time excluding lower priced drugs.

264.    In April 2019, three drug manufacturers—Eli Lilly, Sanofi, and Novo Nordisk—testified before Congress about this evolution in the drug pricing system. Novo Nordisk's President, Doug Langa, explained:

> [T]here is this perverse incentive and misaligned incentives (in the drug pricing system) and this encouragement to keep [list] prices high. And we've been participating in that system because the higher the [list] price, the higher the rebate . . . There is a significant demand for rebates. We spend almost $18 billion in rebates in 2018 . . . [I]f we eliminate all the rebates . . . we would be in jeopardy of losing [our formulary] positions.

265.    Mike Mason, Senior Vice President of Eli Lilly testified at the hearing:

> Seventy-five percent of our [list] price is paid for rebates and discounts to secure [formulary position] . . . $210 of a vial of Humalog is paid for discounts and rebates. . . We have to provide rebates [to PBMs] in order to provide and compete for [formulary position].

266.    In addition, Kathleen Tregoning, Executive Vice President for External Affairs of Sanofi, testified:

> The rebates are how the system has evolved. . . I think the system became complex and rebates generated through negotiations with PBMs are being used to finance other parts of the healthcare system and not to lower prices to the patient.

267.    Over time, Manufacturer Payments have become a significant factor for drug manufacturers in considering when and by how much to raise their list prices.

268.    The documents released by the Senate contemporaneous with the January 2021 Senate Report demonstrate the degree to which drug manufacturers' pricing strategy is focused on the PBMs' profitability. In an internal August 6, 2015 email, drug manufacturer Novo Nordisk executives debated delaying increasing the price of one of its drugs in order to trigger certain Manufacturer Payments owed to CVS Caremark and thus make the price increase more profitable for the PBM, stating:

> Should we take 8/18 [for a price increase], as agreed to by our [pricing committee], or do we recommend pushing back due to the recent CVS concerns on how we take price? . . . We know CVS has stated their disappointment with our price increase strategy (*i.e.* taking just after the 45th day) and how it essentially results in a lower price protection, admin fee and rebate payment for that quarter/time after our increase . . . it has been costing CVS a good amount of money.

269.    In June 2024, the House Committee on Oversight and Accountability released a report titled "The Role of Pharmacy Benefit Managers in Prescription Drug Markets" ("2024 House Committee PBM Report") that found that:

> PBMs often choose higher cost medications for their formularies costing patients more at the counter, employers more to subsidize their prescription drug plans, and taxpayers more for federal health care programs. In reviewing standard formularies for 2020, 2021, and 2022, from the three largest PBMs, the Committee found 300 examples, which

can be found in the Appendix to the report, of the three largest PBMs preferring medications that cost at least $500 per claim more than the medication they excluded on their formulary.

270. Because of the increased list prices, and associated increase in Manufacturer Payments, PBM Defendants' profit per prescription has grown exponentially. A recent study published in the Journal of the American Medical Association titled, "Estimation of the Share of Net Expenditures on Insulin Captured by US Manufacturers, Wholesalers, Pharmacy Benefit Managers, Pharmacies and Health Plans from 2014 to 2018" concluded that the amount of money that goes to the PBMs for each prescription increased over 150% from 2014 to 2018. In fact, for transactions where the PBM Defendants control the insurer, the PBM and the pharmacy (*i.e.* Aetna-CVS Health/Caremark-CVS pharmacy), these Defendants now capture an astonishing 50% of the money spent on each prescription (up from only 25% in 2014), despite the fact that they do not contribute to the development, manufacture, innovation or production of the product.

271. While the PBM Defendants argue that formulary exclusions and Manufacturer Payments reduce costs, the evidence shows otherwise. A study from the Tufts Center for the Study of Drug Development found that cost-effectiveness does not appear to correlate with a drug's excluded or recommended status and rebates appear to play an important role in determining exclusion and recommendation decisions. The Tufts study conducted a head-to-head comparison of excluded versus recommended drugs in the same therapeutic class. In 9 out of 18 instances, the more cost-effective drug was excluded from coverage.

272.    In addition, a February 2020 study by the Leonard D. Schaeffer Center for Health Policy & Economics at the University of South California titled "The Association Between Drug Rebates and List Prices," found that an increase in the amount that drug manufacturers pay back to the PBMs is directly correlated to an increase in prices—on average, a $1 increase in Manufacturer Payments is associated with a $1.17 increase in price—and that reducing or eliminating Manufacturer Payments could result in lower prices and reduced out-of-pocket expenditures.

273.    A report by the National Community Pharmacists Association titled "The Truth About Pharmacy Benefit Managers: They Increase Costs and Restrict Patient Choice and Access" estimated that Manufacturer Payments add nearly 30 cents per dollar to the price consumers pay for prescriptions.

274.    The PBM Defendants are not only driving up drug prices through their formulary construction, but they are also foreclosing patients' access to lower priced drugs by excluding such drugs from their formularies.

275.    The PBM Defendants' exclusionary formularies force list prices and Manufacturer Payments upward and constrict the choices of prescription drugs available to patients and payors.  Frequently, the drugs that the PBM Defendants choose to exclude are lower priced drugs (because the lower priced drugs are less profitable for PBMs). For example, the PBM Defendants exclude many affordable "authorized generic" forms of medications, significantly increasing out of pocket expenses of patients needing those life-saving drugs.

276.    The NYT PBM Investigation found "[e]ven when an inexpensive generic version of a drug is available, PBMs sometimes have a financial reason to push patients to take a brand-name product that will cost them much more." The NYT report continued on:

> Express Scripts typically urges employers to cover brand-name versions of several hepatitis C drugs and not the cheaper generic versions. The higher the original sticker price, the larger the discounts the PBMs finagle, the fatter their profits – even if the ultimate discounted price of the brand name drug remains higher than the cost of the generic.

277.    The NYT PBM Investigation provided another example of a PBM Defendant favoring a more expensive drug on a formulary despite the harm it caused a patient:

> [A] customer came to the local pharmacy to pick up an inhaler. He normally got the generic version of Symbicort, which is used to treat conditions like asthma. This time, though, the patient's P.B.M., Caremark, would pay only for the more expensive brand-name version. The pharmacist on duty, Mark Stahl, said it would cost the patient more than $300 out of pocket — about $60 more than he would have had to pay for the generic version that was no longer covered. The frustrated customer left without the inhaler he came for. A Times reporter witnessed the interaction. Mr. Stahl said that P.B.M. tactics like this were common. "It's a constant struggle all day long . . ."

