## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF VERMONT

THE STATE OF VERMONT,

        *Plaintiff*,

    v.

EVERNORTH HEALTH, INC., et al.,

        *Defendants*.

Civil Action No. 2:24-cv-1103
Hon. Mary Kay Lanthier

## MEMORANDUM IN SUPPORT OF DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS FOR FAILURE TO STATE A CLAIM

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................1

RELEVANT ALLEGATIONS.................................................................................3

LEGAL STANDARD................................................................................................6

ARGUMENT ............................................................................................................6

I.    The Complaint Fails to State a Claim Under the VCPA (Counts I and II)........................7

    A.    The Complaint Fails to Allege Acts or Practices "In Commerce." ......................7

        1.    PBMs, Including Defendants, Do Not Provide Goods or Services Purchased or Sold for General Consumption. ..............................8

        2.    PBMs, Including Defendants, Do Not Operate in a Consumer Market. ..............................10

    B.    Plaintiff's VCPA Claims Fail to Allege Deceptive or Unfair Acts or Practices. ..............................11

        1.    The Complaint Fails to Allege Deceptive Acts or Practices (Count I). ..............................12

            a.    Plaintiff Fails to Allege Material Misstatements or Omissions...............................12

            b.    The Complaint Fails to Allege Deceptive Statements. .................15

            c.    The Complaint's Allegations About Protected Petitioning Activity Are Barred. ..............................18

        2.    The Complaint Fails to State a Claim for Unfair Acts and Practices (Count II). ..............................18

            a.    The Complaint Fails to Allege a Violation of Public Policy. ..............................19

            b.    The Complaint Fails to Allege Immoral, Unethical, Oppressive or Unscrupulous Conduct. ..............................21

            c.    The Complaint Does Not Allege Substantial Injury to Consumers that Is Not Reasonably Avoidable and Not Outweighed by Countervailing Benefits.....................23

        3.    Plaintiff's VCPA Claims Are Time-Barred.............................26

II.    The Complaint Fails to State a Claim for Breach of Fiduciary Duty Under the Vermont PBM Statute (Count III). ..............................29

    A.    Overview of the Vermont PBM Statute.............................29

    B.    Count III Fails As a Matter of Law.............................31

        1.    The Attorney General Is Not Authorized to Enforce the Vermont PBM Statute on Its Own. ..............................31

2.      The Complaint Fails to Plead Facts Sufficient to State a Claim
        That Any PBM Defendant Has Violated Section 9472. ...........................32

3.      Count III Should Be Dismissed as to Contracts Executed Prior
        to January 1, 2023. ....................................................................................34

4.      Count III Also Should Be Dismissed as to "Patients." .............................35

5.      Count III Also Should Be Dismissed as to ERISA Plans. ........................35

III.    Claims Involving Non-PBM Defendants Should Be Dismissed. .....................................37

IV.     Claims Involving Unnamed Drugs Should Be Dismissed. ................................................39

CONCLUSION ............................................................................................................................40

## INTRODUCTION

The State of Vermont ("Plaintiff") seeks to recast rebate negotiations involving pharmacy benefit managers ("PBMs") and drug manufacturers as unlawful "misconduct" designed to inflate the price of pharmaceutical drugs. But pharmaceutical rebates result from hard fought competitive negotiations designed to help curb the impact of the increasing prices of prescription drugs set by drug manufacturers. Rebates therefore benefit the PBMs' health-plan clients, including Vermont clients, by lowering the net cost of prescription drugs clients pay, and have been standard business practice for decades. *See In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices and Antitrust Litig.*, 44 F.4th 959, 964–68 (10th Cir. 2022). Health plans, including plans operated by the State of Vermont itself, hire PBMs in part specifically to negotiate rebates.

Plaintiff nevertheless alleges that PBM Defendants'[1] standard PBM services are improper. Plaintiff alleges that the PBM Defendants violated state consumer protection laws by making public statements about the financial services they perform for sophisticated health plans, and providing standard services such as negotiating with drug manufacturers for rebates, designing formularies, and building pharmacy networks requested by their health-plan clients. Plaintiff further attempts to allege a breach of fiduciary duty under a recently effective provision of 18 V.S.A. § 9472 (the "Vermont PBM Statute") that the Vermont Attorney General cannot invoke here.

Plaintiff's claims for deceptive acts and practices (Count I) and unfair acts and practices (Count II) under the Vermont Consumer Protection Act ("VCPA") are fatally flawed. As an initial

---

[1] For purposes of this motion only, Defendants utilize Plaintiff's "PBM Defendants" terminology to refer to all of the Defendants collectively, even though the majority of Defendants are not PBMs. As explained below, *infra* p. 37-40, and in Defendants' Motions to Dismiss for Lack of Personal Jurisdiction, ECF Nos. 71, 72, this lawsuit fails to allege any relevant conduct as to many named defendants.

matter, the VCPA categorically does not apply to the PBM Defendants' provision of financial services to sophisticated health plans, because PBMs do not participate in the marketplace for any consumer-facing goods or services, as those terms are generally understood and defined under Vermont law.  Plaintiff's claim that the PBM Defendants engaged in "deceptive" conduct also fails because Plaintiff cannot plausibly allege that consumers of pharmaceutical products could be misled by the PBM Defendants' statements about services they provide to health plans—not individuals.  And finally, Plaintiff's claim that the PBM Defendants engaged in "unfair" conduct cannot stand because Plaintiff fails each of the applicable "*Sperry* factors."  Plaintiff's VCPA claims are also barred by the statute of limitations because, as Plaintiff's allegations show, Plaintiff challenges conduct that has been well-known and widely reported for nearly a decade.

Plaintiff's claim under the Vermont PBM Statute (Count III) fails from the onset because (1) this case is brought by the Attorney General, who lacks authority to enforce the statute on its own; (2) Plaintiff does not plausibly allege that the PBM Defendants violated any statutory duty owed to their health-plan clients; and (3) Plaintiff improperly seeks to impose liability for conduct that occurred more than a decade ago based on an alleged fiduciary duty set forth in a statute, which did not go into effect until 2023.  Plaintiff's claim under the Vermont PBM Statute is also predicated on the misguided notion that PBMs have fiduciary duties to individual purchasers of pharmaceutical drugs with whom PBMs have no relationship, fiduciary or otherwise.  Finally, the claim is preempted as to Employee Retirement Income Security Act ("ERISA") plans.

To the extent any portion of Plaintiff's claims survive, the Court at least should dismiss all Defendants that Plaintiff does not allege to have engaged in unlawful conduct.  The Court should

further dismiss Plaintiff's claims to the extent they are based on unidentified drugs or other pharmaceutical products.[2]

## RELEVANT ALLEGATIONS

Prescription drug pricing is complex. One facet, however, is simple: Drug manufacturers set the list price of drugs they make and sell. *See, e.g.*, First Am. Compl. ("Complaint") ¶¶ 22, 267, 295. Manufacturers, therefore, are directly responsible for "rais[ing] their list prices" to "maintain[] their profit margins," thereby causing "drug prices in the United States [to] increase[] exponentially." *Id.* ¶ 22.

PBMs, by contrast, work to *reduce* drug costs, through negotiating rebates (discounts) off of a drug's list price, among other services. *Id.* ¶ 43(b). PBMs' clients are sophisticated health plans—including employers, unions, trusts, and government agencies (such as the State of Vermont)—that sponsor drug benefit plans for beneficiaries. *Id.* ¶¶ 1, 83–84, 137. Health plans contract with PBMs to help manage and contain the cost of providing prescription drug benefits. *Id.* PBMs offer a variety of services to their health-plan clients, which clients can choose to utilize or not, including:

---

[2] Several Defendants—including Evernorth Health, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Express Scripts Pharmacy, Inc.; Ascent Health Services LLC; CVS Health; CVS Pharmacy, Inc.; Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; Caremark Arizona Specialty Pharmacy, L.L.C.; Caremark California Specialty Pharmacy, L.L.C.; Caremark Florida Specialty Pharmacy, L.L.C.; Caremark Illinois Specialty Pharmacy, L.L.C.; Caremark Kansas Specialty Pharmacy L.L.C.; Caremark Massachusetts, L.L.C.; Caremark Michigan Specialty Pharmacy, L.L.C.; Caremark New Jersey Specialty Pharmacy, L.L.C.; Caremark North Carolina Specialty Pharmacy, L.L.C.; Caremark Tennessee Specialty Pharmacy, L.L.C.; Zinc Health Ventures, L.L.C.; and Zinc Health Services, L.L.C.—previously moved to be dismissed from this action for lack of personal jurisdiction. *See* Defendants' Motions to Dismiss for Lack of Personal Jurisdiction, ECF Nos. 71, 72. This Motion incorporates and is made without waiver to those arguments.

***Formulary Development.*** PBMs develop lists of drugs called "formularies" that their health-plan clients can adopt to determine whether and to what extent those clients cover the cost of certain medications for their members. *Id.* ¶¶ 2, 246. Although PBMs develop formularies that they offer to clients, their clients retain ultimate control over whether to accept, reject, or customize an offered formulary and set the coverage that applies to their members. *Id.*

***Rebate Negotiations.*** PBMs play an important role in managing the out-of-pocket cost of pharmaceutical drugs for their health-plan clients. PBMs negotiate with pharmaceutical manufacturers to obtain reduced costs on prescription drugs that they can then offer their clients. *E.g.*, *id.* ¶ 43(b). Through those negotiations, PBMs obtain rebates from manufacturers that can offset the cost of pharmaceutical drugs. Those rebates flow back to the PBMs' clients in accordance with the terms of their client contracts, lowering the clients' net drug costs. *Id.* ¶¶ 2, 288. The PBMs' clients, in turn, determine how those rebates are applied to their health plans. *Id.* ¶¶ 288, 310. In their capacities as PBMs, the PBM Defendants do not transact business directly with their clients' beneficiaries and do not have business relationships with individual end-use consumers of, among other things, prescription medication.

The U.S. Code recognizes the widespread use of rebates as an effective method of controlling drug costs as well. Indeed, federal law specifically authorizes the rebating practices PBMs undertake when performing services related to drugs for federal programs such as Medicare. *See* 42 U.S.C. § 1396r-8; Medicare & State Health Care Programs: Fraud & Abuse; Clarification of the Initial OIG Safe Harbor Provisions and Establishment of Additional Safe Harbor Provisions Under the Anti-Kickback Statute, 64 Fed. Reg. 63518, 63518 (Nov. 19, 1999), OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23734, 23736 (May 5, 2003).