278.    Another clear example of how the PBM Defendants foreclose patient access to lower priced drugs was discussed at the 2023 Senate Hearing.  At that hearing, Senator Susan Collins detailed how drug manufacturer Viatris released a generic drug (Semglee) at a 65% lower list price to the expensive, brand name drug equivalent (Lantus), but Semglee was nonetheless excluded from the PBM Defendants' formularies.  Several years later, Viatris rereleased the exact same

product, this time at a much higher list price (only 5% lower than Lantus); the PBM Defendants *then* allowed Semglee onto many of their formularies.

279.   Another example occurred when Eli Lilly announced that it would produce an authorized generic version of Humalog, and promised that it would "work quickly with supply chain partners to make [the authorized generic] available in pharmacies as quickly as possible."

280.   However, in the months after Eli Lilly's announcement, reports raised questions about the availability of generic Humalog in local pharmacies. A year after the release of this lower priced insulin, the PBM Defendants had broadly excluded or disadvantaged it on their formularies resulting in Eli Lilly's lower-priced, authorized generic being widely unavailable in pharmacies across the country.

281.   Yet another example occurred in the cancer treatment space in 2020 when Express Scripts excluded AstraZeneca's Calquence (drug used to treat Chronic Lymphocytic Leukemia) in favor of the higher-priced Imbruvica (manufactured by AbbVie and Johnson & Johnson). Express Scripts' profit-driven choice ignored that significantly fewer people who took Calquence suffered atrial fibrillation compared to Imbruvica in a head-to-head trial.

282.   In 2022, the Executive Director of the Vermont Pharmacists Association shared this story about the PBM Defendants excluding lower priced drugs in Vermont:

> As a clinician in a primary care clinic. . . a provider I work with asked for my opinion on a message she just received. A patient had been taking an extremely common blood pressure medication called amlodipine, was doing well on it, but her insurance just said it was no longer going to be

covered. I asked her to send me the notification because honestly, I was sure she was misunderstanding. She was not. This patient has employer-provided health insurance through one of the major insurers in the state, with one of the big 3 PBMs processing the pharmacy benefit. And this PBM is requiring a [prior authorization] to cover one of the most common blood pressure medications used in the United States. The NADAC cost for amlodipine is $0.50 per month, but the PBM was pushing the provider to prescribe one that costs $174 per month. Looking closer, I found out that the PBM had done the same thing a few months ago with lisinopril, another incredibly common first line blood pressure medication that costs less than a penny a pill. As a result, the patient went entirely without her blood pressure medication for several months because of the hurdles the PBM deliberately raised. These are not the actions of a company that has any interest in patient welfare. It would be understandable to dismiss this incident as one patient with one PBM, but I can assure you that dozens of these messages come in to every office, every day.

283.    In excluding these and other lower priced drugs, the PBM Defendants are cutting off access to these life-sustaining, affordable treatments for Vermont's insured patient population and instead pushing them to significantly more expensive options.

284.    The global strategic consulting company, Xcenda, put out a report in May 2022 titled "Skyrocketing growth in PBM formulary exclusions continues to raise concerns about patient access" that found:

Exclusions, potentially driven in part by misaligned PBM incentives, have had an extensive impact on patients' access to insulin over the study period. Lower list-priced insulins have been available since 2016—including follow-on insulins, "authorized generic" insulins, and, more recently, biosimilar insulins. However, [the PBM Defendants] often exclude these insulins from their formularies in favor of products with higher list prices and larger rebates. For example, 2 of the 3 [PBM Defendants] have excluded the 2 insulin authorized generics from their formulary exclusion lists since 2020, instead favoring the higher list-priced equivalents. Remarkably, this was true even though the list prices for these authorized generic insulins can be half the list price of the brand. In addition to the exclusions of authorized generic insulins, lower

list-priced biosimilar insulins have also faced formulary exclusions. The first biosimilar insulin was launched in 2021. Due to prevailing market dynamics, 2 identical versions of the product were simultaneously introduced—one with a higher list price and large rebates and one with a lower list price and limited rebates—giving payers the option of which to cover. All 3 PBMs excluded the lower-list priced version in 2022, instead choosing to include the identical product with a higher list price.

285.    Far from using their prodigious bargaining power to lower drug prices and promote patient health as they represent, PBM Defendants use their dominant positions to drive up prices and foreclose patients' access to lower priced drugs in order generate enormous profits. Despite their representations and duties, the PBM Defendants are working directly against the best interests of the State and Vermont consumers and businesses.

### 2.    The PBM Defendants obfuscate and retain Manufacturer Payments as profits

286.    One of the reasons that the PBM Defendants are driving up prices and Manufacturer Payments is that they retain a significant amount of these Payments as profits, including certain Manufacturer Payments that they should pass on to their clients.

287.    Historically, PBM contracts with payors allowed the PBM to keep all or at least some of the Manufacturer Payments they received, rather than pass them along to the payor.

288.    Over time, payors have secured contract provisions guaranteeing them all or some portion of the "rebates" paid by the Manufacturers to the PBMs. But-critically -"rebates" are only a portion of the total secret Manufacturer Payments that PBMs and their affiliates receive.

289.   In this regard, PBMs and Drug manufacturers have created a "whack a mole" system where the consideration exchanged between them (and not shared with payors) is labeled and relabeled. As payors moved to contracts that required PBMs to pass through a majority of the "rebates," PBMs began renaming the Manufacturer Payments in order to keep a larger portion of this money. Payments once known as "rebates" are now called administrative fees, volume discounts, service fees, inflation fees or other industry terms designed to obfuscate and distract from the substantial sums being exchanged and secretly withheld.

290.   And these renamed secret Manufacturer Payments are indeed substantial. A heavily redacted complaint filed by Defendant Express Scripts revealed that *Express Scripts now retains up to 13 times more in "administrative fees" than it passes through to payors in formulary rebates*.[16] Moreover, it appears that PBMs may be reclassifying rebates as other fees in order to retain a higher percentage of these payments. From 2017 to 2019, PBMs' gross profits increased from $25B to $28B even as retained rebates decreased, as a result of increasing administrative and data fees (as shown in Figure 9 below)

---

[16] *Express Scripts, Inc., et al. v. Kaleo, Inc.*, Case No. 4:17-cv-01520-RLW (E.D. Mo 2017).

Figure 9: PBMs' Gross Profits, 2017-2019



291.    Notably, on June 7, 2022, the Federal Trade Commission ("FTC") voted 5-0 to issue a policy statement expressing its intent to investigate PBM Defendant practices, including related to Manufacturer Payments, to determine if these practices constitute unfair and deceptive practices ("PBM FTC Inquiry"). In its policy statement, the FTC cited the effect that Manufacturer Payments have in the context of the exorbitant drug prices and the devastating impact such practices have on the lives of patients.