*Pharmacy Networks.* In addition to negotiating rebates, PBMs also offer their clients access to networks of participating pharmacies. Depending on the health plan's objectives, it may choose not to participate in a PBM's pharmacy network or opt to offer members access to all or only a portion of these pharmacies. *Id.* ¶¶ 2, 176. A pharmacy network may include retail or "brick-and-mortar" pharmacies (*see id.* ¶¶ 186, 314), "specialty" pharmacies, which dispense drugs requiring special handling or closely watched administration (*see id.* ¶ 330), and/or mail-order pharmacies (*see id*. ¶¶ 75, 128, 176). A PBM may be owned by parent companies that also operate pharmacies, which a health plan may choose to include in its pharmacy network on terms determined by the health plan, or not. *See id.* ¶¶ 176, 179; *see also* Defs' Motions to Dismiss for Lack of Personal Jurisdiction, ECF Nos. 71, 72.

Plaintiff brought this suit broadly challenging the PBM Defendants' provision of PBM services to their clients. Plaintiff named twenty-five defendants, which it broadly categorizes into two groups based on corporate affiliation: the CVS Caremark Defendants[3] and the Express Scripts Defendants.[4]

---

[3] The CVS Caremark Defendants, as categorized by Plaintiff, are: CVS Health Corporation; CVS Pharmacy, Inc.; Caremark Rx, L.L.C.; CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; Zinc Health Ventures, L.L.C.; Zinc Health Services, L.L.C.; Caremark Arizona Specialty Pharmacy, L.L.C.; Caremark California Specialty Pharmacy, L.L.C; Caremark Florida Specialty Pharmacy, L.L.C.; Caremark Illinois Specialty Pharmacy, L.L.C.; Caremark Kansas Specialty Pharmacy, L.L.C.; Caremark Massachusetts Specialty Pharmacy, L.L.C.; Caremark Michigan Specialty Pharmacy, L.L.C.; Caremark New Jersey Specialty Pharmacy, L.L.C.; Caremark North Carolina Specialty Pharmacy, L.L.C.; and Caremark Tennessee Specialty Pharmacy, L.L.C. FAC ¶¶ 40–87.

[4] The Express Scripts Defendants, as categorized by Plaintiff, are: Evernorth Health, Inc.; Express Scripts, Inc.; Express Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Medco Health Solutions, Inc.; Express Scripts Pharmacy, Inc.; Ascent Health Services LLC; and Accredo Health Group, Inc. Compl. ¶¶ 88–143.

## LEGAL STANDARD

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain sufficient factual matter which, if accepted as true, "'state[s] a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Dismissal is appropriate when 'it is clear from the face of the complaint that the plaintiff's claims are barred as a matter of law.'" *Biocad JSC v. F Hoffman-La Roche*, 942 F.3d 88, 93 (2d Cir. 2019) (cleaned up) (quoting *Parkcentral Glob. Hub Ltd. v. Porsche Auto Holdings SE*, 763 F.3d 198, 208–09 (2d Cir. 2014)). A complaint must "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests." *Twombly*, 550 U.S. at 555. Moreover, "conclusory allegations are not entitled to the assumption of truth." *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 72 (2d Cir. 2021). Therefore, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'shown'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679. When a complaint "contain[s] so few factual allegations" that it fails to provide defendants with the requisite fair notice, "it is nothing more than a fishing expedition." *Yamashita v. Scholastic Inc.*, 936 F.3d 98, 102 (2d Cir. 2019) (upholding district court's dismissal). In such circumstances, the complaint must be dismissed. *Id.*

## ARGUMENT

Plaintiff alleges three causes of action. The first two are brought under the VCPA, 9 V.S.A. § 2451 *et seq.* alleging violations of the prohibition on deceptive acts and practices (Count I) and unfair acts and practices (Count II). *See* Compl. ¶¶ 377–88. The third cause of action alleges breach of fiduciary duty under the Vermont PBM Statute, 18 V.S.A. § 9472. *Id.* ¶¶ 385–88. As discussed below, each of Plaintiff's claims fails as a matter of law.

6

I.      **The Complaint Fails to State a Claim Under the VCPA (Counts I and II).**

Plaintiff brings two claims under the VCPA, a consumer protection statute, asserting that the PBM Defendants' rebating practices and pharmacy network agreements constituted unfair and deceptive conduct.  Plaintiff's VCPA claims fail as a matter of law because the VCPA applies only to acts or practices "in commerce," which requires Plaintiff to allege conduct in a "consumer market."  Because PBMs exclusively transact with sophisticated health plans to provide complex financial services, and do not operate in a "consumer market," the VCPA does not apply.

Both of Plaintiff's VCPA claims also fail for other reasons.  Plaintiff fails to allege that the PBM Defendants engaged in any deceptive misrepresentations or omissions (Count I) because the PBMs' alleged statements about the services they provide to health plans (PBMs' clients) would not plausibly influence any consumer's decision about whether to purchase prescription medicine, because, again, individuals do not purchase PBM services.  Further, the alleged misrepresentations are quintessential "puffery" that is not actionable as a matter of law.

In addition, Plaintiff fails to allege that the PBM Defendants engaged in "unfair" conduct (Count II) because Plaintiff does not identify any cognizable public policy interest that the PBMs allegedly violated, the rebating practices Plaintiff challenges are not plausibly "unscrupulous" or "immoral," and Plaintiff fails to identify substantial injury to consumers.  On the contrary, Plaintiff challenges industry-standard business arrangements that promote competition in the pharmaceutical market.

A.      **The Complaint Fails to Allege Acts or Practices "In Commerce."**

The VCPA applies only to acts or practices that occur "in commerce."  9 V.S.A. § 2453(a).  "[T]he 'in commerce' requirement narrows the [VCPA's] application to prohibit only unfair or deceptive acts or practices that occur in the consumer marketplace."  *Foti Fuels, Inc. v. Kurrle Corp.*, 2013 VT 111, ¶ 21, 195 Vt. 524, 536, 90 A.3d 885 (2013); *Rousseau v. Coates*, No. 2:18-

7

CV-205, 2020 WL 5604021, at *2 (D. Vt. Sept. 18, 2020). As the Vermont Supreme Court has explained, applying the VCPA outside the "consumer marketplace" would contravene the statutory purpose of "protect[ing] consumers in the general public." *Foti Fuels*, 2013 VT 111, ¶¶ 22–23. Accordingly, a claim under the VCPA will lie only where the plaintiff alleges a transaction "involv[ing] products, goods or services purchased or sold for general consumption, as those terms are generally understood." *Id.* ¶ 25; *see Barton Solar, LLC v. RBI Solar, Inc.*, No. 5:21-CV-25, 2021 WL 3109620, *9 (D. Vt. July 22, 2021); *Cetel v. Kiwan Fin. Grp.*, 460 F.3d 494, 514 (3d Cir. 2006) ("[t]he entire thrust of the [New Jersey Consumer Fraud] Act is pointed to products and services sold to consumers in the popular sense" (citation omitted)). In contrast, the VCPA does not apply to sophisticated contracts that were "tailored to meet" their client's specific needs, and that "feature[] special . . . terms" that are "separately negotiated." *Dole v. Adams*, 674 F. App'x 98, 99 (2d Cir. 2017) (summary order) (applying Vermont law); *Foti Fuels*, 2013 VT 111, ¶ 21. The VCPA does not apply to the conduct alleged here because PBMs do not provide goods or services purchased or sold for general consumption and do not operate in a consumer marketplace.

### 1. PBMs, Including Defendants, Do Not Provide Goods or Services Purchased or Sold for General Consumption.

As Plaintiff's allegations show, PBMs do not provide any "goods or services purchased or sold for general consumption." *Foti Fuels*, 2013 VT 111, ¶ 25. Instead, as alleged in the Complaint, PBMs contract with their sophisticated health-plan clients to provide a suite of services to manage the pharmacy benefit component of their clients' insurance plans. *See* Compl. ¶¶ 165–66. Pursuant to those contracts, PBMs negotiate with pharmaceutical manufacturers to obtain rebates to help offset their clients' drug costs, create lists of drugs called "formularies" that their health plans can choose to use or modify, and provide networks of pharmacies their clients can utilize when individual beneficiaries fill their prescriptions. *Id.* ¶¶ 2, 174, 176, 246. These

sophisticated services are not the type of "products [or] services sold to consumers in the popular sense." *Cetel*, 460 F.3d at 514.

Both the "status of the parties and the nature of the transaction[s]" further confirm that the VCPA does not apply to PBMs' contracts with their health plans. *See id.* PBMs do not offer generalized services to the consuming public—they enter "complex transaction[s] negotiated between [sophisticated parties]," which "cannot reasonably be mistaken for a 'consumer transaction.'" *Barton Solar*, 2021 WL 3109620, at *9. PBMs negotiate each client contract separately, each client contract has different and unique terms, and each client has its own rights and liabilities. PBMs' clients routinely negotiate for specific terms to fit their particular needs. For example, health plans can (and do) negotiate: (1) whether and to what extent the client may audit the PBMs; (2) the formularies the client will utilize; (3) the percentage of negotiated rebates that the plan will receive; and (4) how various fees are characterized and passed through. Compl. ¶¶ 237, 246, 287–89, 310. Moreover, PBMs' formulary options themselves are highly complex, often including "three to five tiers" covering hundreds of drugs with different "cost-share amounts" at the various levels. *See id.* ¶ 172. This "high level of customization—which was achieved through particularly negotiated contract terms rather than boilerplate language—does not typically occur in the consumer marketplace." *Foti Fuels*, 2013 VT 111, ¶ 25; *see Dole*, 674 F. App'x at 99 (VCPA does not apply to "relatively private and individualized" transactions).

As courts across the country routinely hold, PBMs' transactions with health plans are simply not covered by consumer-protection statutes. *See, e.g.*, *In re Restasis (Cyclosporine Ophthalmic Emulsion) Antitrust Litig.*, 355 F. Supp. 3d 145, 157 (E.D.N.Y. 2018); *MSP Recovery Claims, Series, LLC v. Sanofi-Aventis U.S. LLC*, 2020 WL 831578, at *11 (D.N.J. Feb. 20, 2022); *Sergeants Benevolent Ass'n Health & Welfare Fund v. Actavis, plc*, 2018 WL 7197233, at *39,

\*45 (S.D.N.Y. Dec. 26, 2018); *In re Express Scripts, Inc., Pharmacy Benefits Mgmt. Litig.*, 2006 WL 2632328, at \*9 (E.D. Mo. Sept. 13, 2006).  This Court should reach the same conclusion.