292.    On July 9, 2024, the Federal Trade Commission released its interim staff report related to its investigation of the PBM Defendants titled, "Pharmacy Benefit Managers: The Powerful Middlemen Inflating Drug Costs and Squeezing Main Street Pharmacies" ("2024 FTC PBM Report"). In this report, the FTC found "evidence that PBMs and brand pharmaceutical manufacturers sometimes enter

agreements to exclude generic drugs and biosimilars from certain formularies in exchange for higher rebates from the manufacturer."

293. In addition, the PBM Defendants have come up with numerous ingenious methods to hide these renamed Manufacturer Payments in order keep them for themselves.

294. For example, with regard to the Manufacturer Payments now known as "inflation fees," the PBMs often create a hidden spread between how much they receive and the amount the PBMs pay back to their client payors.

295. In particular, drug manufacturers often pay the PBM Defendants "inflation fees" in order to increase the price of their drugs – if a drug manufacturer raises the list price of a drug by more than a set percentage (typically, 6% to 8%) during a specified time period, the manufacturer pays the PBM Defendants an additional "inflation fee." Notably, these inflation fees are based on a percentage of the increased list prices.

296. For many of their clients, the PBMs have separate "price protection guarantees" which provide that if the overall drug prices for that payor increase by more than a set amount, then the PBMs will revert a portion of that amount back to these clients.

297. This allows the PBMs to set these "price protection guarantees" at a higher rate than the thresholds that trigger the Manufacturers' "inflation fees," usually around 12%-15%.

298.    If drug manufacturers increase their list prices more than the 6% (or 8%) inflation fee rate but less than the 10%-15% client price protection guarantee rate, then the PBMs can keep 100% of these "inflation fee" payments.  This is yet another example of how the PBM Defendants can profit from list price increases.

299.    Another method the PBMs have devised to hide the renamed Manufacturer Payments is the use of rebate aggregators.  Rebate aggregators (sometimes referred to as rebate group purchasing organizations or GPOs) are entities that negotiate for, and collect payments from, drug manufacturers on behalf of a large group of pharmacy benefit managers (including the PBM Defendants) and other entities that purchase pharmaceutical drugs.

300.    These rebate aggregators are often owned and controlled by the PBM Defendants, such as Defendants Ascent Health (Express Scripts) and Zinc Health (CVS Caremark).

301.    The PBM Defendants carefully guard the revenue streams from their rebate aggregator activities, hiding them in complex contractual relationships with Ascent Health and Zinc Health, and not reporting them separately in their SEC filings.

302.    Express Scripts' Ascent Health is located offshore in Switzerland, making oversight even more difficult.

303.    Defendants Ascent Health and Zinc Health generate additional and new Manufacturer Payments from new administrative fees, prescription data services, data portals, enterprise fees, and other sources—all based on a percentage

of drug list prices. These are revenues earned in addition to the PBM Defendants'

typical administrative service fees. The PBM Defendants use Zinc Health and Ascent

Health to retain these new Manufacturer Payment fees. These new rebate

aggregator fees have become a substantial source of profits for the PBMs and their

affiliates (Ascent Health and Zinc Health),and are yet another driver of higher drug

prices.

304.    The NYT PBM Investigation found that "in 2022, PBMs and their

[rebate aggregator affiliates] pocketed $7.6 billion in fees, double what they were

bringing in four years earlier."

### Figure 10: Manufacturer Payment Increases



**Fees Paid by Drug Manufacturers Doubled**
What drug manufacturers paid in fees to P.B.M.s or their associated G.P.O.s.

| | |
|---|---|
| 2018 | $3.8 billion |
| 2019 | $4.8 |
| 2020 | $5.5 |
| 2021 | $6.7 |
| **2022** | **$7.6** |

305.    The January 2021 Senate Report contained the following observation

on these rebate aggregators:

> [I]t is noteworthy that industry observers have suggested that the recent
> partnership between Express Scripts and Prime Therapeutics may serve
> as a vehicle to avoid increasing legislative and regulatory scrutiny
> related to administrative fees by channeling such fees through a Swiss-
> based group purchasing organization (GPO), Ascent Health. While there
> are several regulatory and legislative efforts underway to prohibit

manufacturers from paying administrative fees to PBMs, there is no such effort to change the GPO safe harbor rules. New arrangements used by PBMs to collect fees should be an area of continued investigative interest for Congress.

306. In May 2023, the FTC broadened the PBM FTC Inquiry to include the PBM Defendants' affiliated rebate aggregators.

307. On April 19, 2024, the Inspector General of the US Office of Personnel Management (OPM) published its final audit report of Express Scripts management of the pharmacy benefit of the America Postal Workers Union Health Plan (the "Carrier") from 2016 to 2021. The audit found that Express Scripts overcharged the Carrier nearly $44.9 million by not passing through all Manufacturer Payments required under the contract, which included Ascent Health withholding approximately $15.8 million in Manufacturer Payments that should have been passed through to the Carrier.

308. In July 2024, CVS Caremark agreed to pay the State of Illinois $45 million for Manufacturer Payments collected by Zinc Health that should have been passed through to the State of Illinois's health plan.

309. Because the PBM Defendants are able to hide (and retain) a majority of the secret Manufacturer Payments they receive (including by using their affiliated rebate aggregator entities, Ascent Health and Zinc Health), they are able to make significant profits on increasing list prices.

310. Even in the cases where sophisticated payor clients have contracted to receive all Manufacturer Payments tied to their utilization, the PBM Defendants nonetheless use the above-described obfuscation tactics to retain (either directly or

through Ascent Health and Zinc Health) portions of these Manufacturer Payments that they should have passed on to their clients.

311.    As explained in the NYT PBM Investigation

A former executive of a major drug company, whose responsibilities included negotiating with [PBM Defendants' rebate aggregators], said that he had a set pool of money to cover fees to [PBM Defendants' rebate aggregators]and rebates to employers. When he paid more in fees, he offered less in rebates. Employers are none the wiser. They receive rebates. But they can't see the billions of dollars in fees that the [PBM Defendants' rebate aggregators] take for themselves.

> **3.    PBM Defendants drive up prices for patients and payors through their captive specialty and mail order pharmacies**

312.    A third way the PBM Defendants drive up drug prices and harm Vermont patients and payors is through their relationships with their affiliated pharmacies (including Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy) and, in particular, the manner in which they classify and price drugs sold through these pharmacies.