Applying the VCPA to the PBM Defendants' contracts with their clients also would do nothing to further VCPA's purpose of protecting the public at large—it would merely "create an imbalance [of bargaining power] arbitrarily favoring one party" to the agreements.  *Foti Fuels*, 2013 VT 111, ¶ 24.  The PBM Defendants' clients are sophisticated entities with a diverse set of tools available to enforce their own rights, including the right to audit the PBMs with which they do business.  *See* Compl. ¶ 237.  If the PBM Defendants' clients believe their rights have been violated, the ordinary common law remedies based on principles of "contract, tort, and property law" are entirely adequate to redress them.  *See Foti Fuels*, 2013 VT 111, ¶ 21.  For example, Plaintiff alleges that the PBM Defendants improperly characterized various fees or failed to pass them through to their health-plan clients pursuant to their client contracts.  *See* Compl. ¶¶ 309–11.  But these allegations merely sound in contract law and are categorically beyond the scope of the VCPA.  *See, e.g.*, *Winey v. William E. Dailey, Inc.*, 161 Vt. 129, 136, 636 A.2d 744, 749 (1993).

## 2.    PBMs, Including Defendants, Do Not Operate in a Consumer Market.

Plaintiff also does not (and cannot) allege that the PBM Defendants transact with individual consumers or operate in the "consumer market" for prescription drugs, because individual consumers simply have no need for the services PBMs provide.  Rather, as Plaintiff acknowledges, individual consumers contract with "their employers or insurance companies (third-party payors)"—not the PBMs.  *See* Compl. ¶ 170.  Nor does, or could, Plaintiff allege that the PBM Defendants sell pharmaceutical drugs to consumers, because PBMs do not sell pharmaceutical drugs.  For this reason, a California court recently held that PBMs are not subject to liability under a California consumer fraud statute in a case brought by the State of California similarly challenging the PBM Defendants' rebate negotiations and public statements.  *California v. Eli*

*Lilly & Co.*, No. 23STCV00719 (Cal. Super. Ct. June 18, 2024), Order at 9 (Attached as Ex. A). The court explained that the consumer fraud statute did not apply because PBMs "transact with 'pharmaceutical manufacturers, health-plan payors, and retail pharmacies,' not with individual 'consumers.'" *Id.* The same result should hold here.

Plaintiff has attempted to plead around this fatal flaw by naming as Defendants various pharmacies that dispense pharmaceuticals to beneficiaries (the "Pharmacy Defendants").[5] But Plaintiff's inclusion of those Defendants does Plaintiff no good, because Plaintiff does not allege that they engaged in any unfair or deceptive conduct. Although Plaintiff alleges that the PBM Defendants improperly "steered" beneficiaries to their affiliated pharmacies (Compl. ¶¶ 30, 185, 230–231, 314–315, 320), the Complaint alleges that *PBMs*—not pharmacies—unlawfully negotiated rebates, created pharmacy networks, and determined whether drugs will be categorized as "specialty" drugs. *See, e.g.*, *id.* ¶¶ 26, 203, 316, 324, 331. Plaintiff does not allege any wrongful conduct on the part of the Pharmacy Defendants, which simply are alleged to "dispense drugs to the PBMs' covered lives," and receive "reimburse[ment]" from the PBMs. *See id.* ¶ 176.

**B.    Plaintiff's VCPA Claims Fail to Allege Deceptive or Unfair Acts or Practices.**

Even if the VCPA applied to the complex financial services PBMs provide to sophisticated health plans (it does not), Plaintiff fails to allege deceptive acts or practices (Count I) or unfair acts or practices (Count II). Further, Plaintiff's VCPA claims are barred by the statute of limitations.

---

[5] These Defendants include CVS Pharmacy, Inc.; Caremark Rx, L.L.C.; Caremark Arizona Specialty Pharmacy, L.L.C.; Caremark California Specialty Pharmacy, L.L.C; Caremark Florida Specialty Pharmacy, L.L.C.; Caremark Illinois Specialty Pharmacy, L.L.C.; Caremark Kansas Specialty Pharmacy, L.L.C.; Caremark Massachusetts Specialty Pharmacy, L.L.C.; Caremark Michigan Specialty Pharmacy, L.L.C.; Caremark New Jersey Specialty Pharmacy, L.L.C.; Caremark North Carolina Specialty Pharmacy, L.L.C.; and Caremark Tennessee Specialty Pharmacy, L.L.C.; Accredo Health Group, Inc.; ESI Mail Pharmacy Service, Inc., and Express Scripts Pharmacy, Inc.

1.    **The Complaint Fails to Allege Deceptive Acts or Practices (Count I).**

Plaintiff fails to allege that the PBM Defendants engaged in any deceptive acts or practices. To state a "deceptive acts" claim under the VCPA, a plaintiff must show that "(1) there was a representation . . . likely to mislead them; (2) they interpreted the message reasonably under the circumstances; and (3) the misleading effects were material, that is, likely to affect [plaintiff's] conduct or decision with regard to a product." *Lofts Essex, LLC v. Strategis Floor and Décor Inc.*, 2019 VT 82, ¶ 33, 211 Vt. 204, 218, 224 A.3d 116 (2019) (citation omitted).

Plaintiff's deceptive acts claim fails many times over. Plaintiff alleges that the PBM Defendants made misrepresentations and made material omissions about the PBM services they provide. But none of those alleged misstatements or omissions could possibly be material to consumers of pharmaceutical products because individual consumers cannot (and do not) purchase the PBMs' services that were the subject of the alleged misrepresentations and omissions. The alleged misrepresentations independently fail because Plaintiff seeks to impose liability based on the PBMs' opinion statements about the value of their products, which is quintessential "puffery" that cannot be deceptive as a matter of law. Further, Plaintiff's attempt to hold the PBM Defendants liable for the statements to legislative bodies contravenes the PBM Defendants' First Amendment rights to petition government.

a.    **Plaintiff Fails to Allege Material Misstatements or Omissions.**

Plaintiff cannot establish that the PBM Defendants made any material misrepresentations or omissions. "A misrepresentation is material if it is 'likely to affect the consumer's conduct or decision with regard to a product.'" *Ehlers v. Ben & Jerry's Homemade Inc.*, No. 2:19-CV-194, 2020 WL 2218858, at \*5 (D. Vt. May 7, 2020) (citation omitted). Courts measure materiality based on "an objective standard, premised on what a reasonable person would regard as important in making a decision." *Id.* at \*7 (quoting *PH W. Dover Prop., LLC v. Lalancette Eng'rs*, 2015 VT

12

48, ¶ 11, 199 Vt. 1, 5, 120 A.3d 1135 (2015)).  Statements are immaterial as a matter of law if the plaintiff fails to "plausibly allege [that] reasonable consumers would make their purchasing decisions exclusively based on" the alleged statements.  *See id.*

Plaintiff does not, and cannot, plausibly allege that the PBM Defendants made any statements or omissions that a reasonable consumer would regard as important, let alone material, in any purchasing decision.  Plaintiff purports to bring this claim on behalf of (1) individual purchasers of pharmaceutical drugs, and (2) the PBMs' health-plan clients.  *See* Compl. ¶ 38. Plaintiff fails to establish materiality as to either group.

*First*, Plaintiff does not plausibly allege any statements or omissions that are material in a consumer's decision regarding whether to purchase pharmaceutical drugs because Plaintiff exclusively alleges that the PBM Defendants made misrepresentations and omissions about their PBM services.  For example, Plaintiff alleges that the PBM Defendants misrepresented "that their formulary construction lowers the cost of prescription drugs and promotes patient health," "that the Manufacturer Payments they receive lower the cost of prescription drugs," "that their formulary decisions [are] evidence and/or value based," "that the manner in which they classify drugs is evidence and/or value based and is in the best interests of their clients and patients," "that their relationships with [pharmacies] lowers [*sic*] the cost of prescription drugs," "the reasons behind the price increases for prescription drugs," "that their formulary preferences and exclusions are lowering prices," and "the amount of 'savings'" they generate.  *Id.* ¶ 378.  Plaintiff also alleges that the PBM Defendants failed to disclose that "the cost share payments insured consumers pay for brand-name prescription drugs are tied to inflated list prices," "they are excluding lower priced drugs from their formularies," "they are utilizing rebate aggregators," "they financially benefit

13

from preferring and/or excluding certain prescription drugs," and "formulary and exclusions are not based on the best interest of their clients/and or patients." *Id.*

Plaintiff does not—because it cannot—plausibly allege that the alleged misstatements or omissions *about the PBM's services* could possibly be relevant to a consumer's decision about whether to buy pharmaceutical products. As explained above, PBMs do not sell pharmaceutical products, and they do not offer any services to individual beneficiaries. *See supra* p. 3, 8–11. The Complaint contains one single allegation purportedly addressing this element: "[t]hese material misrepresentations and omissions were likely to deceive a reasonable consumer." Compl. ¶ 379. This bald assertion is entirely conclusory and not entitled to a presumption of truth. *Iqbal*, 556 U.S. at 664. Plaintiff alleges no facts suggesting that any consumer's decision about whether to purchase a pharmaceutical product could plausibly be influenced by—much less "exclusively based on"—the PBMs' statements about the complex pharmacy benefit management services they provide to health plans. *See Ehlers*, 2020 WL 2218858, at *7. The District of Hawaiʻi, applying a similar standard, held that the State of Hawaiʻi failed to state a claim under the Hawaiʻi consumer protection laws because it failed plausibly to allege that the PBMs' statements about their services could be material to any consumers' purchasing decisions. *See Hawaiʻi ex rel. Lopez v. CaremarkPCS Health, L.L.C.*, 2024 WL 4625719, at *5–7 (D. Haw. Oct. 30, 2024). This Court should do the same.

*Second*, Plaintiff likewise cannot establish that the PBMs' alleged statements and omissions are material to their health-plan clients. As explained, health plans are sophisticated entities with a wide range of contractual and extra-contractual rights to monitor, oversee, and investigate the conduct of the PBMs with which they do business. *See supra* p. 3, 7–8; Compl. ¶ 237. In addition to their own experience and broad contractual rights, health plans can (and do)

hire third-party consultants that provide advice regarding their selection of PBMs.  *See id.* ¶ 193.

Plaintiff does not provide any factual allegations suggesting that any of the alleged statements or

omissions caused any health plan to select the PBM Defendants' services rather than a different

PBM.

> **b.    The Complaint Fails to Allege Deceptive Statements.**

Even if Plaintiff adequately alleged materiality—which it does not—the first cause of

action still would fail because Plaintiff fails to allege any deceptive misrepresentation or omission.