313.    As explained above, the PBM Defendants are vertically integrated corporate families that include both PBM entities and mail order/specialty pharmacies (among other entities).  Express Scripts (PBM) is affiliated with Accredo (specialty pharmacy) and Express Scripts Pharmacy; CVS Caremark (PBM) is affiliated with CVS Specialty Pharmacy (specialty pharmacy), CVS Pharmacy and CVS Caremark mail order pharmacies.

**Figure 11: PBM Defendant Vertical Integration**



| Parent/Owner | CVS Health Corporation | The Cigna Group |
|---|---|---|
| Drug Private Labeler | Cordavis Limited | Quallent Pharmaceuticals |
| Health Care Provider | MinuteClinic, Signify Health | Evernorth Care Group |
| Pharmacy Benefit Manager | ♥CVS caremark 34% | EXPRESS SCRIPTS 23% |
| "PBM GPO"/Rebate Aggregator | Zinc Health Services | Ascent Health Services |
| Pharmacy - Retail | CVS Pharmacy | |
| Pharmacy - Mail Order | CVS Caremark Mail Service Pharmacy | Express Scripts Pharmacy |
| Pharmacy - Specialty | CVS Specialty Pharmacy | Accredo |
| Health Insurer | Aetna | Cigna Healthcare |

314. By owning their own pharmacies, the PBM Defendants are able to steer their clients' prescription-drug plans to those pharmacies, including by requiring their covered lives to utilize their specialty and mail order pharmacies, including Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy. As stated in the NYT PBM Investigation, the PBM Defendants "push,

and sometimes force, patients to use their pharmacies, whether mail-order or, in CVS's case, the physical drugstores."

315.    In the 2024 FTC PBM Report, the FTC stated, "PBMs may use any number of optimization levers to steer patients to affiliated specialty pharmacies, as internal documents and public comments confirm." The report continued on as follows:

> PBMs may also have a particularly strong incentive to capture specialty prescriptions at their affiliated pharmacies, given their high prices and margins. As an internal PBM board presentation stated, "[s]teering to captive specialty pharmacies" is a "major" driver of value for PBMs . . . Consistent with [this] evidence, an FTC staff analysis of data produced in response to the 6(b) Orders suggests that PBMs may be steering a high proportion of specialty prescriptions filled by commercial health plan members to their affiliated pharmacies . . . Members of commercial health plans managed by two of the Big 3 PBMs filled a significantly larger proportion of their specialty prescriptions at PBM-affiliated pharmacies (67 to 70 percent of dispensing revenue) . . . as compared with the pharmacies overall shares of dispensing revenue (ranging from nine to 28 percent per pharmacy). The high rates of dispensing at PBM-affiliated pharmacies compared with the pharmacies' overall shares suggests that the PBMs may be steering many of the specialty prescriptions filled by members of the health plans they manage.

316.    The 2024 House Committee PBM Report found:

> The three largest PBMs [including the PBM Defendants here] each own retail, mail-order, and specialty pharmacies that are "preferred" in-network under the pharmacy benefit. PBMs steer patients to pharmacies they own by various means, including: (1) preventing patients from receiving 90-day prescriptions at competing pharmacies; (2) abusing data received by the PBM to target patients with highly profitable medications; (3) only covering specialty medications if they are dispensed from a particular pharmacy; and (4) charging patients higher copays at competing pharmacies to incentivize patients to use the PBM owned pharmacy. [Such practices] harms patients and independent community pharmacies, increasing drug prices for patients, employers, and government payers.

317.    On July 23, 2024, executives from the PBM Defendants testified once again before Congress.  At this hearing, executives from both PBM Defendants testified that Express Scripts and CVS Caremark do not steer patients to their own captive pharmacies. These statements are false.  Indeed, on August 28, 2024, James Comer, Chairman of the US Committee on Oversight and Accountability, sent letters to Adam Kautzner, President of Express Scripts and David Joyner, President of CVS Caremark asking the executives to correct the record and informing these executives that:

> [their PBM steering] statements contradict[] both the [House Committee on Oversight and Accountability] and Federal Trade Commission's (FTC) findings Express Scripts [and] CVS Caremark steer patients to PBM-owned pharmacies. The Committee found evidence detailed in its recent report, that Express Scripts engages in targeted outreach to patients, using data the PBM received from competing pharmacies, encouraging patients to move their prescriptions to Express Scripts' mail-order pharmacy.  Additionally, the Committee received evidence from patients who have been forced to receive their medications from pharmacies affiliated with CVS Caremark instead of the pharmacy of their choosing.

318.    The Committee's letters to both CVS Caremark and Express Scripts included reminders that the executives could be fined and/or imprisoned if they knowingly made false statements to Congress.

319.    In addition, an owner of a family pharmacy in Vermont shared the following stories about the PBM Defendants steering patients to their own pharmacies in 2022:

> I have a family with 4 children and 1 of them is a special needs child. They have been coming to my pharmacy for years. The dad got a new job and his insurance changed to MVP [insurer using CVS Caremark as a PBM when] they were told that they could no longer come to my Pharmacy. They have to drive 20 minutes to go to South Burlington to

get their prescriptions filled at the CVS on Dorset Street. The mother has pleaded with them to let her fill their prescriptions at my pharmacy, but they will not. She needs to take 1 hour out of her day to go get her prescriptions for her daughter when she could do this in 10 minutes. This time is very valuable to the mother but not to the PBM [Defendant CVS Caremark].

A diabetic elderly patient that lives 2 doors down from my pharmacy is forced to go mail order for his prescriptions. We can easily bring him anything he needs but his insurance has forced him to mail order. He told them there is no reason for him to change. He can get everything he needs and we deliver it to him whenever he wants. He asked to stay with us, but they would not allow that.

320.  Steering patients to their own pharmacies provides the PBM Defendants with the opportunity to "agree" to excessively high reimbursement rates with the pharmacies they own such as Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy (*i.e.*, reimbursement rates that greatly exceed the pharmacy's actual cost to acquire the drugs)—rates that the PBM Defendant would never agree to pay in a truly market-based transaction.

321.  As a result, the PBM Defendants charge patients and payors far more than the drugs actually cost the pharmacy to acquire, and then the PBM Defendant or its affiliated pharmacy (including Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy) pockets the difference (or "spread"). As explained in the NYT PBM Investigation:

One surefire way for the PBM or its in-house pharmacy to profit is to charge thousands of dollars more than what a drug costs.  The [New York] Times identified repeated instances of PBMs doing just that. The steepest markups often involve generic versions of expensive medications like cancer.