"Deception is measured by an objective standard, looking to whether the representation or

omission had the 'capacity or tendency to deceive' a reasonable consumer."  *Carter v. Gugliuzzi*,

168 Vt. 48, 56, 716 A.2d 17 (1998).  Vermont courts "distinguish statements of fact from

statements of opinion, . . . holding that misrepresentations of [statements of fact] may constitute

fraud while misrepresentations of [statements of opinion] cannot."  *PH W. Dover Prop.*, 2015 VT

48, ¶ 12.  Representations therefore are not actionable if they are "subjective evaluations of

workmanship rather than objectively verifiable statements of fact."  *Heath v. Palmer*, 2006 VT

125, ¶ 14, 181 Vt. 545, 549, 915 A.2d 1290 (2006).  Merchants' subjective statements are "mere

commercial puffery, 'the truth or falsity of which cannot be precisely determined,'" and therefore

are incapable of deceiving consumers.  *See id.* (quoting *Avery v. State Farm Mut. Auto Ins. Co.*,

835 N.E.2d 801, 846 (Ill. 2005)).

As the Second Circuit has explained, "a general claim of superiority over comparable

products that is so vague that it can be understood as nothing more than a mere expression of

opinion" is puffery as a matter of law.  *See Time Warner Cable, Inc. v. DIRECTV, Inc.*, 497 F.3d

144, 160 (2d Cir. 2007).  Thus, representations that a business could save money or offers premium

products are textbook examples of generalized statements that do not support a claim.  For

example, the Vermont Supreme Court has recognized that statements that a product was the "most

outstanding value," or that a merchant's products were of "premium quality," are inactionable. *See Heath*, 2006 VT 125, ¶ 14 (citing *McGraw v. Loyola Ford, Inc.*, 723 A.2d 502, 512 (Md. Ct. App. 1999) and *Tietsworth v. Harley-Davidson, Inc.*, 677 N.W.2d 233, 245–46 (Wis. 2004)). Similarly, a court in this District held that a campground purveyor's statement that he offered "a well-maintained and premier campground," and published information about the campground's "maintenance and safety," were not deceptive as a matter of law. *Repucci v. Lake Champagne Campground, Inc.*, 251 F. Supp. 2d 1235, 1240–41 (D. Vt. 2002); *see also, e.g.*, *Kessler v. Loftus*, 994 F. Supp. 240, 244 (D. Vt. 1997) (statements regarding "adequate security" and "competent representation"); *EBWS, LLC v. Britly Corp.*, 2007 VT 37, ¶¶ 27–28, 181 Vt. 513, 523, 928 A.2d 497 (2007) (builder's statement that project would take "two months start to finish").[6]

The alleged misstatements here fall comfortably within that category of non-actionable statements. As explained above, Plaintiff's alleged misrepresentations constitute generalized statements about the value of the PBM services that the PBM Defendants provide. *See supra* p. 15–16. For example, Plaintiff alleges as misrepresentations statements by CVS Defendants such as:

- "CVS Health is Improving Access and Lowering Costs." Compl. ¶ 215a;

- "CVS Health helps people navigate their health care by improving access, lowering costs and being a trusted partner for every meaningful moment of their health." *Id.* ¶ 215b (cleaned up);

- "CVS Health's pharmacy benefit manager (PBM) brings value to consumers and our clients, which include employers, unions and government health plans, by working to lower prescription drug costs." *Id.* ¶ 215c (cleaned up);

---

[6] *See also Mulder v. Kohl's Dep't Stores, Inc.*, 865 F.3d 17, 22 n.5 (1st Cir. 2017) ("advertising of 'amazing prices'"); *Rosenzweig v. Azurix Corp.*, 332 F.3d 854, 869 (5th Cir. 2003); *Forsyth v. Humana, Inc.*, 114 F.3d 1467, 1481 (9th Cir. 1997), *overruled on other grounds by Lacey v. Maricopa Cnty.*, 693 F.3d 896 (9th Cir. 2012).

- "CVS Caremark's 'formulary design continues to deliver savings while optimizing plan member experience.'" *Id.* ¶ 216;

- "CVS Caremark exists to make prescription drugs more affordable." *Id.* ¶ 217a (cleaned up);

- "CVS Caremark's size and scale allow us to go toe-to-toe with drug companies, driving competition and negotiating discounts that make the difference between someone affording their medication or going without." *Id.* ¶ 217d (cleaned up);

- "CVS Caremark takes on every challenge, manage [*sic*] every drug, and deliver [*sic*] savings and safety." *Id.* ¶ 217e (cleaned up);

- "At CVS Health, we are committed to using every tool possible and continuing to drive innovation to bring down the cost of drugs. We remain focused on providing the right drug to the right patient at the right time at the lowest possible cost." *Id.* ¶ 219c;

- CVS Caremark's goal is to ensure "that the cost of a drug is aligned with the value it delivers in terms of patient outcomes . . . in 2018, we are doing even more to help keep drugs affordable with our new Savings Patient Money initiative." *Id.* ¶ 226c.

Plaintiff's alleged misrepresentations by Express Scripts, Inc. are more of the same:

- "Drugmakers set prices, and we exist to bring those prices down." *Id.* ¶ 209;

- PBMs "negotiate with drug companies to get the prices down." *Id.* ¶ 211;

- Express Scripts "works with plan sponsors to provide a benefit that delivers the best clinical outcome and the lowest possible cost." *Id.* ¶ 212 (cleaned up);

- "By delivering smarter solutions to patients and clients, PBMs provide better care and lower cost with every prescription, every time." *Id.* ¶ 212a;

- "Express scripts engages 'in strategies that help reduce the prices of specialty drugs.'" *Id.* ¶ 213 (cleaned up);

- "At Express Scripts we negotiate lower drug prices with drug companies on behalf of our clients, generating savings that are returned to patients." *Id.* ¶ 226b.

At most, the alleged misrepresentations amount to nothing more than "subjective evaluations" that the services offered (negotiating with pharmaceutical manufacturers to obtain rebates to offset their clients' drug costs) are beneficial. These statements are classic non-actionable puffery.

17

c.      **The Complaint's Allegations About Protected Petitioning Activity Are Barred.**

Even if Plaintiff had alleged deceptive and material misstatements or omissions (it did not), the Court must at the very least dismiss claims to the extent they are predicated on speech protected by the First Amendment. Plaintiff alleges that the PBM Defendants made false representations in testimony before Congress and the Vermont legislature. *See* Compl. ¶¶ 112, 214–15, 225–26, 317. But statements made during legislative testimony are protected by the First Amendment under "Petition Clause immunity." *CSMN Inv., LLC v. Cordillera Metro. Dist.*, 956 F.3d 1276, 1283 (10th Cir. 2020) (holding *Noerr-Pennington* doctrine applies outside antitrust context as "Petition Clause immunity"); *Tuosto v. Philip Morris USA Inc.*, 2007 WL 2398507, at \*5–6 (S.D.N.Y. Aug. 21, 2007). Any VCPA claim based on those statements fails.

2.      **The Complaint Fails to State a Claim for Unfair Acts and Practices (Count II).**

The second cause of action alleges that the PBM Defendants committed unfair acts and practices by using their supposedly "dominant market position to drive up [drug] prices—while simultaneously excluding patient and payor access to lower priced . . . drugs[.]" Compl. ¶ 382a. In construing the "unfairness" provision of § 2453(a), Vermont courts are to "be guided by the construction of similar terms contained in Section 5(a)(1) of the Federal Trade Commission Act," as amended periodically by the Federal Trade Commission ("FTC") and United States courts. 9 V.S.A. § 2453(b). Vermont courts therefore apply the so-called "*Sperry* factors," which ask whether the alleged practice (1) "offend[s] public policy as it has been established by statutes, common law, or otherwise"; (2) is "immoral, unethical, oppressive or unscrupulous"; and (3) "causes substantial injury to consumers." *Christie v. Dalmig, Inc.*, 136 Vt. 597, 601, 396 A.2d 1385, 1388 (1979) (adopting factors considered by the FTC in addressing whether an act or practice is unfair); *see generally FTC v. Sperry & Hutchinson Co.*, 405 U.S. 233 (1972).

The FTC, however, long ago clarified that the modern unfairness test requires plaintiffs to demonstrate that the challenged act or practice has caused substantial injury to consumers that is not "reasonably avoidable by consumers themselves and not outweighed by countervailing benefits to consumers or to competition."  15 U.S.C. § 45(n) (explaining an alleged unfair act or practice cannot be deemed unlawful "unless the act or practice causes or is likely to cause substantial injury to consumers"); *see also Foti Fuels*, 2013 VT 111, ¶ 23.  The failure to make this showing is dispositive, regardless of the plaintiff's showing on the second *Sperry* factor.  *See* FTC Policy Statement on Unfairness, Letter from the FTC to Hon. Wendell Ford and Hon. John Danforth, Senate Comm. on Com., Sci., and Transp. (Dec. 17, 1980), appended to *In re Int'l Harvester Co.*, 104 F.T.C. 949, 1070–76 & n.41 (1984) (abandoning second *Sperry* factor as inherently vague and duplicative).  And while "public policy considerations," may be taken into account with the first *Sperry* factor in determining whether an act or practice is "unfair," they "may not serve as a primary basis for such consideration."  *See id.*  Plaintiff fails to establish each factor, and the unfairness claim should be dismissed.

> a.    **The Complaint Fails to Allege a Violation of Public Policy.**

As discussed above, public policy considerations may not serve as a primary basis for an unfairness determination, and here, they provide no basis at all.  Indeed, the Complaint fails to allege any action that "offends public policy as it has been established by statutes, common law, or otherwise."  *Sperry*, 405 U.S. at 244 n.5.

Plaintiff primarily attempts to repackage its failed claim under the Vermont PBM Statute, 9 V.S.A. § 9472.  *See* Compl.  ¶ 383.  But as explained in greater detail below, Plaintiff's reliance on section 9472 fails because (1) the Attorney General lacks authority to bring this lawsuit, (2) this statute was enacted after the relevant period and after the challenged conduct occurred, (3) ERISA preempts the Vermont PBM Statute in the overwhelming majority of its applications, and (4) the

19

Vermont PBM Statute does not apply to alleged harms to individual consumers. *See infra* p. 35. The Court should not allow Plaintiff to avoid these fundamental defects by re-asserting its faulty statutory claim under the guise of a VCPA claim. Because Plaintiff failed to establish a claim under section 9472, its corresponding VCPA claim fails as well. *See, e.g.*, *In re GM Ignition Switch Litig.*, 202 F. Supp. 3d 362, 375–76 (S.D.N.Y. 2016) ("Given the Court's denial of New GM's motion with respect to Cockram's actual fraud claim, it follows that New GM's motion is also denied with respect to Cockram's VCPA claim [involving alleged fraud] as well.").

Plaintiff's only other asserted public policy is 18 V.S.A. § 9401(a), which provides that it is "the policy of the State of Vermont . . . to ensure that all residents have access to quality health services at costs that are affordable." But section 9401(a)'s aspiration to "ensure" that health services "are affordable" cannot constitute the predicate public policy for an unfairness claim. The requirement that an unfairness claim be grounded in some cognizable principle of public policy ensures that unfairness claims fall within "some common-law, statutory, or other established concept of unfairness." *Sperry*, 405 U.S. at 244 n.5. The generalized desire to make healthcare more affordable in no way resembles any "established" common law right. *See id.*; *Hawaiʻi*, 2024 WL 4625719, at *9 (dismissing "unfairness" claim against PBMs because plaintiff failed to "identify a specific public policy"). Defendants are aware of no case finding conduct "unfair" based on such a generalized notion of public policy. Under Plaintiff's theory, any increase in prices in healthcare goods or services—whatever the reason—would violate the VCPA. That is not the law.