322.    The NYT PBM Investigation provided the following example of the

PBM Defendants charging much more than wholesale cost for a generic cancer drug:

**Figure 12: Abiraterone Acetate PBM Defendant Prices**



323.    In addition, a June 2024 study by Three Axis Advisors found that the

PBM Defendants are charging their clients a significantly higher markups on both

brand and generic drugs through their captive mail order pharmacies than the mark-

ups consumers and payors are being charged at independent pharmacies (see Figure

13).

**Figure 13: Average Markups for Medicines Dispensed through Mail Order versus other channels**



324.    The PBM Defendants' vertical integration with pharmacies—combined with the fact that the PBMs have sole discretion to determined how a drug is categorized (brand, generic, specialty)—can be particularly harmful to Vermont payors and patients in the specialty drug market.

325.    Specialty drugs have become one of the biggest drivers of prescription-drug spending. As originally envisioned, the "specialty" designation was for drugs that were used to treat complex, chronic conditions, and/or required special handling and administration, or oversight from a health care provider monitoring for side effects and ensuring that the treatment is effective.

326.    Specialty drugs account for more than half of all pharmacy spending, with total non-discounted spending in 2022 at approximately $324 billion (compared to $311 billion for non-specialty).

327.    The PBM Defendants recognize the significant recent rise in the costs associated with specialty drugs. Express Scripts recognizes that, "Even though less than 2% of the population uses specialty drugs, those prescriptions account for a staggering 51% of total pharmacy spending." CVS Caremark has stated that specialty drug spending now accounts for 54% of overall drug spending.

328.    The cost of specialty drugs has become a significant expense for Vermont payors and patients.

329.    Specialty drugs now account for a large and growing proportion of pharmacy dispensing revenue as well (estimates range from nearly 40 percent to over 50 percent), but only a small fraction of total prescription volume (roughly two percent). The named specialty pharmacy Defendants, CVS Specialty Pharmacy and Accredo Health, capture over 50% of the revenue generated by specialty pharmacies.

**Figure 14: Specialty Dispensing Revenue Shares (Retail and Mail Order)**



81

330.   Importantly, there is no universal standard regarding what constitutes a "specialty" drug and the designation has become largely arbitrary. Indeed, the three largest PBMs in the country, including the PBM Defendants, disagree about whether a particular drug is "specialty" or not roughly half the time:

**Figure 15: PBMs' Specialty Drug Lists**



331.   Whether a drug is classified as a brand drug, a generic drug, or a "specialty" drug can have a major impact on the price that patients and payors pay for that drug and, in turn, the amount of profit the PBM Defendants make. And the PBM Defendants often have sole discretion to make the determination for their client payors and their members.

332.   As PBM expert Linda Cahn described in a 2010 article titled "When Is a Brand a Generic? In a Contract With a PBM":

PBMs' freedom under nearly all existing contracts to misclassify drugs – and to classify drugs differently for different purposes – potentially affects virtually every aspect of drug coverage, making contract terms, and the reporting about the satisfaction of contract terms, of little, if any, value to clients.

333.    As their names imply, specialty drugs are supposed to be unique; whereas generic drugs are not. Despite this (and counterintuitively) both PBM Defendants include hundreds of generic drugs on their "specialty" drug lists.

334.    For example, in 2023, Express Scripts included 302 generic drugs on its specialty drug list, whereas CVS Caremark included 241 generic drugs on its specialty list. Misclassifying generic drugs as "specialty" drugs can be hugely profitable for the PBM Defendants.

335.    As discussed above, the PBM Defendants set the prices that their client payors pay for specialty drugs at a higher rate than the prices the payors pay for non-specialty drugs, such as generic drugs.

336.    And the PBM Defendants can—and often do—require that their clients and members (patients) use the PBMs' own pharmacies, such as Accredo Health and CVS Specialty Pharmacy, to purchase specialty drugs.

337.    The PBM Defendants further use the manner in which they classify a drug to steer patients to their own pharmacies. The 2024 FTC PBM Report included the following:

> One potential mechanism that PBMs may use to steer prescriptions to their affiliated pharmacies is to classify drugs as specialty . . . Once a drug is added to a PBM's specialty drug lists, this may trigger exclusivity provisions in contracts with certain payors that require use of the PBM's affiliated specialty pharmacy . . . Public commenters have indicated, for example, that '[m]any PBMs will re-classify a medication as a specialty

drug primarily based on a very high cost' and then 'force their plan members to fill specialty medications only at pharmacies directly owned by the PBMs."

338.    When a PBMs' clients and covered lives (patients) are required to obtain "specialty" drugs from the PBM's own "specialty" pharmacy, such as Accredo Health and CVS Specialty Pharmacy, it provides powerful incentives for the PBM Defendants to both keep prices high and to designate generic drugs as "specialty."

339.    On September 11, 2023, the *Wall Street Journal* published an investigation on this is issue titled, "Generic Drugs Should Be Cheap, but Insurers Are Charging Thousands of Dollars for Them" ("WSJ Generic Drug Report"). In this report, Shannon Ambrose, co-founder and Chief Operating Officer at Archimedes (a company that competes with PBMs to manage specialty drug spending), explained, "The incentive is there for the PBMs and [their] specialty pharmacies to keep prices as high as possible."

340.    This model also incentivizes the PBM Defendants to give preferential formulary treatment to generic "specialty" drugs with higher list prices so as to maximize spread. If two similar generic "specialty" drugs cost roughly the same for the PBM Defendant's pharmacy (including CVS Specialty Pharmacy and Accredo Health) to acquire, the PBM will be incentivized to favor the one with a higher list price, as that will maximize the spread between the list price-based price it receives from its payor clients and the price that CVS Specialty Pharmacy and/or Accredo Health pays to acquire the drug (which is much lower). If the PBM includes only the drugs with the higher list price on its formulary, patients and the PBM Defendants'

payor clients will be forced to pay more without any corresponding benefit other than profit for the PBM.

341.    By misclassifying generic drugs as specialty drugs (and then choosing the "generic" specialty drug with the highest price for formulary inclusion), the PBM Defendants are able to charge payors and patients in Vermont excessive prices for what should be affordable drugs.

342.    For example, the cancer drug Gleevec went generic in 2016 and can be bought today for as little as $55. However, according to the WSJ Generic Drug Report, CVS Caremark and Express Scripts are charging their clients $6,600 a month or more for Gleevec through their affiliated specialty pharmacies, despite the same drug being available in generic form for $55.

343.    The 2024 FTC PBM Report also focused on Gleevec in examining data submitted by the PBM Defendants. The FTC Report found that the PBMs were reimbursing their own affiliated pharmacies for Gleevec at significantly higher rates than they were unaffiliated pharmacies and at rates that were hundreds of times the average cost for pharmacies to acquire the drug (NADAC)[17].