In any event, although "health services" is not defined in § 9401(a), the common reading is that it applies only to services provided by health care providers and facilities that perform medical treatments and procedures for individuals, not to PBMs. The definitions of "health care

services" and "health services" that appear in other chapters of Title 18 confirm this interpretation. *See, e.g.*, 18 V.S.A. § 9481 (defining "health care service" as "services for the diagnosis, prevention, treatment, cure, or relief of a physical, dental, behavioral, or mental health condition or substance use disorder, including procedures, products, devices, and medications"); 18 V.S.A. § 9432 (defining "health services" as "activities and functions of a health care facility that are directly related to care, treatment, or diagnosis of patients").

### b.    The Complaint Fails to Allege Immoral, Unethical, Oppressive or Unscrupulous Conduct.

Plaintiff has not plausibly alleged that Defendants engaged in immoral, unethical, oppressive, or unscrupulous conduct. *See Christie*, 136 Vt. at 601. The Vermont Supreme Court has held that the failure to establish "oppressive or unscrupulous" conduct, such as "unfounded or oppressive" tactics, or acts of "retaliation," is fatal to a claim for unfairness. *See Lalande Air & Water Corp. v. Pratt*, 173 Vt. 602, 603–04, 795 A.2d 1233 (2002); *see also, e.g.*, *JLD Props. Of St. Albans, LLC v. Patriot Ins. Co.*, 576 F. Supp. 3d 172, 179 (D. Vt. 2021). And, as discussed above, the second *Sperry* factor has been abandoned by the FTC.

To the extent Plaintiff contends that the PBM Defendants' work negotiating rebates, contracting with payors, and establishing pharmacy networks are "oppressive or unscrupulous," that effort fails. Indeed, the District of Hawai'i rejected an attempt to cast the PBMs' rebating practices as "unfair" under precisely this standard. *See Hawai'i*, 2024 WL 4625719, at *9. As the court explained, "[t]he rebate and formulary-placement strategies described in the [complaint] do not rise to the level of the type of conduct" sufficient to establish immoral or unscrupulous conduct. *Id.*

21

Plaintiff's claim here fails for the same reason. Negotiating rebates is a standard industry practice in which employers, unions, government entities (such as the State of Vermont),[7] and others participate in an effort to *lower* drug prices that only *manufacturers* set. It is also an *obligation* enshrined in federal policy. *See, e.g.*, Office of Personnel Management ("OPM"), Federal Employee Health Benefits ("FEHB") Program Standard Contract (2019) at I-18 (requiring FEHB-carriers' contracts with PBMs address manufacturer rebate negotiations); 42 U.S.C. § 1396r–8(a)(1) (requiring rebate agreements to be entered into between manufacturers and states to participate in federal Medicaid program); Medicare & State Health Care Programs: Fraud & Abuse, 64 Fed. Reg. 63518, 63518 (Nov. 19, 1999); OIG Compliance Program Guidance for Pharmaceutical Manufacturers, 68 Fed. Reg. 23731, 23734, 23736 (May 5, 2003) (explaining "manufacturers should pay particular attention to ensuring that they . . . are paying appropriate rebate amounts for their drugs").

Formulary design and pharmacy network services are also standard industry practices governed by federal directive and health plan choice. Indeed, in performing these contractually mandated duties for TRICARE (Express Scripts) and FEHB (Express Scripts and Caremark), the PBM Defendants are subject to detailed governmental standards and regulations, specifying, for example, the type and structure of the formularies being administered and the scope and standards for the pharmacy networks being utilized. *See, e.g.*, Notice of Removal ¶ 21, ECF No. 1

---

[7] Vermont participates in a federal Medicaid program that requires rebate negotiations with drug manufacturers. 42 U.S.C. § 1396r–8(a)(1). *See, e.g.*, Vt. Gen. Assemb., *Testimony presented to the Vermont Legislature H. 233: An act relating to pharmacy benefit management and Medicaid wholesale drug distribution* (Feb. 15, 2024), https://tinyurl.com/s3htrp6n. This Court can take judicial notice of documents, like this, from official government websites. *See, e.g.*, *Rynasko v. New York Univ.*, 63 F.4th 186, 191 n.4 (2d Cir. 2023) (taking judicial notice of a document from the State of New York website).

(explaining that the Department of Defense ("DOD") mandates that Express Scripts utilize the "DOD's formulary, a tiered cost-sharing structure, and a preference for generic over branded products"); *id.* at ¶ 28 (detailing OPM's "standards related to pharmacy network management" required for inclusion in FEHB-carriers' PBM contracts). The PBM Defendants' work for these federal agencies furthers "[s]trong and distinctly federal interests" in providing healthcare to federal employees. *See Coventry Health Care of Mo. v. Nevils*, 581 U.S. 87, 96 (2017) (cleaned up). Congress specifically sought to insulate this critical work from state-law interference by enacting a sweeping preemption provision evidencing Congress' "broad pre-emptive purpose." *Id.*[8]

Other health plans similarly have ultimate authority over the formulary design and pharmacy network participation for their plans. *See, e.g., Moeckel v. Caremark, Inc.*, 622 F. Supp. 2d 663, 687 (M.D. Tenn. 2007). They may select among a PBM's standard formularies, work with PBMs to customize those standard formularies, or create their own formularies for their plans. Further, health plans select which, if any, of PBMs' pharmacy networks to participate. That the alleged conduct of the PBM Defendants involves standard practices governed by federal and health plan directives undermines any plausible argument that such conduct is immoral, unethical, oppressive, or unscrupulous.

        c.      **The Complaint Does Not Allege Substantial Injury to Consumers That Is Not Reasonably Avoidable and Not Outweighed by Countervailing Benefits.**

The Complaint does not contain facts establishing a substantial injury to consumers that is not "reasonably avoidable" and not "outweighed by countervailing benefits to consumers or

---

[8] The PBM Defendants can and will pursue separate FEHBA and/or TRICARE preemption defenses if any portion of Plaintiff's claims survives dismissal.

competition." 15 U.S.C. § 45(n). "Substantial injury" can be caused by "small harm to a large number of people, or if it raises a significant risk of concrete harm." *Fed. Trade Comm'n v. RCG Advances, LLC*, 695 F. Supp. 3d 368, 387 (S.D.N.Y. 2023) (citation omitted); 15 U.S.C. § 45(n). The Complaint alleges that the PBM Defendants' conduct caused substantial injury because they "used their dominant market position to drive up prices" of pharmaceutical products, which "Vermont patients and payors had no choice other than to pay." Compl. ¶ 382. Plaintiff's allegations fail for three reasons.

*First*, Plaintiff cannot point to rising drug prices to establish substantial injury because, as Plaintiff concedes, drug manufacturers—not PBMs—set drug prices. As the Complaint alleges, "the amount Vermont consumers (both patients and payors) pay for prescriptions increases" "*when drug manufacturers increase their list prices*." *Id.* ¶ 171 (emphasis added). Plaintiff further explains that the reason drug manufacturers raise prices is because they wish to "maintain[] their profit margins." *Id.* ¶ 22. If anyone injured consumers by raising drug prices, it is drug manufacturers—not PBMs. *See In re Insulin Pricing Litig.*, 2024 WL 416500, at *46 (D.N.J. Feb. 5, 2024) ("But if all or some of those rebates are passed along to consumers, this . . . raises individualized questions regarding whether Defendants' conduct caused those injuries."). It would be absurd to hold the PBM Defendants liable under Vermont consumer protection laws specifically to allow drug manufacturers to increase their own profits. *See Hawai'i*, 2024 WL 4625719, at *10 (finding allegations that PBMs practices "increase[ed] the out-of-pocket costs for prescription drugs" insufficient to establish substantial injury).

Even assuming, *arguendo*, that the PBM Defendants controlled drug prices (they do not), "allegations of high pricing, by themselves, do not constitute unfair or deceptive trade practices." *Leslie v. Quest Diagnostics, Inc.*, 2018 WL 1535235, at *4 (D.N.J. Mar. 29, 2018) (collecting

24

2:24-cv-01103-mkl    Document 79-1    Filed 04/15/25    Page 28 of 45

cases); *see also, e.g.*, *Mcgee v. Diamond Foods, Inc.*, 2016 WL 816003, at *8 (S.D. Cal. Mar. 1, 2016) ("increasing profit margins does not constitute an unfair business practice"); *Winkelmann v. Novartis A.G.*, 2018 WL 3122329, at *5 (D.N.J. June 25, 2018).

*Second*, Plaintiff fails to sufficiently plead that the alleged injury is not "reasonably avoidable" by consumers. Plaintiff's asserted harm ignores that the PBM Defendants' health-plan clients are sophisticated entities that could avoid the alleged harms simply by choosing to hire different PBMs. Plaintiff does not allege that the two PBMs named as defendants in this case are the only PBMs operating in the market, nor does it allege any reason that the PBM Defendants' clients could not simply hire different PBMs if they believed they were paying too much, or were otherwise displeased with the PBM Defendants' services. Because these sophisticated plans had a "free and informed choice" between numerous PBMs in the market, an unfairness claim does not lie. *See FTC v. Windward Mktg., Inc.*, 1997 WL 33642380, at *11 (N.D. Ga. Sept. 30, 1997); *see In re Int'l Harvester Co.*, 104 F.T.C. at 1074 (FTC "expect[s] the marketplace to be self-correcting" and rely on individuals' ability "to make their own private purchasing decisions").

*Third,* Plaintiff also fails to plead that the alleged injury is not outweighed by countervailing benefits to consumers or competition. Rather, as Plaintiff's own allegations show, the PBMs' rebating practices create substantial *benefits* by forcing drug manufacturers to compete on price in ways they otherwise would not. The rebates PBMs negotiate impose competitive market pressures on drug manufacturers by making them compete on formulary placement. As Plaintiff alleges, PBMs are able to use their volume of claims "in the market as leverage when negotiating with other entities in the pharmaceutical pricing chain," such as drug manufacturers. Compl. ¶ 192. Plaintiff further alleges that PBMs use that leverage in part to obtain rebates from drug manufacturers, which they pass through directly to their health-plan clients. *See id.* ¶¶ 288,

310.  As the Tenth Circuit therefore recognized, PBMs' negotiations with manufacturers have been found to "*stimulate* price competition." *In re EpiPen (Epinephrine Injection, USP) Mktg., Sales Pracs. & Antitrust Litig.*, 44 F.4th at 989 (emphasis added).