---

[17] NADAC is the National Average Drug Acquisition Cost ("NADAC") price and is a price set by the Centers for Medicare and Medicaid Services (CMS) that is calculated based on CMS's survey of the retail pharmacies acquisition cost.

**Figure 16: Gross Pharmacy Reimbursement Rates for a One-Month Supply of Generic Gleevec Paid to PBM-Affiliated and Unaffiliated Pharmacies by Commercial and Medicare Part D Plans and Members, and NADAC**



344.     The WSJ Generic Drug Report also found that "[a]cross a selection of these so-called specialty generic drugs, [Express Scripts] and CVS's prices were at least 24 times higher on average than roughly what the medicines' manufacturers charge."

345.     The WSJ Generic Drug Report also focused on another cancer drug, the generic version of Tarcera, which costs only $73 a month at Cost Plus. However, Express Scripts is charging $4,409 to patients who are compelled to use Express Scripts' vertically integrated specialty pharmacy.

346.     Another example of the PBM Defendants categorizing a generic drug as a specialty drug and then significantly overcharging their client payors and patients for the drug is the multiple sclerosis medication teriflunomide (generic Aubagio). Teriflunomide products have relatively similar drug prices (as measured by list price); however, the cost of this medication can vary significantly depending upon

whether it is dispensed by a cost-plus mail pharmacy or a PBM-affiliated specialty mail-order pharmacy. In a report released on June 25, 2024 by 46Brooklyn, a non-profit who advocates to improve accessibility and usability of US drug pricing data, found that plan sponsors are being charged an average of $4,465 per teriflunomide prescription at PBM-affiliated mail-order pharmacies despite the same drug being available at Cost Plus for less than $20.

347.    A recent complaint filed in the District of New Jersey undertook a similar analysis and found that a major health plan with employees across the country was being charged by Express Scripts and its affiliated specialty pharmacy over $10,000 for a 90pill prescription of generic Aubagio despite that same prescription being available for $40 at Wegmans, $41 at ShopRite, $76 at Walmart, and $77 at Rite Aid.    The complaint stated that the "roughly $10,000 (per prescription) difference between what pharmacies pay to acquire [generic Aubagio] and what [Express Scripts' covered lives] pay for the exact same drug goes largely into the pockets of the PBM."[18]

348.    The NYT PBM Investigation identified additional examples of the PBM Defendants overcharging for generic drugs by misclassifying them as specialty drugs. The NYT PBM Investigation found "several instances of [CVS Caremark] overcharging [its client] thousands of dollars more for generic multiple sclerosis

---

[18] *Ann Lewandowski, et al. v Johnson and Johnson and the Pension & Benefits Committee of Johnson and Johnson*, Civ. No. 3:24-cv-000671-ZNQ-RLS (DNJ 2024) (Dkt. No. 44).

drugs than what those same drugs would cost at online pharmacies like the one created by the billionaire Mark Cuban."

349.  The NYT Investigation also discussed a patient that was taking a generic version of a cancer medication, everolimus, and CVS Caremark was charging its client $138,000 a year for a drug that cost the CVS pharmacy only $14,000 a year to purchase. As stated by the NYT: "the $124,000 difference reflected the approximate yearly profit that CVS was collecting just on [one patient's] prescription . . . 'We were getting ripped off,' [the patient] said."

350.  The PBM Defendants are using their market power and their vertical integration with their captive pharmacies, including Accredo Health and CVS Specialty Pharmacy, to significantly overcharge Vermont patients and payors and to foreclose access to lower cost options.

### 4.  PBM Defendants increase their profits by harming pharmacies in their networks

351.  Another way the PBM Defendants are harming patients and payors and profiting off higher drug prices is through pharmacies with whom they contract, including those in Vermont.

352.  The PBM Defendants decide which pharmacies are included in the PBM's network and how much they will reimburse these pharmacies for each drug dispensed.

353.  The PBM Defendants do not disclose to their clients or network pharmacies how much the PBM is receiving from or paying to the other.

354. This lack of transparency allows the PBM Defendants to engage in practices that harm both the PBMs' payor clients and patients and pharmacies.

355. For the pharmacies in their network, the PBM Defendants are under-reimbursing them by coercing them into contracts with exceedingly low—at times below cost—reimbursement rates.

356. The PBM Defendant reimbursement calculations are opaque and unpredictable in ways that allow the PBM Defendants to profit at the expense of independent pharmacies. The 2024 FTC PBM Report discussed this opacity:

> Most pharmacies, especially independents and small chain pharmacies, lack the resources to understand the financial arrangements that determine their reimbursement [from PBMs] and revenue streams, which can make it difficult to stay in business. For example, a 2016 survey of 600 community pharmacies found that two thirds reported having no detail on how and when direct and indirect remuneration was assessed. Rather, the claims adjudication engine and resulting calculations are essentially a black box.

357. The rate that the PBM pays the pharmacies is set forth in the contract between the PBM and pharmacy. The vast majority of PBM-pharmacy contracts provide that the PBM will pay the pharmacy a "lesser of" a number of different potential prices (including AWP and WAC). Notably, however, in the majority of instances (particularly for generic drugs), the PBM will reimburse the pharmacy at the PBM-generated price known as the Maximum Allowable Cost ("MAC").

358. Both PBM Defendants develop and maintain their own set of MAC price lists for generic drugs. The PBM Defendants' "MAC lists" are proprietary and confidential and are created, maintained, and continuously updated by the PBM

Defendants, sometimes on a weekly basis. MAC lists are not shared with the pharmacies.

359. Through manipulation of their MAC prices, the PBM Defendants often reimburse pharmacies at very low, below cost rates. On the other side of the transaction (as discussed above), the PBM Defendant will charge their clients a much higher rate (often set based on AWP prices) and pocket the "spread" between these two amounts as profit.

360. PBMs also use high list prices to generate additional profits from pharmacies by charging the pharmacies post-purchase fees and clawbacks based on the manufacturer's list prices—and again, the higher the list price for each medication sold, the more the PBMs generate in these pharmacy fees.

**C.    PBM Defendants' Conduct Harms Vermont Patients and Payors.**

361. The PBM Defendants' misconduct described above has harmed the State, Vermont patients, and Vermont payors.

362. As stated above, the price that both Vermont payors and patients (including both insured and uninsured patients) pay for prescription drugs is tied to the list price. Despite their representations, the PBM Defendants are driving up the list prices for prescription drugs.

363. Thus, given their market dominance, nearly all Vermont patients and payors have been harmed by having to pay increased prices as a result of the PBM Defendants' formulary construction, Manufacturer Payment negotiations, and mail order/specialty pharmacy practices described above.