Even if Plaintiff had sufficiently alleged injury as to health plans—it did not—it failed to plead that the injury affected a "large number" of the PBM Defendants' consumers.  *RCG Advances, LLC*, 695 F. Supp. 3d at 387.  The consumers of the PBM Defendants' services at issue are a small, identifiable set of Vermont health plans.

### 3.    Plaintiff's VCPA Claims Are Time-Barred.

Plaintiff's VCPA claims also fail because Plaintiff brought them too late.  Courts may grant motions to dismiss as barred by the statute of limitations "if that defense is apparent from the face of the complaint."  *Royal v. Ret. Bd. of the Bert Bell/Pete Rozelle NFL Ret. Plan*, 2021 WL 4484925, at *1 (2d Cir. Oct. 1, 2021) (summary order) (citation omitted).  Under Vermont law, civil actions, including VCPA claims, are subject to a six-year statute of limitations.  *Kaplan v. Morgan Stanley & Co.*, 2009 VT 78, ¶ 7, 186 Vt. 605, 987 A.2d 258 (2009); 12 V.S.A. § 511 (imposing a six-year statute of limitations with respect to all civil actions); *id.* § 461 (imposing the same with respect to civil actions brought in the name of the state).  The "statute of limitations begins to run at the point when a plaintiff has a cause of action."  *Gettis v. Green Mountain Econ. Dev. Corp.*, 2005 VT 117, ¶ 22, 179 Vt. 117, 892 A.2d 162 (2005).  The Vermont Supreme Court has explained that "[a] cause of action is generally said to accrue upon the discovery of facts constituting the basis of the cause of action or the existence of fact sufficient to put a person of ordinary intelligence and prudence on inquiry which, if pursued, would lead to the discovery."  *Kaplan*, 2009 VT 78, ¶ 7 (citation omitted). The statute of limitations therefore "begins to run when the plaintiff has notice of information that would put a reasonable person on inquiry, and the

plaintiff is ultimately chargeable with notice of all the facts that could have been obtained by the exercise of reasonable diligence in prosecuting the inquiry." *Id*. (citation omitted).

Because Plaintiff filed its original Complaint on July 17, 2024, the statute of limitations bars claims that accrued prior to July 17, 2018. *See* 12 V.S.A. § 466. Plaintiff's relevant causes of action accrued well prior to that date, and the suit therefore is plainly barred by the statute of limitations.

For starters, there is no doubt that the conduct Plaintiff challenges happened long outside the limitations period. For example, Plaintiff alleges that it is challenging PBMs' implementation of a new formulary strategy in order to drive up prices that began "around 2012." Compl. ¶ 247. Plaintiff further challenges a host of public statements that were made prior to 2012. *Id.* ¶¶ 225–26. Plaintiff also alleges that the prices of the challenged drugs have been rising since at least 2012, with some beginning in the late 1990s. *Id.* ¶¶ 155–59. As Plaintiff's own charts make clear, the prices of many drugs *stopped* increasing years ago. *Id.* ¶¶ 155–56 (Figures 1 & 2).

Plaintiff's contention that the PBM landscape is supposedly controlled by a few players as "a result of significant consolidation with the industry" is not new either. *Id.* ¶ 4. As Figure 6 of the Complaint makes clear, the facts forming the basis for this alleged consolidation became public as early as ***2006***, when twenty-three entities were consolidated into thirteen entities, and were certainly public as of ***2012***—when those thirteen entities were further consolidated into nine entities—the year during which the Complaint alleges that PBMs began to engage in the exclusionary practices forming the basis for the suit. Based on these facts, a court dismissed as time-barred a case brought against PBMs by the State of California based on similar conduct. *See* California Order at 4–5 (Ex. A).

Further, there is no doubt that Plaintiff knew or should have known of the facts forming the basis for its claims before 2018. *See Kaplan*, 2009 VT 78, ¶ 7. Since 2017, other civil litigants have asserted similar legal theories challenging essentially the same conduct by the same parties. The first of these cases, *In re Insulin Pricing Litig.*, was filed on February 2, 2017. *See* No. 3:17-00699-BRM-LHG (D.N.J.). As Plaintiff alleges here, the plaintiffs there asserted unfair competition claims based on similar allegations. The filing of this and other related lawsuits were well-publicized in the national press, as the Complaint recognizes. *See, e.g.*, Compl. ¶¶ 220, 226c, 290; s*ee also, e.g.*, Ex. B, Katie Thomas, *Drug Makers Accused of Fixing Prices on Insulin*, N.Y. Times (Jan. 30, 2017); Ex. C, Carolyn Y. Johnson, *Diabetes Patients Sue Insulin Makers for 'Pricing Fraud'*, Wash. Post (Jan. 30, 2017); Ex. D, *Lawsuit Accuses Drug Makers of Conspiring to Hike Insulin Prices*, CBS News (Feb. 22, 2017).[9]

Plaintiff does not, and cannot, rely on equitable tolling to salvage its untimely claims. Courts apply the equitable tolling doctrine "only when (1) the defendant actively misled the plaintiff or prevented the plaintiff in some extraordinary way from filing a timely lawsuit; or (2) the plaintiff timely raised the precise claim in the wrong forum." *Beecher v. Stratton Corp.*, 170 Vt. 137, 143, 743 A.2d 1093, 1098 (1999). Neither factor is present here. Instead, Plaintiff was free to file its lawsuit and failed to do so in the required timeframe. Other states, as explained above, filed substantially similar lawsuits based on publicly available information as early as 2017. In no way can Plaintiff show that Defendants "actively misled or prevented the plaintiff in some extraordinary way from discovering the facts essential to the filing of a timely lawsuit," where other states filed substantially similar lawsuits based on public information. *Kaplan*, 2009 VT 78,

---

[9] The Court may take judicial notice of this contemporaneous reporting, as "it is appropriate to take news articles into account even on a Rule 12(b)(6) motion." *421-A Tenants Ass'n v. 125 Court St. LLC*, 760 F. App'x 44, 49 n.4 (2d Cir. 2019).

¶ 7.  Plaintiff therefore cannot claim that equitable tolling applies.  *Doe v. Camacho*, 2024 VT 72, ¶ 41, 329 A.3d 156 (2024).

## II.     The Complaint Fails to State a Claim for Breach of Fiduciary Duty Under the Vermont PBM Statute (Count III).

The third cause of action should be dismissed in its entirety for two reasons.  First, the Attorney General lacks the authority to enforce the Vermont PBM Statute as it seeks to do here.  Second, the Complaint fails to plead facts sufficient to state a claim that any Defendant has violated the Vermont PBM Statute.  The Complaint fails to identify a single PBM Defendant arrangement with Plaintiff or any health plan serving residents of Vermont that allegedly fails to comply with 18 V.S.A. § 9472 and alleges no facts that would support any such claim.

Even if the third cause of action is not entirely dismissed on those two grounds, it fails for three other independent reasons.  First, it fails as a matter of law to the extent it purports to apply to PBM contracts executed prior to January 1, 2023.  The applicable provisions of the Vermont PBM Statute apply solely to agreements executed after that date.  Second, it fails as a matter of law to the extent it purports to enforce a statutory duty owed to "patients" as opposed to the PBM Defendants' health-plan clients.  Third, ERISA preempts section 9472 as applied to ERISA benefit plans.

### A.     Overview of the Vermont PBM Statute.

The Vermont PBM Statute regulates PBM industry practices through the Commissioner of Financial Regulation (the "Commissioner").  The Vermont PBM Statute was amended in 2022 to include a fiduciary duty provision, 18 V.S.A. § 9472(a), which is the crux of Count III.  Section 9472(a) states that a PBM has a fiduciary duty to its health insurer client "that includes a duty to be fair and truthful toward the health insurer, to act in the health insurer's best interests, and to

perform its duties with care, skill, prudence, and diligence."[10]  Subsections (b) through (f) identify nine specific activities required or prohibited, including providing all financial and utilization information requested by a health insurer client (§ 9472(c)(1)), notifying health insurers of any proposed or ongoing conflicts of interest (*id.*, (c)(2)), disclosing certain information about payments and costs related to the dispensation of certain drugs or classes of drugs (*id.*, (c)(3) – (4)), disclosing financial terms and arrangements between the PBM and a drug manufacturer (*id.*, (c)(5)), disclosing the aggregate amount the PBM retained on claims charged to a health insurer for prescriptions filled (*id.*, (d)), prohibiting a PBM agreement with a health insurer from reserving discretion to the PBM to move a drug to a higher tier in a formulary or remove a drug from a formulary more frequently than two times a year (*id.*, (e)), and limiting the amount a person covered by a health plan may be required to pay for a prescription (*id.*, (f)).  A "health insurer" includes an entity "organized in Vermont that provides a health plan to beneficiaries who are employed or reside in Vermont[.]"  18 V.S.A. § 9471(2).

To enable PBMs and health plans to adapt their contracts and dealings to the new regulatory obligations, certain provisions of the Vermont PBM Statute at issue here became effective January 1, 2023.  Section 9472 applies specifically to "a contract or health plan issued, offered, renewed, recredentialed, amended, or extended on or after January 1, 2023[.]"  2021, Adj. Sess., Act No. 131, § 6(a) (signed May 30, 2022).  In addition, the Vermont Legislature provided PBMs doing

---

[10] From July 1, 2007 through December 31, 2022, a prior version of § 9472 imposed a different duty requiring a PBM to "discharge its duties with reasonable care and diligence and be fair and truthful under the circumstances then prevailing that a pharmacy benefit manager acting in like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  18 V.S.A. § 9472(a) (2007); *see also Doe v. Vermont Off. of Health Access*, 2012 VT 15A, ¶ 26, 191 Vt. 517, 530, 54 A.3d 474, 483 (2012) ("We presume that the Legislature intended to change the meaning of a statute when it amends it").  Notwithstanding the fact that this old provision governs the majority of the Complaint's relevant period, *see* Compl. ¶ 78a, the Complaint is silent as to which duty Plaintiff claims PBM Defendants violated.

business in Vermont "on or before January 1, 2023 . . . six months following that date to come into compliance" with the new provisions of the Vermont PBM Statute.  *Id.* at § 6(b).

The Vermont Legislature subsequently repealed sections 9492 and 9494—the provisions under which Plaintiff sued—and passed substantially similar legislation aimed at regulating PBMs. *See* 2023, Adj. Sess., Act No. 127 (signed May 30, 2024); 2023, Adj. Sess., Act No. 127 § 4(a)(2) (noting repeal of 18 V.S.A. §§ 9471–9474 effective July 1, 2029).  The enforcement provision of that legislation (codified at 18 V.S.A. § 3613) makes clear that the Commissioner has exclusive enforcement authority over the statute—indeed, that enforcement provision does not even mention the Attorney General.  *See* 18 V.S.A. § 3613.