364.    In addition to the price increases, the PBM Defendants' misconduct has also harmed Vermont patients and payors by foreclosing access to lower priced drugs.

365.    As a result of the substantial increase in costs and formulary exclusions, some Vermont patients have been foreclosed from access to the drugs that they need to stay healthy or, in some cases, to even stay alive.  Patients who can no longer afford their medications are often forced to ration, skip doses, and/or otherwise not adhere to the treatment plans prescribed by their doctors.

366.    The lack of access of affordable medications and forced lack of adherence leads to substantial harm to the patients' health and well-being, as well as additional healthcare costs.

367.    Lack of adherence can also lead to increases in overall healthcare costs. One national model projected that improved adherence to diabetes medication would avert 699,000 emergency department visits and 341,000 hospitalizations annually, for a savings of $4.7 billion. The model further found that eliminating the loss of adherence would lead to another $3.6 billion in savings, for a combined potential savings of $8.3 billion.

368.    Lack of adherence to medications also has a significant adverse effect on labor productivity in terms of absenteeism (missing work due to health-related reasons), presenteeism (being present at work but not productive), and disability (inability to perform necessary physical tasks at work).

369.    A recent article by the Kaiser Family Foundation explained how the inflated prices for GLP-1 drugs caused by PBM Defendants' misconduct is harming patients:

> [O]ver half of adults who had taken a GLP-1 drug, including those with insurance, said the cost was "difficult" to afford. But it is patients with the lowest disposable incomes who are being hit the hardest. These are people with few resources who struggle to see doctors and buy healthy foods. In the United States, Novo Nordisk charges about $1,000 for a month's supply of Ozempic, and Eli Lilly charges a similar amount for Mounjaro. The high prices also mean that not everyone who needs the drugs can get them. "They're kind of disadvantaged in multiple ways already and this is just one more way," said Wedad Rahman, an endocrinologist with Piedmont Healthcare in Conyers, Georgia . . . By the time many of Rahman's patients see her, their diabetes has gone unmanaged for years [because they cannot afford their medicines] and they're suffering from severe complications like foot wounds or blindness. "And that's the end of the road," Rahman said. "I have to pick something else that's more affordable and isn't as good for them."

370.    Even when Vermont patients can still afford their medications, as a direct result of PBM Defendants shifting which medications are favored on their formularies ("non-medical switching"), patients are forced to periodically switch medications, undergo step therapy protocols, or go through a lengthy appeal process (or try the favored drug first) before receiving the patient's preferred medication.

371.    Non-medical switching, and in particular, for biologic or specialty drugs, causes increased health problems and increased healthcare costs for patients, payors, and the healthcare system.

372.    Non-medical switching and lack of adherence also results in avoidable complications and higher overall healthcare costs. For example, an American Diabetes Association working group recently noted that people with high cost-sharing are less

adherent to recommended dosing, which results in short- and long-term harm to their health.

373.    Historically, PBM exclusions have focused on medicines with generic equivalents or classes where multiple products have been shown to achieve similar clinical outcomes. Now, PBMs often exclude medicines for conditions such as oncology, HIV, and autoimmune disorders, for which variation in patient response to treatment has been well-documented.

374.    This means that certain Vermont patients have been forced to switch from their current medication to their PBM Defendant's preferred alternative. Further, because medications to treat chronic diseases are among the most frequently targeted by formulary exclusions, vulnerable patients with chronic illnesses are disproportionately affected.

375.    For these patients, who often have treatment regimens involving multiple medications that need to work together, having access to their choice of medications can be critical. Frequent changes can be particularly problematic, as changes in one medication can trigger the need for other changes and disrupt treatment.

376.    The PBM Defendants' misconduct and the harm it causes are ongoing.

## VI.    CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### VIOLATION OF THE VERMONT CONSUMER PROTECTION ACT
### DECEPTIVE ACTS AND PRACTICES

377.    The State realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

378.    PBM Defendants engaged in deceptive acts or practices in commerce in violation of the VCPA, 9 V.S.A. § 2453(a), by making material misrepresentations and omissions as follows:

a. Misrepresenting that their formulary construction lowers the cost of prescription drugs and promotes patient health;

b. Misrepresenting that the Manufacturer Payments they receive lower the cost of prescription drugs;

c. Misrepresenting that their formulary decisions as evidence and/or value based decisions;

d. Misrepresenting that the manner in which they classify drugs is evidence and/or value based and is in the best interests of their clients and patients;

e. Misrepresenting that their relationships with their mail order and specialty pharmacies, including Accredo Health, Express Scripts Pharmacy, CVS Pharmacy, and CVS Specialty Pharmacy, lowers the cost of prescription drugs and promotes patient health;

f. Misrepresenting and concealing the reasons behind the price increases for prescription drugs;

g. Misrepresenting that their formulary preferences and exclusions are lowering prices and promoting patient health;

h. Misrepresenting the amount of "savings" that they generate for their clients, patients, and the healthcare system;

i.   Failing to disclose that the cost share payments insured consumers pay for brand-name prescription drugs are tied to inflated list prices rather than the actual prices paid by entities in the pharmaceutical system;

j.   Failing to disclose and concealing that they are excluding lower priced drugs from their formularies to drive up their profits;

k.   Failing to disclose that they are utilizing rebate aggregators, including Defendants Ascent Health and Zinc Health, to rename, obfuscate, and retain Manufacturer Payments;

l.   Failing to disclose and concealing that they financially benefit from preferring and/or excluding certain prescription drugs on their formularies; and

m.  Failing to disclose and concealing that formulary preferences and exclusions are not based on the best interests of their clients and/or patients.

379.   These material misrepresentations and omissions were likely to deceive a reasonable consumer. The meaning Plaintiff ascribes to Defendants' misrepresentations is reasonable, given the nature thereof.

## SECOND CAUSE OF ACTION
## VIOLATION OF THE VERMONT CONSUMER PROTECTION ACT UNFAIR ACTS AND PRACTICES

380.   The State realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

381.   PBM Defendants have committed unfair acts or practices in commerce, in violation of the VCPA, 9 V.S.A. § 2453(a).

382.   PBM Defendants' conduct and practices described above are unfair under the VCPA because they are likely to cause substantial injury to consumers which are not reasonably avoidable by consumers and not outweighed by countervailing benefits. In particular:

a.  PBM Defendants used their dominant market position to drive up prices—while simultaneously excluding patient and payor access to lower priced (and often times life-saving) drugs in order to maximize their profits; and

b.  Vermont patients and payors had no choice other than to pay the inflated prices caused by Defendants' conduct because: (1) the PBM Defendants have near complete control of the pharmaceutical pricing chain in Vermont and often mandated use of their captive pharmacies and (2) in many cases Vermont patients needed the drugs at-issue to sustain a healthy life.