### B.    Count III Fails As a Matter of Law.

#### 1.    The Attorney General Is Not Authorized to Enforce the Vermont PBM Statute on Its Own.

The plain language of the Vermont PBM Statute does not authorize the Attorney General to bring this suit on its own.  Section 9474 vests the Commissioner with "the *exclusive* authority to investigate, examine, and otherwise enforce the provisions of this subchapter relating to a pharmacy benefit manager in connection with the pharmacy benefit manager's contractual relationship with, and any other activity with respect to, a health insurer[.]"  18 V.S.A. § 9474(d) (emphasis added).  The Vermont PBM Statute further makes clear that the Commissioner "may investigate, examine, or otherwise enforce a violation of this subchapter."  *Id.* § 9474(c).  In contrast, the Attorney General's authority is narrowly circumscribed.  The Attorney General may "consult" with the Commissioner "prior to the commencement of any investigation or enforcement action," *id.* § 9474(b) and bring a "joint enforcement action" with the Commissioner, *id.* § 9474(e), but the Attorney General's enforcement authority does not extend to the subjects about which the Commissioner has "exclusive authority."  *Id.* §§ 9474(a), (d).

31

This unambiguous language dooms Plaintiff's claim. While the State of Vermont is the Plaintiff, the Complaint is signed solely by the Attorney General and private counsel in Mississippi and Texas. The Commissioner has not signed the Complaint, and the Complaint does not allege that the Commissioner has investigated whether the PBM Defendants have violated the Vermont PBM Statute, or that it joins the Attorney General and counsel from Mississippi and Texas in this action. These failures are not a mere technicality that can be excused given the central and exclusive role the Legislature has explicitly assigned to the Commissioner in enforcing the Vermont PBM Statute. The third cause of action therefore must be dismissed in its entirety.

Even if section 9474 authorized the Attorney General to bring this lawsuit (it does not), the Legislature eliminated that authority when it passed further legislation last session to regulate PBMs. *See* 2023, Adj. Sess., Act No. 127 § 1. Although section 9474 remains on the books until 2029, the more recent legislation passed by the Legislature clarified that, to the extent that there is a conflict between 18 V.S.A. § 9471 *et seq.* and 18 V.S.A. § 3601 *et seq.* prior to July 29, 2029, the latter "shall control." *See* 2023, Adj. Sess., Act No. 127 § 4(b). Any purported enforcement authority under section 9474 plainly would "conflict with" the operative provision, which vests exclusive enforcement authority with the Commissioner. 18 V.S.A. § 3613; *see* 2023, Adj. Sess., Act No. 127 § 4(b). Thus, Plaintiff does not even cite the operative enforcement statute.

## 2. The Complaint Fails to Plead Facts Sufficient to State a Claim That Any PBM Defendant Has Violated Section 9472.

The Complaint fails to provide "fair notice" of the grounds upon which the third cause of action rests. *Twombly*, 550 U.S. at 555. Notwithstanding that Plaintiff itself has contracted with certain PBM Defendants for PBM services, the State fails to allege that any specific PBM arrangement arising after January 1, 2023 violates the Vermont PBM Statute. The Complaint does not allege, let alone provide factual basis for any such allegation, that either PBM Defendant

breached any duty the statute imposes. The Complaint nowhere alleges that PBM Defendants failed to provide all financial and utilization information requested by a health insurer client (*id.*, (c)(1)); failed to notify a health insurers of any proposed or ongoing conflicts of interest (*id.*, (c)(2)); failed to disclose relevant information about payments and costs related to the dispensation of drugs (*id.,* (c)(3) – (4)); failed to disclose all financial terms and arrangements between the PBM and a drug manufacturer (*id.,* (c)(5)); failed to disclose the aggregate amount the PBM retained on all claims charged to a health insurer for prescriptions filled (*id.,* (d)); agreed with a health insurer to reserve discretion to the PBM to move a drug to a higher tier in a formulary or remove a drug from a formulary more frequently than two times a year (*id.,* (e)); or required a person covered by a health plan to pay more for a prescription than allowed by the Vermont PBM Statute (*id.,* (f)).

Plaintiff does not purport to identify any actual instance in which any Defendant failed to comply with these provisions.  Where, as here, the Plaintiff does not allege, let alone provide factual basis for any allegation, that the PBM Defendants breached any subsection of section 9472, Plaintiff fails to provide "fair notice of what the . . . claim is and the grounds upon which it rests," as required under *Twombly*.  550 U.S. at 555.[11]  As the Second Circuit has acknowledged, "to sustain such a complaint that alleges nothing but suspicions . . . is to invite transformation of the courts into an audit bureau[.]"  *Yamashita*, 936 F.3d at 107.  This pleading failure also warrants dismissal of Count III in its entirety.

---

[11] Besides contesting the facts with respect to the PBM Defendants' performance of specific contracts, the PBM Defendants may also have defenses related to specific contracts based, *e.g.*, on ERISA preemption and arbitration clauses.

### 3.    Count III Should Be Dismissed as to Contracts Executed Prior to January 1, 2023.

In addition to the above grounds for dismissing Count III in its entirety, Count III alternatively fails with respect to any contracts that were executed prior to January 1, 2023. Although the Complaint alleges that the "'relevant time period' is January 1, 2011-present" (Compl. ¶ 78 n.11), the fiduciary duty set forth in section 9472(a), which forms the basis for Count III, applies only to contracts "issued, offered, renewed, recredentialed, amended, or extended" on or after January 1, 2023, and provided PBMs six months following that date to come into compliance with the Vermont PBM Statute. *See supra* p. 29–31. Prior to enactment of the 2022 amendments to the Vermont PBM Statute, the Department of Financial Regulation emphasized to the Vermont Legislature the need to provide "sufficient lead time" for "health insurers to make substantive changes to their operational processes" and for the Department to "develop processes and procedures . . . [to] be prepared to enforce" the Vermont PBM Statute.[12] The Court accordingly should dismiss the third cause of action to the extent Plaintiff alleges it to applies to contracts executed prior to January 1, 2023.[13]

---

[12] Dep't of Fin. Reg., Letter to Senate Committee on Health and Welfare re: H.353 Additional Testimony (2022), available at https://tinyurl.com/a3d3ax8h.

[13] Nor is there any argument for retroactive application of the provisions of the Vermont PBM Statute at issue here. In Vermont, "absent the most clear and unequivocal language, a statute affecting legally existing rights should not be construed to operate retrospectively." *Curran v. Marcille*, 152 Vt. 247, 250, 565 A.2d 1362, 1364 (1989) (citing *Northwood AMC Corp. v. Am. Motors Corp.*, 139 Vt. 145, 148, 423 A.2d 846, 848 (1980)). The Contracts Clause similarly prohibits states from "grossly distort[ing] a company's existing contractual relationships with its employees by superimposing retroactive obligations upon the company substantially beyond the terms of its [contracts]." *Allied Structural Steel Co. v. Spannaus*, 438 U.S. 234, 249–50 (1978). The Vermont PBM Statute does not state that section 9472 or any other section applies retroactively to existing or past contracts.

### 4.     Count III Also Should Be Dismissed as to "Patients."

The third cause of action alleges that the PBM Defendants breached a fiduciary duty owed under Section 9472 to their "clients' and *patients*" and that this breach caused harm to "Vermont *patients* and payors[.]"  Compl. ¶¶ 387–88 (emphasis added).  As discussed above, however, Section 9472(a) provides that PBMs have a fiduciary duty to their "health insurer client[s]"—*not* to "patients" or anyone else.  *See* 18 V.S.A. §§ 9472(a); 9471(2).  As such, the third cause of action should be dismissed as to these non-health-plan-client "patients."

### 5.     Count III Also Should Be Dismissed as to ERISA Plans.

The Employment Retirement Income Security Act "contains elaborate provisions for the regulation of employee benefit plans [and] sets forth reporting and disclosure obligations for plans, imposes a fiduciary standard of care for plan administrators, and establishes schedules for the vesting and accrual of pension benefits."  *Massachusetts v. Morash*, 490 U.S. 107, 113 (1989).  Because of ERISA's "objective of uniformity in plan administration," ERISA contains a broad preemption clause that provides that ERISA "shall supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan."  *Liberty Mut. Ins. Co. v. Donegan*, 746 F.3d 497, 508 n. 10, 511 (2d Cir. 2014) (quoting 29 U.S.C. § 1144(a)).  An "employee benefit plan" is "any plan . . . which was . . . or is . . . established or maintained by an employer or by an employee organization . . . to the extent that such plan . . . was established or is maintained for the purpose of providing for its participants or their beneficiaries . . . medical . . . benefits."  29 U.S.C. § 1002(1).  Section 9472 as written applies to any health plan provided to beneficiaries who are employed or reside in Vermont offered by a "health insurer," including an "employer, labor union, or other group of persons organized in Vermont."  18 V.S.A. § 9471(2)(B).  Section 9472 by its terms purports to cover ERISA plans.

A state law "relates" to an ERISA plan where it has "[1] a connection with or [2] reference to an ERISA plan." *Donegan*, 746 F.3d at 504. State laws have a "connection" with ERISA plans if they "govern[] a central matter of plan administration or interfere[] with nationally uniform plan administration." *Rutledge v. Pharm. Care Mgmt. Ass'n*, 592 U.S. 80, 86 (2020). In considering whether a state law governs a central matter of plan administration or interferes with nationally uniform plan administration, courts consider whether a state law "require[s] providers to structure benefit plans in particular ways," "bind[] plan administrators to specific rules for determining beneficiary status," or force an ERISA plan to adopt a certain scheme of substantive coverage." *Id.* at 86–87. "It is sufficient for preemption purposes that the statute eliminates the choice of *one* method of structuring benefits." *CIGNA Healthplan of Louisiana, Inc. v. State of La. ex rel. Ieyoub*, 82 F.3d 642, 648 (5th Cir. 1996) (emphasis added).

Here, section 9472 has a "connection with" an ERISA plan because it purports to relate to fiduciary responsibilities. *See e.g.,* 18 V.S.A. § 9472(a); *Donegan*, 746 F.3d at 504; *In re Express Scripts, Inc.*, 2008 WL 1766777, at *10 (E.D. Mo. Feb. 6, 2008) (dismissing breach of fiduciary duty claim because "ERISA's preemption clause applies *at least* to state laws 'relating to . . . fiduciary responsibilities'") (citation omitted) (emphasis in original)). The Vermont PBM Statute also has a connection with ERISA plans because its other provisions requiring that, and dictating how, PBMs make certain disclosures to plans, pass along benefits to plans, and make formulary decisions "require providers to structure benefit plans in particular ways" and force health-plan clients to structure their benefit plans in accordance with the statutory scheme or to administer benefits on their own. *See* §§ 9472(b)–(d); *see also Rutledge*, 592 U.S. at 86–87; *Pharm. Care Mgmt. Ass'n v. District of Columbia*, 613 F.3d 179, 188 (D.C. Cir. 2010) ("a law that bind[s] plan administrators to any particular choice' is pre-empted"); *Donegan*, 746 F.3d at 508 n. 10 (adopting

*Pharm. Care Mgmt. Ass'n* to conclude that "'the objective of uniformity in plan administration' is not for 'some reason inapplicable simply because a plan has contracted with a third party to provide administrative services'").