383.   In addition, PBM Defendants' misconduct offends public policy and is unethical, oppressive, and unscrupulous.  In particular:

a.  It is a public policy of the State of Vermont that "health care is a public good for all Vermonters and to ensure that all residents have access to quality health services at costs that are affordable." *See* 18 V.S.A. § 9401(a):

b.  It is a Vermont public policy that PBMs discharge their contractual duties with "reasonable care and diligence" and disclose the following: (1) potential conflicts of interest; (2) benefits directly or indirectly accruing to the PBM as a result of dispensing a substitute prescription drug for a prescription drug for a prescribed drug to a Vermont patient; (3) benefits from volume of sales of any particular drug or classes or brands of drugs; and (4) rebates or other financial arrangements the PBM negotiated with drug manufacturers. *See* 18 V.S.A. § 9472.:

c.  It is a public policy in Vermont that the PBM Defendants extend a fiduciary duty to their payors and patients to be "fair and truthful toward the health insurer, to act in the health insurer's best interests, and to perform its duties with care, skill, prudence, and diligence" and to pass on any payments or benefits received based on volume of sales of prescription drugs to their health insurer clients. *See* 18 V.S.A. § 9472 *et seq*:

d.  It is a public policy in Vermont that the PBM Defendants disclose to their clients all financial terms and arrangements for remuneration of any kind that apply between the PBM Defendant (including any of their affiliated rebate aggregators and/or mail-order/specialty pharmacies) and any prescription drug manufacturer that relate to benefits provided to beneficiaries under or services to their clients, including formulary management and drug-switch programs, educational support, claims processing, and pharmacy network fees charged from retail pharmacies and data sales fees. *See* 18 V.S.A. § 9472 *et seq*: and

96

e.   The PBM Defendants violated these public policies by:

- constructing formularies and negotiating Manufacturer Payments in a manner that drove up prices and shut off access to lower priced treatments and quality health care at costs that are affordable,

- obfuscating and retaining (either directly or through their rebate aggregators) the benefits that they received from volume of sales of particular drugs (*i.e.* Manufacturer Payments) rather than disclose these payments and pass them on to Vermont payers and patients, and

- foreclosing access to affordable prescription drugs by intentionally categorizing drugs (brand, generic, specialty) in a manner that significantly drove up the prices at their captive pharmacies and then mandating that payors and patients utilize these pharmacies.

384.   The PBM Defendants' unfair conduct caused harm to Vermont consumers.

## THIRD CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

385.   The State realleges and incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint as if fully set forth herein.

386.   Under Vermont law, the PBM Defendants have a fiduciary duty to be "fair and truthful toward the health insurer, to act in the health insurer's best interests, and to perform its duties with care, skill, prudence, and diligence" and to pass on any payments or benefits received based on volume of sales of prescription drugs to their health insurer clients. *See* 18 V.S.A. § 9472 *et seq.*

387.   PBM Defendants breached that duty by failing to act in their clients' and patients' best interests by driving up the prescription drug prices, restricting access to lower priced medications, obfuscating and retaining payments and benefits based

on volume of sale of prescription drugs, and driving up pricing spreads to increase PBM Defendants' profits.

388.    PBM Defendants breach of this duty caused harm to Vermont patients and payors by increasing the prices they paid for prescription drugs and by foreclosing access to lower priced alternative.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff State of Vermont respectfully request the Court enter judgment in its favor and the following relief:

1.    A judgment determining that PBM Defendants have violated the Vermont Consumer Protection Act;

2.    A judgment determining that PBM Defendants have breached their fiduciary duty;

3.    A permanent injunction prohibiting PBM Defendants from engaging in the unfair and deceptive acts and practices identified herein;

4.    A judgment requiring PBM Defendant to disgorge all profits obtained as result of their violation of the Vermont Consumer Protection Act;

5.    A judgment requiring PBM Defendant to disgorge all profits obtained as result of their breach of fiduciary duty;

6.    A judgment requiring PBM Defendants to pay damages in an amount to be proven at trial that were incurred as a result of their breach of fiduciary duty;

7.    Civil penalties of $10,000 for each violation of the Vermont Consumer Protection Act;

8.    A judgment requiring Defendants to pay restitution to Vermont payors and patients affected by Defendants' violations of the Vermont Consumer Protection Act;

9.    The award of investigative and litigation costs and fees to the State of Vermont; and

10.    Such other and further relief as the Court may deem just and appropriate.


Dated at Montpelier, Vermont this _13 day of September, 2024.


Respectfully submitted,

**CHARITY R. CLARK**
Attorney General

*Jill S. Abrams*
Jill S. Abrams
Merideth C. Chaudoir
Assistant Attorneys General
Office of the Attorney General
Consumer Protection Unit
109 State Street
Montpelier, Vermont 05609
Phone: (802) 828-1106
Jill.abrams@vermont.gov
Merideth.Chaudoir@vermont.gov


Of Counsel:

W. Lawrence Deas, Esquire (*pro hac vice* forthcoming)
William Liston III, Esquire (*pro hac vice* forthcoming)
LISTON DEAS PLLC
Post Office Box 14127
Jackson, Mississippi 39236
Tel. (601) 981-1636
lawrence@listondeas.com
william@listondeas.com

Joanne Cicala, Esquire (*pro hac vice* submitted)
Josh Wackerly, Esquire (*pro hac vice* submitted)
R. Johan Conrod, Esquire (*pro hac vice* submitted)
THE CICALA LAW FIRM PLLC
101 College Street
Dripping Springs, Texas 78620
Tel. (512) 275-6550
joanne@cicalapllc.com

josh@cicalapllc.com
johan@cicalapllc.com

Matthew C. McDonald, Esquire (*pro hac vice* forthcoming)
DAVID NUTT & ASSOCIATES PC
605 Crescent Blvd., Suite 200
Ridgeland, Mississippi 39157
Tel. (601) 898-7302
Mattm@davidnutt.com

Tanya D. Ellis (*pro hac vice* forthcoming)
Trey Watkins (*pro hac vice* forthcoming)
FORMAN WATKINS & KRUTZ LLP
210 East Capitol Street, Suite 2200
Jackson, Mississippi 39201-2375
Tel. (601) 960-8600
Fax. (601) 960-8613
tanya.ellis@formanwatkins.com
trey@formanwatkins.com

*Attorneys for Plaintiff, State of Vermont*