The D.C. Circuit previously struck down several nearly identical provisions imposing a fiduciary duty on PBMs and mandating similar disclosure, pass through, and formulary change requirements on the basis of ERISA preemption. In *Pharmaceutical Care Management Association v. District of Columbia*, the court held that D.C.'s virtually identical provisions forced a plan to "decide between administering its pharmaceutical benefits internally upon its own terms or contracting with a PBM to administer those benefits upon the terms laid down" in the statute, and were thus preempted. 613 F.3d at 188. According to the D.C. Circuit, "each [provision] regulate[d] the administration of employee benefits by requiring a PBM to follow a specific practice in administering pharmaceutical benefits on behalf of an [employee benefit plan]." *Id.* at 185. With respect to the fiduciary provisions, "by specifying the standard of conduct to which a PBM must adhere, i.e., that of a fiduciary . . . [these provisions] also regulate the administration of employee benefits." *Id.* The Court concluded that "the obvious purpose of [D.C.'s PBM statute], as effectuated through these provisions, is to prescribe the way PBMs decide which pharmaceuticals to provide to plan beneficiaries and to prevent PBMs from inflating the price the plan pays for those pharmaceuticals." *Id.* Moreover, because these provisions touched upon "a central matter of plan administration," the court determined they would be preempted if they "also have an impermissible effect upon" an employee benefit plan. *Id.* at 186. The same is true here.

Accordingly, the third cause of action is also preempted by ERISA as to ERISA plans.

## III.    Claims Involving Non-PBM Defendants Should Be Dismissed.

To the extent the Court finds that Plaintiff has alleged any viable claims, all claims still should be dismissed as to the non-PBM Defendants—that is, the entities that are not themselves

37

pharmacy benefit managers. Plaintiff's lawsuit challenges as unlawful only the conduct of PBMs—such as constructing formularies, passing through rebates, and establishing pharmacy networks. *See* Compl. ¶¶ 14–22.

Plaintiff makes no allegations of violative conduct by any non-PBM Defendant entity—which include group purchasing organizations;[14] the Pharmacy Defendants;[15] administrative entities;[16] and corporate parents of some Defendants.[17] *See* ECF Nos. 71, 72. These Defendant entities should thus be dismissed.[18] *See e.g., Mississippi ex rel. Fitch v. Eli Lilly & Co.*, 2022 WL 18401603, at *5 (S.D. Miss. Aug. 29, 2022) (dismissing claims against CVS Pharmacy); *Moeckel v. CaremarkRx Inc.*, 385 F. Supp. 2d 668, 674 (M.D. Tenn. 2005) (dismissing claims against Caremark Rx). Plaintiff tries to plead around this deficiency by clumping numerous affiliated (and unaffiliated) entities into two groups: "CVS Caremark" and "Express Scripts." Compl. ¶¶ 79, 130; *see supra* p. 5 n. 3–4. Plaintiff's improper pleading, however, runs roughshod over well-settled principles of corporate law and pleading standards.

Any attempt by Plaintiff to hold any parent Defendant liable for the acts of its subsidiaries fails. "It is a general principle of corporate law 'deeply ingrained in our economic and legal

---

[14] The GPO Defendants include Zinc Health Ventures, L.L.C.; Zinc Health Services, L.L.C.; and Ascent Health Services LLC.

[15] *See supra* p. 11 n. 5.

[16] The administrative Defendant is Express Scripts Administrators, LLC.

[17] The corporate parent Defendants of some Defendant entities include CVS Health Corporation and Evernorth Health, Inc.

[18] Although Medco was a PBM pre-dating 2012, Plaintiff's VCPA claims against Medco are timed barred because, as the Complaint concedes, it stopped PBM operations relevant to this lawsuit following its 2012 acquisition by Express Scripts, Inc, Compl. ¶ 108—well outside the VCPA's six-year statute of limitations. Moreover, Plaintiff's 18 V.S.A. § 9472 claim cannot reach Medco because the Vermont PBM Statute is not retroactive.

systems' that a parent corporation . . . is not liable for the acts of its subsidiaries." *United States v. Bestfoods*, 524 U.S. 51, 61 (1998) (citation omitted). Courts enforce corporate separateness "even when a parent wholly owns its subsidiary and the entities have identical officers and directors." *Wenske v. Blue Bell Creameries, Inc.*, 2018 WL 5994971, at *5 (Del. Ch. Nov. 13, 2018). Courts will disregard the corporate form only where "the corporate form has been used to perpetrate a fraud," or where necessary to serve the ends of justice, such as where "a corporate shell is used merely as a sham to deprive a plaintiff of a remedy." *Doherty v. Town of Woodstock*, 2023 VT 56, ¶¶ 9, 12, 218 Vt. 474, 310 A.3d 916 (2023) (cleaned up). As certain Defendants explained in their Motions to Dismiss under Rule 12(b)(2), there is no basis to disregard the corporate form here. Plaintiff does not allege any abuses of the corporate form, does not assert that the corporate form will deprive any plaintiff of a remedy, and does not allege that any Defendant disregarded corporate formalities. *See* ECF Nos. 71, 72.

Plaintiff's assertions that fail to identify which Defendant they are directed towards and lump Defendants together without distinction represent precisely the type of "wholly conclusory statement[s] of claim" that "warrant[ed] dismissal" in *Twombly*. *Ladeairous v. Att'y Gen. of New York*, 592 F. App'x 47, 48 (2d Cir. 2015) (citing *Twombly*, 550 U.S. at 561–63).

## IV. Claims Involving Unnamed Drugs Should Be Dismissed.

If the Court finds that Plaintiff has adequately pleaded any VCPA claim, it should limit any claims to the specific medications about which Plaintiff makes factual allegations. Plaintiff purports to challenge the PBM Defendants' rebating, formulary, and pharmacy-interaction conduct regarding an undefined set of pharmaceutical products. But Plaintiff never alleges which specific products—or even which categories of products—are the subject of the alleged conduct. Other than diabetes products and drugs categorized as "specialty drugs," Plaintiff identifies only eight specific drug types—certain drugs used to treat multiple sclerosis, unidentified "cancer drugs,"

39

Humira, Calquence, Imbruvica, Gleevec, Tarcera, Aubagio, and unidentified medicines for HIV. Compl. ¶¶ 158–59, 261, 281, 342, 345, 373.

To the extent Plaintiff attempts to bring claims regarding unidentified pharmaceutical drugs, any generalized allegations about additional drugs or the PBMs' overall conduct do not provide the PBMs Defendants "fair notice of what the claim is and the grounds upon which it rests." *Yamashita*, 936 F.3d at 102. PBMs negotiate with hundreds of drug manufacturers and obtain rebates for thousands of prescription drugs. Plaintiff's conclusory allegations about other pharmaceutical drugs fail to inform the PBMs about the conduct Plaintiff challenges—Plaintiff does not allege which drugs had inflated prices or which manufacturer negotiations were unlawful, nor does Plaintiff allege unfair or deceptive conduct in connection with the unnamed drugs and unnamed Defendants. Plaintiff's attempt to sue based on unidentified drugs constitutes "nothing more than a fishing expedition" and should be dismissed. *Id.*

## CONCLUSION

For the foregoing reasons, the Court should dismiss the Complaint as to all Defendants pursuant to Federal Rule of Civil Procedure 12(b)(6).

Dated: April 15, 2025

Respectfully submitted,

RULE GARZA HOWLEY LLP                    DOWNS RACHLIN MARTIN PLLC

                                         */s/ Gina M. Puls*
Deborah A. Garza*                        Gina M. Puls
Daniel J. Howley*                        Tristram J. Coffin
Emily M. Renzelli*                       Downs Rachlin Martin PLLC
Emma P. Dick*                            199 Main Street
Erica N. Baum*                           PO Box 190
901 7th Street NW, Suite 600             Burlington, VT 05402-0190
Washington, DC 20001                     Telephone: (802) 863-2375
(202) 843-9280                           gpuls@drm.com
garza@rulegarza.com                      tcoffin@drm.com
howley@rulegarza.com

renzelli@rulegarza.com
dick@rulegarza.com
baum@rulegarza.com
(*admitted pro hac vice)

*Counsel for Evernorth Health, Inc., Express Scripts, Inc., Express
Scripts Administrators, LLC; ESI Mail Pharmacy Service, Inc.; Medco
Health Solutions, Inc.; Express Scripts Pharmacy, Inc.; Accredo Health
Group, Inc.; Ascent Health Services, LLC*

WILLIAMS & CONNOLLY LLP                 DINSE P.C.


                                        */s/ Kendall Hoechst*
Enu Mainigi*                            Kendall Hoechst, Esq.
Craig D. Singer*                        Anne Rosenblum, Esq.
R. Kennon Poteat III*                   Dinse P.C.
Adam J. Podoll*                         209 Battery Street, PO Box 988
Daniel Dockery*                         Burlington, VT 05402
680 Maine Avenue SW                     khoechst@dinse.com
Washington, DC 20024                    arosenblum@dinse.com
Telephone: (202) 434-5000
emainigi@wc.com
csinger@wc.com
kpoteat@wc.com
apodoll@wc.com
ddockery@wc.com
(*admitted pro hac vice)

*Counsel for CVS Health Corporation; CVS Pharmacy, Inc.; Caremark Rx,
L.L.C.; CaremarkPCS Health, L.L.C.; Caremark, L.L.C.; Zinc Health
Ventures, L.L.C.; Zinc Health Services, L.L.C.; Caremark Arizona
Specialty Pharmacy, L.L.C.; Caremark California Specialty Pharmacy,
L.L.C.; Caremark Florida Specialty Pharmacy, L.L.C.; Caremark Illinois
Specialty Pharmacy, L.L.C.; Caremark Kansas Specialty Pharmacy L.L.C.;
Caremark Massachusetts Specialty Pharmacy, L.L.C.; Caremark Michigan
Specialty Pharmacy, L.L.C.; Caremark New Jersey Specialty Pharmacy,
L.L.C.; Caremark North Carolina Specialty Pharmacy, L.L.C.;
and Caremark Tennessee Specialty Pharmacy, L.L.C.*

## **CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on April 15, 2025 a copy of the foregoing was filed

electronically.  Notice of this filing will be sent to all parties in this case by operation of the Court's

CM/ECF system.  Parties may access this filing through the Court's CM/ECF system.

*/s/ Gina M. Puls*
Gina M. Puls
